## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

GUJARAT FLUOROCHEMICALS LIMITED,

               *Plaintiff,*

      v.

THE UNITED STATES,

               *Defendant.*

_____

**NON-CONFIDENTIAL VERSION**[1]

Court No. 22-00120

Confidential Business Proprietary Information Deleted on Pages 8–11

## DEFENDANT'S PARTIAL OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

OF COUNSEL:
PAUL KEITH
Senior Attorney
Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement & Compliance

DANIEL F. ROLAND
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0514
E-mail: daniel.f.roland@usdoj.gov

May 4, 2022

Attorneys for Defendant

---

[1] The CM/ECF filing system prevented both Mr. Roland and Ms. Burke from filing the confidential version of this opposition, indicating to each: "You are not authorized to seal an entry or document for any of the parties in this case." Accordingly, defendant files this non-confidential version today and will submit the confidential version on May 5 (assuming the CM/ECF issue has been resolved).

# TABLE OF CONTENTS

I.      INTRODUCTION................................................................................................2

II.     BACKGROUND.................................................................................................3

III.    STANDARD OF REVIEW FOR A PRELIMINARY INJUNCTION....................5

IV.     ARGUMENT ......................................................................................................6

        A.  GFL Has Failed To Show That Posting Statutory Cash Deposits At The
            Final CVD Rate Will Cause Immediate Irreparable Harm................................6

        B.  The Balance Of Hardships And Public Interest Factors Disfavor An
            Injunction Against The Collection Of Cash Deposits At The Final
            CVD Rate........................................................................................................14

        C.  GFL Has Not Shown A Clear Likelihood Of Success On The Merits ...............16

        D.  The Court Should Issue A Limited Injunction Against Liquidation And
            Reject GFL's Request For Overbroad And Indeterminate Relief ......................20

V.      CONCLUSION..................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Ashley Furniture Industries LLC v. United States,*
  No. 21-00283, 2022 WL 895398 (Ct. Int'l Trade Mar. 28, 2022) ....................................21, 22

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
  239 F.3d 1343 (Fed. Cir. 2001) ........................................................................................ 5

*Best Mattresses Int'l Co. Ltd. v. United States,*
  557 F. Supp. 3d 1338 (Ct. Int'l Trade 2022)........................................................................22

*Capella Sales & Services Ltd. v. United States,*
  180 F. Supp. 3d 1293 (Ct. Int'l Trade 2016)........................................................................15

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v.*
  *United States,* 393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019)........................................... 6, 7, 21

*Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States,*
  389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019)........................................................................12

*Corus Group PLC v. Bush,*
  217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002)........................................................................12

*Elkem Metals Co. v. United States,*
  135 F. Supp. 2d 1324 (Ct. Int'l Trade 2001)........................................................................ 9

*GPX Int'l Tire Corp. v. United States,*
  587 F. Supp. 2d 1278 (2008) ........................................................................................ 6

*Harmoni Int'l Spice, Inc. v. United States,*
  211 F. Supp. 3d 1298 (Ct. Int'l Trade 2017)....................................................................15, 16

*Husteel Co. v. United States,*
  34 F. Supp. 3d 1355 (Ct. Int'l Trade 2014)........................................................................22

*Int'l Custom Prod., Inc. v. United States,*
  30 CIT 21 (2006) ................................................................................................13, 15

*Int'l Fresh Trade Corp. v. United States,*
  26 F. Supp. 3d 1363 (Ct. Int'l Trade 2014)........................................................................12

*J. Conrad LTD v. United States,*
  457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020)........................................................................ 6

*Kwo Lee, Inc. v. United States*,
   24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ........................................................ 16

*MacMillan Bloedel Ltd. v. United States*,
   16 CIT 331 (1992) ............................................................................................. 14

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ............................................................................................. 5

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................. 5

*Olympia Indus., Inc. v. United States*,
   30 CIT 12 (2006) ...................................................................................... 13, 15, 16

*Otter Prods., LLC v. United States*,
   37 F. Supp. 3d 1306 (Ct. Int'l Trade 2014) ................................................... 5, 6, 7

*Premier Trading, Inc. v. United States*,
   144 F. Supp. 3d 1354 (Ct. Int'l Trade 2016) ..................................................... 12

*Queen's Flowers de Colombia v. United States*,
   947 F. Supp. 503 (Ct. Int'l Trade 1996) ......................................................... 6, 13

*Shandong Huarong Gen. Grp. v. United States*,
   122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ................................................. 5, 6, 12

*Shree Rama Enterprises v. United States*,
   983 F. Supp. 192 (Ct. Int'l Trade 1997) ......................................................... 11, 12

*Sumecht NA, Inc. v. United States*,
   331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018) ....................................................... 7

*U.S. Auto Parts Network, Inc. v. United States*,
   319 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ..................................................... 13

*Valeo N. Am., Inc. v. United States*,
   277 F. Supp. 3d 1361 (Ct. Int'l Trade 2017) ..................................................... 14

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................... 5, 6, 14

**Statutes**

19 U.S.C. § 1516a .............................................................................................. 7, 14, 16
19 U.S.C. § 1671b .................................................................................................... 3
19 U.S.C. § 1671d .................................................................................................... 4
19 U.S.C. § 1671e(a)(3) ....................................................................................... 7, 14
19 U.S.C. § 1677g(a) ................................................................................................. 8
28 U.S.C. § 2639(a)(1) ............................................................................................ 15

**Administrative Determinations**

*Granular {PFTE} Resin from India and the Russian Federation: Initiation of {CVD}*
    *Investigations,* 86 Fed. Reg. 10,931 (Dep't of Commerce Feb. 23 2021) ................................. 3

*Granular {PTFE} Resin from India,* 86 Fed. Reg. 35,479 (Dep't of Commerce
    Jul. 6, 2021) (Preliminary Determination) ................................................................. 3

*Granular {PFTE} Resin From India,*
    87 Fed. Reg. 3,765 (Dep't of Commerce Jan. 25, 2022) ................................................. 3, 4, 14

*Granular {PFTE} Resin From India and the Russian Federation,*
    87 Fed. Reg. 14,509 (Dep't of Commerce Mar. 15, 2022) ............................................... *passim*

*Granular {PFTE} from India and Russia; Determinations,*
    87 Fed. Reg. 14,038 (Int'l Trade Comm'n Mar. 11, 2022) ................................................. 4

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

GUJARAT FLUOROCHEMICALS LIMITED,            )
                                            )
                                            )
            *Plaintiff*,                    )
                                            )
        v.                                  )
                                            )
                                            )
THE UNITED STATES,                          )
                                            )
            *Defendant*.                    )
_____)

**NON-CONFIDENTIAL
VERSION**

Court No. 22-00120

Confidential Business Proprietary
Information Deleted on Pages 8–11

**DEFENDANT'S PARTIAL OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response in partial opposition to the motion for a preliminary injunction filed by plaintiff, Gujarat Fluorochemicals Limited (GFL). *See* Pl. Mem. Supp. Mot. Prelim. Inj., ECF No. 10 (GFL Mem.). For the reasons set forth below, GFL's motion should be granted, in part, and denied, in part.

Specifically, the Court should deny GFL's request to force the United States Department of Commerce (Commerce) to allow GFL to post cash deposits on its entries of granular polytetrafluoroethylene (PTFE) resin from India at the rate of 4.75 percent rather than requiring GFL to post cash deposits on such entries at 31.89 percent—the rate set in the countervailing duty (CVD) order on *Granular {PTFE} Resin From India and the Russian Federation*, 87 Fed. Reg. 14,509 (Dep't Commerce Mar. 15, 2022) (the CVD Order). The Court should also deny GFL's request for an injunction against liquidation with an indeterminate scope and instead issue a limited injunction consistent with Form 24 that would end on February 28, 2023—the end of the first review period—to which we consent.

1

## I.    __INTRODUCTION__

Although GFL contends the situation here is unprecedented, the circumstances leading to the present motion are garden variety:   Commerce issued a CVD order covering a product produced and/or exported by a party who disagrees with its assigned cash-deposit rate and seeks review of Commerce's determination.   GFL's dissatisfaction with the rate here and subsequent judicial challenge are therefore nothing new.   In fact, the only atypical aspect of this case is GFL's attempt to disrupt the statutory scheme and enjoin the collection of cash deposits pending this Court's review.

Despite acknowledging its request is "{u}nlike most motions" and that enjoining collection of cash deposits is "rare" (GFL Mem. at 2, 50), GFL does not show this case warrants extraordinary relief.   GFL focuses almost solely on its purported likelihood of success.   Even assuming, for argument's sake, a likelihood of success, GFL fails to establish that the other factors favor an injunction.   Critical here, GFL provides a wholly inadequate showing on irreparable harm, relying on conclusory assertions and unsupported speculation about *potential* future harm and pointing to alleged cash-flow issues that may be later restored.  The balance of hardships and public interest do not favor GFL either.   GFL overlooks that posting cash deposits at the ordered rate pending judicial review is not a hardship warranting an injunction but merely an ordinary consequence of the statutory scheme.  GFL also discounts that its requested relief will not guard the revenue of the United States and runs counter to the determination at the core of this matter—that the domestic industry must be protected from injury caused by countervailable subsidies.  And on the merits, GFL overstates its case and overlooks aspects of the record that undercut its position.   Under well-settled law, GFL "must establish" all four factors to obtain the rare and extreme relief it seeks.  It

fails to do so, and its motion to enjoin the collection of cash deposits at the ordered rate should be denied.

As for GFL's requested injunction against liquidation, Commerce consents to a limited statutory injunction with a finite end date at the end of the first review period. However, it disagrees with the open-ended scope of GFL's request—relief GFL does not meaningfully attempt to demonstrate is warranted. Because GFL has failed to show entitlement to an indeterminate injunction, the Court should deny this aspect of GFL's motion and enter the Government's proposed injunction.

## II.    **BACKGROUND**

On January 27, 2021, Daikin America, Inc., submitted a CVD petition concerning imports of granular PTFE resin from India. *See Granular {PTFE} Resin from India and the Russian Federation: Initiation of {CVD} Investigations*, 86 Fed. Reg. 10,931 (Dep't Commerce Feb. 23, 2021). Commerce initiated a CVD investigation on February 23, 2021, and set the period of investigation (POI) from April 1, 2019, through March 31, 2020. *See Granular {PTFE} Resin from India,* 86 Fed. Reg. 35,479 (Dep't Commerce Jul. 6, 2021) (Preliminary Determination). On March 9, 2021, Commerce selected GFL, "the exporter/producer that accounts for the largest volume of subject merchandise during the POI," for individual examination as the mandatory respondent in the investigation. *See Granular {PTFE} Resin from India*, Preliminary Decision Memorandum (Jun. 28, 2021) (Ex. 2 to GFL Mem).

On July 6, 2021, Commerce issued its preliminary determination in which it preliminarily assigned GFL an estimated CVD rate of 4.75 percent and ordered cash deposits to be collected at that same rate. Preliminary Determination, 86 Fed. Reg. at 35,480; 19 U.S.C. § 1671b(d)(1)(A) & (B). Later, on January 25, 2022, Commerce published its final affirmative CVD determination,

finding that countervailable subsidies are being provided to producers and exporters of granular PTFE resin from India and assigning GFL a CVD rate of 31.89 percent and, consistent with the statute, requiring it to post cash deposits on entries at 31.89 percent. *See Granular {PTFE} Resin From India*, 87 Fed. Reg. 3,765, 3,766 (Dep't Commerce Jan. 25, 2022) (Final Determination), and accompanying issues and decision memorandum, 87 ITADOC 3,765 (IDM) (Ex. 5 to GFL Mem.); 19 U.S.C. § 1671d(c).

On March 8, 2022, the International Trade Commission (ITC) issued its determination that imports of granular PTFE resin from India materially injured the domestic industry. *See Granular {PTFE} from India and Russia; Determinations*, 87 Fed. Reg. 14,038 (Int'l Trade Comm'n Mar. 11, 2022). Following the ITC's injury determination, Commerce published the CVD Order on March 15, 2022. *Granular {PTFE} Resin from India and the Russian Federation: {CVD} Orders*, 87 Fed. Reg. 14,509, 14,510 (Dep't of Commerce Mar. 15, 2022). For entries of merchandise subject to the CVD Order, Commerce explained that, "{w}ith the exception of entries occurring after the expiration of the provisional measures period and before the publication of the ITC's final affirmative injury determinations{,} countervailing duties will be assessed on unliquidated entries of granular PTFE resin from India and Russia entered, or withdrawn from warehouse, for consumption on or after July 6, 2021." CVD Order, 87 Fed. Reg. at 14,509–510.

Following publication of the CVD Order, on April 12, 2022, GFL commenced this five-count action, challenging Commerce's Final Determination. Summons, ECF No. 1; Compl., ECF No. 6. The following day, GFL filed a motion for a preliminary injunction, seeking relief in two respects:

> (1) to force Commerce to allow GFL to post cash deposits on its entries of granular PTFE resin from India subject to the CVD Order at the lower cash deposit rate of 4.75% calculated in the Preliminary Determination instead of requiring that GFL post cash deposits on such entries at the rate of 31.89% set by the CVD Order; and

(2) to prevent Commerce from issuing instructions to liquidate or making or permitting liquidation of GFL's unliquidated entries subject to the CVD Order pending the entry of a final and conclusive decision in this litigation, including all remands and appeals.

*See* GFL Mem. at 1–2.

## III.   STANDARD OF REVIEW FOR A PRELIMINARY INJUNCTION

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). A preliminary injunction is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). To obtain a preliminary injunction, a party must establish each of four elements: "(1) that it will be immediately and irreparably injured; (2) that there is a likelihood of success on the merits; (3) that the public interest would be better served by the relief requested; and (4) that the balance of hardship on all the parties favors the {movant}." *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2014) (citation omitted); *see also Winter*, 555 U.S. at 20–21.

Pertinent here, because the movant "must establish" all four factors, the failure to prove any one of them compels the denial of injunction relief. *See Winter*, 555 U.S. at 20; *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted preliminary relief unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (citations omitted), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C,* 547 U.S. 388 (2006); *Shandong Huarong Gen. Grp. v. United States*, 122 F. Supp. 2d 143, 145 (Ct. Int'l Trade 2000) ("If Plaintiff fails to prove any one of these factors, its motion must fail."). Although some courts

have previously employed a "sliding scale" in evaluating the four injunction factors, "{i}nsofar as the sliding scale standard relaxes the necessary showing of irreparable harm to something less than a likelihood, that standard is no longer viable after *Winter*." *J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1374 (Ct. Int'l Trade 2020); *see also Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.").

Moreover, as GFL recognizes, an injunction against the collection of cash deposits will be granted "only in the rarest of instances." *GPX Int'l Tire Corp. v. United States*, 587 F. Supp. 2d 1278, 1284 (2008) (quoting *Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503, 506 (Ct. Int'l Trade 1996)); GFL Mem. at 50 (acknowledging the "high bar" here and that "it is rare for this Court to enjoin collection of cash deposits").

## IV.    ARGUMENT

### A.    GFL Has Failed To Show That Posting Statutory Cash Deposits At The Final CVD Rate Will Cause Immediate Irreparable Harm

A plaintiff seeking an injunction bears an "extremely heavy burden" to establish irreparable injury. *Shandong Huarong*, 122 F. Supp. 2d at 146. "In evaluating irreparable harm, the court must consider 'the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief.'" *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (*Lumber*) (citations and alteration omitted). "It is not enough to establish 'a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown.'" *Id.* (citations omitted). "Critically, irreparable harm may not be speculative" or "determined by surmise." *Id.* (citations omitted). It must be "demonstrated by probative evidence." *Otter*, 37 F. Supp. 3d at 1315 (citations omitted). "Failure as to this factor is grounds for denying injunctive

relief." *Lumber*, 393 F. Supp. 3d at 1277; *see also, e.g.*, *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018), *aff'd*, 923 F.3d 1340 (Fed. Cir. 2019); *Otter*, 37 F. Supp. 3d at 1316. As established below, GFL's posting of statutory cash deposits does not constitute irreparable harm.

Before turning to GFL's shortcomings on this factor, it bears repeating that GFL's request to the enjoin collection of cash deposits is unusual and, as GFL concedes, "{u}nlike most motions for preliminary injunction" filed with this Court, which "typically seek to enjoin liquidation of entries." GFL Mem. at 2. Indeed, pursuant to the statute, Commerce is required to issue updated cash-deposit instructions at the conclusion of an administrative review, and those instructions remain in effect even if the administrative review is subject to litigation before this Court. Although this Court routinely issues statutory injunctions enjoining the *liquidation* of entries, the statute does not envision the Court enjoining Commerce from instructing CBP to collect cash deposits at a certain rate. *See* 19 U.S.C. § 1516a(c)(2) (providing that the USCIT "may enjoin the *liquidation* of some or all entries of subject merchandise covered by a determination . . ." (emphasis added)). And this makes sense given the corresponding statutory requirement to collect cash deposits when Commerce issues a CVD order. *See* 19 U.S.C. § 1671e(a)(3). Therefore, this matter is no different than any other in which a party believes its cash-deposit rate should be lower: a party may either challenge the final results (as GFL has done) upon which the cash-deposit instructions are based (in which case Commerce will update the instructions if it reaches a new decision not in harmony with the final results), or request an administrative review of the suspended entries for which the cash deposits are paid.

Here, even overlooking the unusual nature of its request, GFL does not meet its "heavy burden" to establish immediate and irreparable harm. It identifies three main forms of harm it will

allegedly suffer from posting the statutorily prescribed cash deposits: (1) reduced cash flow from increased cash deposits; (2) reputational harm and lost future business; and (3) lost revenue. *See* GFL Mem. at 44–47. But despite making broad claims of harm, GFL's assertions are speculative and unsupported by probative evidence. The *only* evidentiary support for GFL's position is an affidavit from Kapil Malhotra, the Global Business Unit Head (Fluoropolymers) of GFL. *See* Ex. 20 to GFL Mem. ("Aff."). Mr. Malhotra's self-serving declaration, however, is unspecific and conclusory, leaving GFL with nothing to substantiate its position.

*First*, regarding cash flow, GFL says it expects to make approximately [ ] in CVD cash deposits per month through the next year, [ ] of which are due to the "excess 27% *ad valorem* rate" required by Commerce's CVD Order. GFL Mem. at 46–47. Although GFL argues these deposits will "negatively impact{} its cash flow and profitability" (*id.*), it overlooks that the same would be true for *any* cash deposit, including those made at the 4.75 percent rate that GFL agrees to pay and does not challenge as causing irreparable harm. Additionally, while Mr. Malhotra states that GFL will have "that much less to invest in future business with U.S. customers," he provides no details on GFL's total assets or investment capital that remains available notwithstanding these cash deposits; nor does he state whether, when, and to what extent GFL actually intends to invest this or any money into future business with U.S. customers. *See* Aff. ¶¶ 10–12. In fact, Mr. Malhotra does not attempt to explain or illustrate how the purported reduction in investment dollars will impact GFL's business, much less specify how GFL's business will be *immediately* and *irreparably* harmed by this reduced cash flow. In other words, Mr. Malhotra fails to show that having [ ] less in cash will make an immediate or even meaningful difference to GFL's business.

And even if GFL's assertions were substantiated, it fails to show that this purported economic burden stemming from posting cash deposits will be *irreparable*. Indeed through silence, GFL implicitly recognizes that, if it is ultimately determined that the 31.89 percent CVD deposit rate was too high, GFL will receive a refund with interest. *See* 19 U.S.C. § 1677g(a) ("Interest shall be payable on overpayments . . . of amounts deposited on merchandise entered, or withdrawn from warehouse, for consumption . . . .").

*Next*, on reputational harm and lost future business, GFL again offers a series of speculative and unfounded assertions. Contending it "has been forced to reach out to all of its existing customers to mitigate and renegotiate its contracts with them," GFL states that these renegotiation efforts will have "long lasting negative consequences" on its "good will, reputation and brand." *See* GFL Mem. at 46. Specifically, GFL asserts that customers "will remember" that GFL sought to renegotiate pricing, which will result in "business uncertainty and loss of customers." *Id.* Even putting aside GFL's failure to show why the higher CVD rate forced it to renegotiate deals in the first place, GFL offers no probative evidence to support this speculative argument. For one, GFL provides no customer affidavits indicating that the renegotiations had or will have a negative impact on their relationships. GFL likewise points to no contract that has been lost or delayed because of these renegotiation efforts. Nor does it identify any customers who have actually "look{ed} elsewhere for supply" or "look{ed} for processing of PTFE resin outside the United States." GFL Mem. at 47. That GFL has lost no existing customers despite the current [                    ], *see* GFL Mem. at 46; Aff. ¶14, undermines its position and underscores that its speculative fears of *potential* loss of future business "cannot provide the basis for a finding of irreparable injury." *Elkem Metals Co. v. United States*, 135 F. Supp. 2d 1324, 1331–32 (Ct. Int'l Trade 2001) (rejecting "speculative and conclusory" statements on future harm).

Mr. Malhotra's affidavit fails to resolve these issues, too. His statements largely parrot the conclusory assertions GFL makes in its brief. Although he adds that GFL may suffer "reputational damage" and a "loss of customer goodwill" if it is unable to fulfill orders with certain U.S. customers, *see* Aff. ¶ 12, he fails to explain why GFL will ever be in that position much less quantify how many orders it will not be able to meet or how those future unfilled orders will specifically impact GFL's business. Mr. Malhotra also indicates in conclusory fashion that, "based on the customer's reactions thus far," GFL's reputation and brand have already been damaged and that GFL "expects that some U.S. customers will either completely stop buying" or "reduce purchases" from GFL because they "will remember" the renegotiated pricing. *See* Aff. ¶ 14. But critical here, even if these vague and speculative assertions were substantiated with evidence, such alleged damage has already occurred and cannot be remedied by the injunction GFL seeks. In any event, GFL's renegotiated pricing stems from its own benefit of countervailable subsidies; [      ] to counteract the subsidization is a result contemplated by the statutory scheme.

GFL also asserts that the increased CVD rate will "negatively impact" its "ability to earn new business" and cause it to "adjust its business plans and behaviors," leading to "lost business opportunities." GFL Mem. at 46. But again, GFL cites nothing in support of these conclusory assertions. *See id.* In addition, it fails to articulate why its business plans must be adjusted because of the higher CVD rate or specify how its plans will change. And perhaps more important, it offers no explanation on how these unidentified future changes will allegedly result in lost business or even attempt to quantify the business that will supposedly be lost. Nothing in Mr. Malhotra's affidavit cures these flaws or substantiates GFL's claims either.

*Finally*, relying again only on Mr. Malhotra's affidavit, GFL contends that it has contractual commitments to deliver the subject merchandise that will be fulfilled at a loss of

approximately $[        ] per month.  *See* GFL Mem. 45; Aff. ¶¶ 8–9.  But neither Mr. Malhotra nor GFL explain why or show how these contracts are "commercially punitive" and must be fulfilled at a "loss," let alone an "irrecoverable" loss.  *See* GFL Mem. 45; Aff. ¶¶ 8–9.  Based on Mr. Malhotra's calculations, *see* Aff. ¶ 8 & Attachment 1, GFL only incurs purported revenue losses [                          ]—a peculiar outcome that would indicate the 4.75 percent rate set in Commerce's preliminary determination is a [                          ].  To the extent GFL suggests that it has negotiated its contracts in such a manner, it has plainly failed to show as much.  GFL provides no contracts—not an example or even the pertinent terms thereof—or other evidence to reveal the framework of its agreements or to enable the Court to assess how the current CVD rate may lead to these purported losses.  Instead, GFL points only to Mr. Malhotra's conclusory assertions and basic arithmetic, which do not provide the missing details.  And even if GFL's contracts have been arranged such that it will take a loss under the current 31.89 percent rate in the CVD Order, as GFL even acknowledges, "{l}ost sales or future financial losses alone do not establish irreparable harm." GFL Mem. at 47.

Indeed, under similar circumstances, where a plaintiff failed to substantiate its claims, this Court has repeatedly declined to find irreparable harm.  For example, in *Shree Rama Enterprises v. United States*, the plaintiffs submitted six affidavits that included "customer letters" and "descriptions of conversations with customers" showing that the customers "have switched or will switch suppliers," yet the court still found such proof "insufficient."  *See* 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997).  Deeming affidavits from interested parties "weak evidence," the court denied the motion to enjoin the collection of deposits at the increased rates, explaining that, if it were to grant the motion "on so little documentary evidence, it would essentially be holding that

11

any substantial increase in deposit rates before a final court decision constitutes irreparable harm *per se*." *Id.* at 195–96.

And in *Corus Group PLC v. Bush*, despite evidence that the plaintiff "may suffer an adverse economic impact," the court ruled that it failed to establish irreparable harm because there was insufficient evidence that the plant at issue was "in danger of imminent closure." *See* 217 F. Supp. 2d 1347, 1354–55 (Ct. Int'l Trade 2002). The *Corus* court reasoned that, because "{e}very increase in duty rate will necessarily have an adverse {e}ffect on foreign producers and importers," finding irreparable harm on these facts would "effectively create a *per se* irreparable harm rule in similar challenges—a result likely contrary to the extraordinary nature of the remedy." *Id.* at 1355. The logic in *Shree Rama* and *Corus* applies with even more force here given the paucity of evidence submitted by GFL.

Numerous other decisions are in accord with *Shree Rama* and *Corus* and confirm that GFL's weak evidentiary showing fails to satisfy the irreparable harm factor here. *See, e.g.*:

- *Shandong Huarong*, 122 F. Supp. 2d at 145–49 (denying motion to enjoin collection of deposits at increased rate where evidence consisted solely of an affidavit from plaintiff's "major customer" and was not bolstered "through independent evidence indicating exactly how and when" the lost sales "would force it out of business");

- *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 389 F. Supp. 3d 1386, 1398–1403 (Ct. Int'l Trade 2019) (rejecting plaintiffs' claim that it would suffer lost sales, loss of goodwill, and loss of business opportunities despite submission of several declarations and other documents because evidence was "unspecific," "inconclusive," and "too speculative");

- *Premier Trading, Inc. v. United States*, 144 F. Supp. 3d 1354, 1359 (Ct. Int'l Trade 2016) (concluding the record did not establish irreparable harm where plaintiff relied on a single affidavit of a company manager that contained "bald assertions without accompanying support");

- *Int'l Fresh Trade Corp. v. United States*, 26 F. Supp. 3d 1363, 1368 (Ct. Int'l Trade 2014) (rejecting claim of irreparable harm where plaintiff produced no independent evidence and submitted only two affidavits from its vice president);

- *Int'l Custom Prod., Inc. v. United States*, 30 CIT 21, 24–29 (2006) (finding plaintiff failed to demonstrate irreparable harm where it relied almost entirely on a conclusory declaration from its president and submitted "no financials, contracts, or other proof to make its case"); and

- *Olympia Indus., Inc. v. United States*, 30 CIT 12, 17 (2006) (determining plaintiff did not show it will face immediate and irreparable injury even though it demonstrated it will suffer "some economic loss should the demand for cash deposits be enforced").

None of GFL's cited authority should change the Court's calculus here either. *See* GFL Mem. at 13, 46, 47. In *U.S. Auto Parts Network, Inc. v. United States*, for example, the court found the irreparable harm factor satisfied, but the plaintiff there had provided credible evidence showing it would have been able to meet the roughly $9 million bond requirement for, "at best, a couple weeks" before *going out of business*. *See* 319 F. Supp. 3d 1303, 1307–08 (Ct. Int'l Trade 2018). Similarly, in *Queen's Flowers de Colombia v. United States*, the court found that eight companies had established irreparable harm by showing that they would face "immediate extinction." *See* 947 F. Supp. 503, 506–07 (Ct. Int'l Trade 1996). Notably, the *Queen's* court also determined that, despite other companies showing they would be "seriously compromised by the new deposit rate," those companies had *not* established irreparable harm because their sales of non-subject merchandise would permit them to "survive." *Id.* at 507. In contrast to these cases, GFL does not contend it faces immediate or even eventual extinction, placing this case on the other end of the spectrum.

Accordingly, because GFL has merely identified the effect of having its countervailable subsidy benefits counteracted as intended by the statute, the Court should find that GFL's speculative and unsupported claims fail to establish immediate irreparable injury. On this basis alone, the Court should deny the request for a preliminary injunction.

**B.      The Balance Of Hardships And Public Interest Factors Disfavor An Injunction Against The Collection Of Cash Deposits At The Final CVD Rate**

The balance of hardships does not weigh in GFL's favor, nor is it in the public interest to enjoin the collection of cash deposits at the rate set in the CVD Order.

When assessing the balance of hardships, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter* 555 U.S. at 24 (citation omitted).   GFL contends the balance of hardships tips in its favor because GFL would "suffer irreparable harm" without its requested injunction.   GFL Mem. at 48.  But as explained above, GFL failed to substantiate its claims of irreparable harm, undercutting its position on this factor, too.  The only established "harm" GFL faces is posting the higher cash deposit rate pending judicial review of Commerce's determination.   "{P}aying deposits pending court review," however, is not a hardship warranting an injunction; it is merely "an ordinary consequence of the statutory scheme." *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1366 (Ct. Int'l Trade 2017) (quoting *MacMillan Bloedel Ltd. v. United States*, 16 CIT 331, 333 (1992)).

To the extent GFL claims a hardship from potential contractual losses, the equities do not favor its position.   According to Mr. Malhotra, GFL negotiated certain contracts for imports in 2022 after the Preliminary Determination issued and Commerce set a CVD rate at 4.75 percent, causing the subsequent 31.89 percent rate to be "commercially punitive." *See* Aff. ¶¶ 7–8.  If Commerce's determination is not reversed, though, GFL will encounter the same financial exposure it now allegedly faces.  And it was within GFL's power to avoid these risks when negotiating its contracts, either by waiting to finalize them until *after* Commerce's Final Determination issued or by accounting for a potential increase in the CVD rate.  GFL evidently made a business decision not to do so, despite knowing Commerce's Preliminary Determination

was *preliminary* and subject to change.  Accordingly, the "equities cannot tip in {its} favor" when it "knowingly" placed itself at risk.  *See Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1317 (Ct. Int'l Trade 2017).

GFL also suggests that an injunction will maintain the status quo and cause the Government "no hardship" (GFL Mem. at 48), but enjoining the collection of cash deposits at the ordered rate— relief not contemplated by 19 U.S.C. § 1516a(c)(2)—would *alter* the status quo and suspend the effect of the statute requiring such collection.  *See* 19 U.S.C. § 1671e(a)(3); *Capella Sales & Services Ltd. v. United States*, 180 F. Supp. 3d 1293, 1302 (Ct. Int'l Trade 2016) (noting statutory requirement to post a cash deposit, bond, or other security at the applicable rate, *i.e.*, the estimated countervailable subsidy rate determined in the final determination, when Commerce issues a CVD order).  As a consequence, the revenue to which the statutory scheme is directed would be left unprotected—a hardship to the Government.  *See Int'l Custom*, 30 CIT at 31 (finding hardship factor did not favor plaintiff where the Government faced potential loss of revenue, despite plaintiff having to pay a higher duty and find a domestic source for its merchandise).

The public interest does not favor GFL either.  According to GFL, enjoining the collection of cash deposits at the rate determined by Commerce will serve the public interest of ensuring compliance and enforcement of the trade laws.  *See* GFL Mem. At 49–50.  But as courts have found, this "argument with respect to the public interest is unconvincing."  *Olympia*, 30 CIT at 18. After all, use of available judicial remedies (*i.e.*, this proceeding challenging Commerce's determination) is a premise of this compliance.  Moreover, an injunction that disrupts the statutory scheme will not serve the public interest, because it would disregard that Commerce's determination is presumed correct, *see* 28 U.S.C. § 2639(a)(1), and would "implicitly endorse

15

{GFL's} non-cooperation with Commerce," contrary to the public interest in promoting enforcement of the trade laws, *see Harmoni*, 211 F. Supp. 3d at 1318.

On the other hand, "protecting the revenue of the United States" by requiring GFL to post cash deposits at the rate in the Final Determination and the CVD Order constitutes "a significant public interest." *See Harmoni*, 211 F. Supp. 3d at 1318; *Olympia*, 30 CIT at 18–19 (concluding the Government has a "substantial public interest claim" in protecting revenue). GFL acknowledges as much. *See* GFL Mem. at 49 (quoting *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1332 (Ct. Int'l Trade 2014)).

Because GFL failed to establish that these factors are in its favor, the motion for a preliminary injunction should be denied for these additional reasons.

### C.   GFL Has Not Shown A Clear Likelihood Of Success On The Merits

Giving short shrift to the other injunction factors, GFL spends almost its entire 50-page brief attempting to show it has a high likelihood of success. However, in doing so, GFL effectively asks this Court to short circuit the judicial process and address the merits in detail before the case gets off the ground. But the Court need not fully wade into these arguments, for GFL's shortcomings on the other factors provide a sufficient basis to deny the injunction. And even if the Court considers the likelihood of success, GFL ignores the deferential standard of review—overlooking aspects of the record that undercut its position and show that Commerce's decision is supported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B) (providing that a determination will be held unlawful if "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

GFL raises two main issues, each related to Commerce's determination of a 26.50 percent net subsidy rate for India's State Industrial Development Corporation's (SIDC) provision of land for less-than-adequate-remuneration program, which benefitted GFL's cross-owned affiliate and

input supplier Inox Wind Limited (IWL).  First, GFL asserts that Commerce erred by investigating IWL and determining that the energy IWL sold to GFL was primarily dedicated to GFL's downstream production such that subsidies received by IWL should also be allocated to GFL's sales.  *See* GFL Mem. at 14–20.  Second, GFL challenges Commerce's benchmark selection for land, which Commerce used to determine the subsidy rate for the SIDC's provision of land to IWL. *Id*. at 20–36.  On each issue, Commerce complied with the applicable statute and regulations and supported its determination with substantial evidence on the record.  But even assuming GFL raises legitimate arguments, these issues should be fully considered in the normal course of this litigation, consistent with the statutory scheme.  GFL has not raised any issues above or beyond the normal scope of those routinely considered by this Court in antidumping duty or countervailing duty cases.

Regarding Commerce's examination of IWL and determination that IWL's wind energy was primarily dedicated to GFL's downstream merchandise, GFL is not likely to succeed on the merits.  GFL asserts that Commerce failed to explain the differing treatment of IWL between the 2017 investigation of PTFE resin from India and the instant investigation of granular PTFE resin. GFL Mem. at 17.  As GFL acknowledges, however, Commerce explained that "{t}he record of each proceeding is separate, reflects different facts, and encompasses a different time period."  *Id*. at 15.  While GFL disagrees with this explanation, and argues both investigations involve "indistinguishable facts," it fails to *show* as much.  *See id*. at 6, 15.  GFL also identifies no aspects of Commerce's determination that are unexplained or inconsistent with Commerce's regulations. And for good reason—Commerce's determination follows its regulations regarding "primarily dedicated" inputs.

As Commerce explained, the regulations provide that,

> If there is cross-ownership between an input supplier and a downstream producer,
> and production of the input product is primarily dedicated to production of the

> downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

IDM at 11. The record establishes that *all* wind energy produced by IWL was sold to GFL, which GFL used in manufacturing "all merchandise" at its Dahej plant. *See id.* at 11–12. Substantial evidence therefore supports Commerce's determination that the input product was primarily dedicated to GFL's downstream production.

GFL mistakenly focuses on the fact that the energy provided to GFL was used to produce subject and non-subject merchandise, arguing that this means it cannot be "primarily dedicated." *See* GFL Mem. at 19. As Commerce explained, however, the "regulations do not specify whether the downstream product must be subject or non-subject merchandise." IDM at 11. Moreover, because Commerce included GFL's *total sales* (*i.e.*, sales of subject and non-subject merchandise) in the denominator used to determine the net benefit, *see* GFL Mem. at Ex. 17 (dividing "the benefits allocable to the POI by combined total POI sales of IWL and GFCL" to calculate the subsidy rate), the calculations properly account for the fact that GFL used the purchased energy in the production of both subject and non-subject merchandise.

GFL also argues that the sale of wind energy makes up a small proportion of IWL's total sales because IWL's "core business is the production of wind turbines." *See* GFL Mem. at 18–19. This is a red herring that misses the point. Consistent with its regulations, Commerce properly examined whether "production of the *input product* is primarily dedicated to production of the downstream product." IDM at 11 (emphasis added). As Commerce explained, the entirety of IWL's production of wind energy, the input product, was sold to GFL for the production of downstream merchandise, making IWL's "core business" irrelevant to the analysis. *See id.* ("GFCL reported that 'the entire amount of power generated by IWL is sold to GFCL.'").

Given the deferential standard of review, GFL also is not likely to succeed on the merits regarding Commerce's selection of a land benchmark used to determine the benefit of the SIDC's provision of land for less-than-adequate remuneration. Commerce addressed its selection of a land benchmark at length in its Final Determination. *See* IDM at 13–22. Specifically, Commerce explained its reasoning in rejecting GFL's two land purchases as benchmarks, stating that they "involved purchases of agricultural land from farmers" and "were not comparable to the industry-ready land that the GIDC and SIDC provide." *Id.* at 15. Commerce further explained that "there was no indication that these land parcels had the infrastructure or amenities in place comparable to what manufacturers would expect on GIDC or SIDC land." *Id.*

Regarding Commerce's selection of the Mumbai and Ahmedabad land benchmarks, Commerce explained that these were the "best available land benchmarks on the record" after eliminating the other three land purchases. *Id.* at 14–16. Although GFL disagrees with Commerce's reliance on these benchmarks, Commerce explained its rationale for their selection:

> While we have no clear indication on the record of what the future use of these land parcels will be, we do note that both land parcels were advertised as former textile mill land and, thus, would have a comparable level of industrial infrastructure, for benchmarking purposes pursuant to 19 CFR 351.511.

*Id.* at 16. Commerce also addressed GFL's arguments regarding the comparability of the land in Mumbai to the SIDC land in Madhya Pradesh, explaining that the parties did not submit the types of information on the record that Commerce would need to examine regional comparability and that would rebut the petitioner's benchmark submission. *Id.* at 16–18.

Additionally, even ignoring the evidence on the record, if this Court were to determine that Commerce failed to address certain arguments or support its benchmark selection with substantial evidence, this would not preclude Commerce from re-examining the issue in a remand proceeding, providing additional supporting explanation, and rendering a supported determination that

continues to use the same benchmarks.  Therefore, even a likelihood that GFL could succeed in obtaining a remand order does not by itself mean that GFL is likely to ultimately receive the CVD rate it seeks to impose by preliminary injunction.

More important, because GFL has failed to establish any of the other criteria that would justify a preliminary injunction, these substantive issues should be considered by this Court in due course once all parties have had the opportunity to fully brief them.  For now, we submit that these are live issues for which GFL's success is not "likely" and which do not warrant such unusual and extraordinary treatment.

### D.   The Court Should Issue A Limited Injunction Against Liquidation And Reject GFL's Request For Overbroad And Indeterminate Relief

GFL seeks to enjoin Commerce from issuing instructions to liquidate any unliquidated entries subject to the CVD Order "pending the entry of a final and conclusive decision in this litigation, including all remands and appeals."  GFL Mem. at 2.  The Government opposes this relief *in part*.  Right now, no entries are subject to liquidation with an assessed rate as the result of Commerce's Final Determination or CVD Order, so no injunction is necessary.  Yet the Government routinely consents to injunctions in cases seeking judicial review of Commerce's final determinations if the injunction terminates at the end of the first period of review.  Following this practice, and as set forth in our proposed order, the Government consents to a limited statutory injunction consistent with the terms of Form 24 but opposes the indeterminate aspect of GFL's requested relief as to entries that will be made after February 28, 2023 (the "Disputed Entries").

GFL has not shown entitlement to an injunction against liquidation with an indeterminate scope.  In fact, GFL largely ignores that it seeks an injunction against liquidation, and it makes no effort to address the duration of its proposed relief.  For example, on irreparable harm, GFL identified no threat that the Disputed Entries will be liquidated in the near future.  *See Lumber*,

393 F. Supp. 3d at 1276. ("It is not enough to establish 'a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown.'") (citations omitted). And for good reason—no such immediate threat exists. Given that, from the preliminary determination forward, entries of subject merchandise are suspended pending an administrative review (or automatic liquidation if no review is requested, which cannot occur until the end of the review period), the *earliest* date that GFL's entries could become subject to liquidation is after March 31, 2023, *i.e.*, the end of the anniversary month in which parties may request an administrative review of the first period of review entries. Additionally, despite that no injunction is necessary to counter any irreparable or immediate harm that might occur, the Government consents to the entry of a statutory injunction through the end of the first review period, *i.e.*, through February 28, 2023. Moreover, if needed and at the appropriate time, GFL can move to extend the injunction, making any potential threat of liquidation even more attenuated. The availability of this recourse renders the potential liquidation of the Disputed Entries a mere possibility, not an "actual" threat.

The public interest will not be served by enjoining liquidation of the Disputed Entries either. Because GFL is engaged in judicial review and can petition this Court for an extension or modification of the agreed-to injunction (if or when necessary), the interest of fair enforcement of the trade laws will not be furthered by an injunction of indeterminate duration. Viewed another way, no valid public interest can be served by enjoining the liquidation of future entries that are not subject to liquidation in the first place.

Commerce's agreement to an injunction with an end date also is consistent with other injunctions this Court has issued against liquidation. For example, in *Ashley Furniture Industries, LLC v. United States*, the movants requested similar relief: to enjoin the Government "during the

21

pendency of this litigation, including any appeals, from issuing instructions to liquidate or permitting the liquidation of certain unliquidated entries of {subject merchandise}." No. 21-00283, 2022 WL 895398, at *1 (Ct. Int'l Trade Mar. 28, 2022). As the Court stated, the movants in *Ashley Furniture* had "well over one year" before they might suffer the alleged irreparable harm associated with liquidation. *Id.* at *15. Despite the movants advancing many arguments to convince the Court they were entitled to such relief—arguments not presented by GFL—the Court declined to issue an open-ended injunction, concluding that the threat of liquidation of future entries was neither "presently existing" nor "actual" and that the public interest would be better served by *not* issuing an injunction of indeterminate scope. *See id.* at *15–19, 22–24. The same result should issue here. *See also, e.g., Husteel Co. v. United States*, 34 F. Supp. 3d 1355, 1360, 1364 (Ct. Int'l Trade 2014) (issuing an injunction in an investigation that covered unliquidated entries made "on or after July 18, 2014 up to and including September 30, 2015," *i.e.*, through the end of the first period of review); *but see Best Mattresses Int'l Co. Ltd. v. United States*, 557 F. Supp. 3d 1338, 1347 (Ct. Int'l Trade 2022) (granting injunction on the liquidation of subject merchandise "for the pendency of the litigation").

## V.    <u>CONCLUSION</u>

For these reasons, the Court should grant, in part, and deny, in part, GFL's motion and enter our proposed injunction.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:                     s/ Daniel F. Roland
PAUL KEITH                     DANIEL F. ROLAND
Senior Attorney                Trial Attorney
Department of Commerce      U.S. Department of Justice
Office of the Chief Counsel     Civil Division
  for Trade Enforcement & Compliance   Commercial Litigation Branch
                                P.O. Box 480
                                Ben Franklin Station
                                Washington, D.C. 20044
                                Tel: (202) 305-0514
                                E-mail: daniel.f.roland@usdoj.gov

May 4, 2022                   Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules. According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 7,034 words.

<div align="center"><u>/s/ Daniel F. Roland</u></div>

May 4, 2022

**UNITED STATES COURT OF INTERNATIONAL TRADE**

——————————————————————————

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant.* | ) |

———————————————————————————)

Court No. 22-00120

**ORDER**

Upon consideration of the Motion for a Preliminary Injunction filed by plaintiff, Gujarat

Fluorochemicals Limited (GFL), defendant's partial opposition thereto, and all other pertinent

papers, it is hereby,

ORDERED that GFL's Motion for a Preliminary Injunction is GRANTED IN PART

AND DENIED IN PART; and it is further

ORDERED that defendant, the United States, together with the delegates, officers,

agents, and servants, including employees of the U.S. Customs and Border Protection and the

United States Department of Commerce, is enjoined during the pendency of this litigation,

including all appeals, from issuing instructions to liquidate or making or permitting liquidation of

unliquidated entries of granular polytetrafluoroethylene (PTFE) resin from India:

(1)   That were produced and/or exported by Gujarat Fluorochemicals Limited; Inox Leasing and Finance Limited; Inox Wind Limited;

(2)   That were the subject of the United States Department of Commerce's final determination in *Granular Polytetrafluoroethylene Resin From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3,765 (Dep't Commerce Jan. 25, 2022) and *Granular Polytetrafluoroethylene Resin From India and the Russian*

*Federation: Countervailing Duty Orders*, 87 Fed. Reg. 14,509 (Dep't Commerce Mar. 15, 2022);

(3)     That were/are entered, or withdrawn from warehouse, for consumption into the United States during the period of July 6, 2021 through February 28, 2023, excluding any merchandise entered, or withdrawn from warehouse, for consumption, on November 3, 2021 through March 11, 2022;

and it is further

ORDERED that the entries covered by this injunction shall be liquidated in accordance with the final court decision in this action, including all appeals and remand proceedings, as provided for in 19 U.S.C. § 1516a(e); and it is further

ORDERED that any entries inadvertently liquidated after this order is signed but before this injunction is fully implemented by U.S. Customs and Border Protection shall be promptly returned to unliquidated status and suspended in accordance with this injunction.

SO ORDERED.

_____
Judge

Dated: _____, 2022
      New York, New York

2