## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, )<br><br>*Plaintiff,* )<br>v. )<br><br>THE UNITED STATES, )<br><br>*Defendant,* )<br>and )<br><br>DAIKIN AMERICA INC., )<br><br>*Defendant-Intervenor.* ) | **<u>NON-CONFIDENTIAL VERSION</u>**<br><br>Court No. 22-00120<br><br>Confidential Business Proprietary Information removed from Pages: 19, 20, 22, 23, 26, 27, 28, 39, 42. |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

John M. Gurley
Diana Dimitriuc Quaia
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

July 21, 2022                    *Counsel for Gujarat Fluorochemicals Limited*

## TABLE OF CONTENTS

**Page**

I.   RULE 56.2 STATEMENT ............................................................. 3

II.  ISSUES PRESENTED AND SUMMARY OF ARGUMENT ......................... 3

    A.   Whether Commerce properly investigated IWL and determined that IWL provided an input to GFCL primarily dedicated to the production of the downstream product? ............................................................... 3

    B.   Whether Commerce's determination to countervail the provision of land by the Gujarat Development Corporation ("GIDC") to GFCL was in accordance with law? ................................................................. 4

    C.   Whether Commerce's benchmark selections for the provision of land by the GIDC and the provision of land by the State Industrial Development Corporation ("SIDC") were based on substantial evidence and in accordance with law? ................................................................. 4

III. FACTUAL BACKGROUND ......................................................... 5

    A.   The CVD Investigation of Granular PTFE Resin from India Is the Second CVD Investigation on PTFE Resin Involving GFCL in the Last Five Years. ................................................................................ 6

    B.   The Preliminary CVD Determination. ...................................... 6

    C.   The Post-Preliminary CVD Determination. ................................ 8

    D.   The *Final Determination* and *Order*. ................................... 9

IV.  STANDARD OF REVIEW ......................................................... 11

V.   ARGUMENT ....................................................................... 12

    A.   Commerce's Determination to Conduct an Investigation of IWL Was Based on an Incomplete Consideration of the Factual Record and Was Arbitrary. ............................................................................ 13

        1.   The Input Supplier Attribution Rule Under Commerce's Regulations ...................................................................... 13

        2.   Commerce's Departure From Its Determination In The 2017 Investigation is Arbitrary and Not Based On Substantial Evidence ....... 17

        3.   In this Investigation, as in the 2017 Investigation, the Power Generated by IWL Was Not Primarily Dedicated to the Production of Downstream Inputs ...................................................... 20

    B.   Commerce's Determination to Countervail the Provision of Land by the GIDC is Unlawful ................................................................. 23

        1.   Commerce's Determination Is Inconsistent with the Statute .................. 23

i

# TABLE OF CONTENTS
(continued)

**Page**

2.   Legal Standard for Sales for LTAR and Commerce's Practice Governing Selection of Benchmarks ...................................... 24

3.   Commerce Unreasonably Rejected the Private Transactions Provided by GFCL For Use As Benchmarks ............................................. 26

4.   Commerce Failed to Address Any of GFCL's Arguments Challenging the Ahmedabad Benchmark. ............................... 30

C.   Commerce's Benchmark Selections to Calculate the Benefit for the Provision of Land to IWL and GFCL, Respectively, Are Contrary to Law and Unsupported by the Record Evidence ........................................... 31

1.   The Mumbai and Ahmedabad Benchmarks Provided by Petitioner Do Not Meet the Regulatory Requirements and Are Thus Unusable. ............................................... 33

     a.   Neither the Mumbai Nor the Ahmedabad Benchmarks Are Based on Actual Transactions ...................................... 34

          (i)   Mumbai Benchmark .......................................... 35

          (ii)   Ahmedabad Benchmark .................................. 35

     b.   There is No Evidence Demonstrating that the Ahmedabad and Mumbai Auctions Were Competitively Run or Involved Private Parties ............................................ 36

2.   Commerce's Determinations that the Mumbai Land and the Ahmedabad Land Are Comparable Parcels to the SIDC and GIDC land Parcels Are Not Based on Record Evidence ................................... 38

     a.   Mumbai ................................................................ 38

     b.   Ahmedabad .......................................................... 42

3.   Commerce Considers "Proximity" of Potential Benchmarks When Determining Usability as a Tier One Benchmark and the Evidence on the Record Demonstrates that Mumbai is Not Proximate to IWL's Facilities. ...................................... 46

4.   The Mumbai Benchmark Is Inconsistent with Commerce's Prior CVD Determinations Involving India .................................... 48

VI.   Conclusion .................................................................. 49

AFDOCS/25990036.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx Inc. v. United States*,
  167 F.Supp.2d 1353 (Ct. Int'l Trade 2001) ..........................................................................31

*Bowman Transp., Inc. v. Ark-Best Freight System, Inc.*,
  419 U.S. 281 (1974)...............................................................................................12, 20, 46

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)..........................................................................................................12

*Chaparral Steel Co. v. United States*,
  901 F.2d 1097 (Fed. Cir. 1990)..........................................................................................48

*Chevron. Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013).....................................................................................11, 12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984).....................................................................................................11, 12

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)..........................................................................................................11

*DAK Americas LLC v. United States*,
  456 F.Supp.3d 1340 (Ct. Int'l Trade 2020) ...................................................................19, 20

*DuPont Teijin Films USA, LP v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005)..........................................................................................11

*Fine Furniture (Shanghai) Ltd. v. United States*,
  748 F.3d 1365 (Fed. Cir. 2014)..........................................................................................24

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)..........................................................................................11

*Rhone Poulenc, Inc. v. United States*,
  899 F.2d 1185 (Fed. Cir. 1990)..........................................................................................48

*SKF USA Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001).....................................................................................12, 20

*SKF USA Inc. v. United States*,
  630 F.3d 1365 (Fed. Cir. 2011).....................................................................................12, 18

iii

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1994) ......................................................................................19

*Ulasim Sanayi A.S. v. United States*,
    498 F.Supp.3d 1345 (Ct. Int'l Trade 2021) ................................................31

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998)...................................................................12

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ..................................................................41

**Statutes**

19 U.S.C. § 1671(a) .............................................................................................4

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................11

19 U.S.C. § 1671(a)(1).......................................................................................13

19 U.S.C. § 1677(5)(B) ......................................................................................24

19 U.S.C. § 1677(5)(B)(i) ..................................................................................24

19 U.S.C. § 1677(5A) .........................................................................................24

19 U.S.C. § 1677(5)(E)(iv) ......................................................................24, 25, 26

**Regulations**

19 C.F.R. § 351.525(b)(6)(iv) .............................................................4, 14, 17, 21

19 C.F.R. §351.525(b)(6)(i) ........................................................................13, 17

19 C.F.R. § 351.511(a)(2)(i) ....................................................................... *passim*

19 C.F.R..§ 351.511(a)(2) ............................................................................26, 27

19 C.F.R. § 351.511 ...........................................................................................33

**Administrative Determinations**

Certain Cold-Rolled Steel Flat Products from Brazil, 81 Fed. Reg. 49940
    (Dep't Commerce July 29, 2016) .................................................................15

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg.
    38361
    (Dep't Commerce June 22, 2020) .................................................................21

iv

*Certain Lined Paper Products from Indonesia,* 71 Fed. Reg. 47174
  (Dep't Commerce August 16, 2006)...........................................................................16, 21

*Certain Polyethylene Terephthalate Resin from India*, 81 Fed. Reg. 13334................................48

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from
  the People's Republic of China,* 75 Fed. Reg. 57444
  (Dep't Commerce Sept. 21, 2010) ........................................................................................16

*Common Alloy Aluminum Sheet from Bahrain*, 86 Fed. Reg. 13333
  (Dep't Commerce Mar. 8, 2021)...........................................................................................40

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348
  (Dep't Commerce Nov. 25, 1998) ................................................................................ *passim*

*Fine Denier from India*, 86 Fed. Reg. 26903
  (Dep't of Commerce May 18, 2021).....................................................................................37

*Forged Steel Fittings from the People's Republic of China,* 83 Fed. Reg. 50342
  (Dep't Commerce Oct. 5, 2018) ...........................................................................................33

*Granular Polytetrafluoroethylene Resin from India*, 86 Fed. Reg. 35479
  (Dep't Commerce Jul. 6, 2021)..................................................................................... *passim*

*Granular Polytetrafluoroethylene Resin From India,* 87 Fed. Reg. 3765
  (Dep't Commerce Jan. 25, 2022)................................................................................... *passim*

*Granular Polytetrafluoroethylene Resin From India and the Russian Federation*,
  87 Fed. Reg. 14509
  (Dep't Commerce Mar. 15, 2022).....................................................................................3, 11

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the
  Republic of Turkey*, 81 Fed. Reg. 47349
  (Dep't Commerce Jul. 21, 2016)......................................................................................26, 29

*Polytetrafluoroethylene Resin from India,* 83 Fed. Reg. 23422
  (Dep't Commerce May 21, 2018).................................................................................6, 25, 27

*Polytetrafluoroethylene Resin from India,* 83 Fed. Reg. 9842
  (Dep't Commerce Mar. 8, 2018)........................................................................................6, 17

*Urea Ammonium Nitrate Solutions from the Republic of Trinidad and Tobago*, 87
  Fed. Reg. 37828
  (Dep't of Commerce June 24, 2022)....................................................................................21

*Utility Scale Wind Towers From India,* 86 Fed. Reg. 56896
  (Dep't Commerce Oct. 13, 2021) ................................................................................. *passim*

v

**Other Authorities**

H. Rep. No. 103–826(I), reprinted in 1994 U.S.C.C.A.N. 4040.....................................................31

*Transaction*, Merriam-Webster.com, https://www.merriam-
    webster.com/dictionary/transaction?src=search-dict-box, (last visited, Jul. 21,
    2022) ........................................................................................................................................34

vi

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, | ) |
| *Plaintiff*, | ) **NON-CONFIDENTIAL VERSION** |
| v. | ) |
| | ) Court No. 22-00120 |
| THE UNITED STATES, | ) |
| *Defendant,* | ) Confidential Business Proprietary |
| and | ) Information removed from Pages: 19, |
| | ) 20, 22, 23, 26, 27, 28, 39, 42. |
| DAIKIN AMERICA INC., | ) |
| *Defendant-Intervenor.* | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the United States Court of International Trade, Plaintiff Gujarat Fluorochemicals Limited ("GFCL"), by and through its attorneys, respectfully moves this Court for judgment on the agency record with regard to certain issues decided by the U.S. Department of Commerce ("Commerce") in the final determination in the countervailing duty ("CVD") investigation of granular polytetrafluoroethylene ("PTFE") from India. *See Granular Polytetrafluoroethylene Resin From India,* 87 Fed. Reg. 3765 (Dep't Commerce Jan. 25, 2022) (final affirm. CVD & critical circum. determ.) ("*Final Determination*"), and accompanying IDM (Jan. 18, 2022) ("*IDM*"), ECF No. 27-2, P.R. 248.

As explained in more detail below, Commerce's determinations in this investigation are not only unlawful, they are truly troubling. Commerce's failure to follow some of the most basic procedures before issuing its final determination and assigning high countervailing duty rates to GFCL is remarkable, as demonstrated by the examples below:

1

- For one alleged subsidy Commerce failed to find the most basic legal predicate – whether the provision of land represents a financial contribution by an authority and whether it is specific.  It is doubtful this Court has ever seen subsidy determinations resulting in high rates assigned to respondents that failed to meet this threshold statutory determination.  On remand, Commerce must undertake some type of analysis to meet its statutory obligation. The fundamental point is that this kind of basic error and casual approach permeated the *Final Determination*.

- With respect to Inox Wind Limited ("IWL"), an affiliate of GFCL, Commerce required IWL to file a CVD questionnaire when just four years ago, with virtually identical facts, Commerce did not require IWL to provide a questionnaire response. Commerce has yet to explain "why" it required IWL to file a questionnaire response.

- For the Ahmedabad land benchmark used, Commerce failed to analyze in any detail a *single* argument made by Plaintiff objecting to the use of that information as a benchmark. Such an approach is unlawful on its face.

- Where Commerce did attempt to describe why it selected the Mumbai and Ahmedabad land benchmarks, Commerce made statements which are not based on the record, and are blatantly incorrect on their face.

Plaintiff is quizzical why Commerce did not request a voluntary remand given the gravity of the legal and factual errors in the *Final Determination*.

2

## I.      RULE 56.2 STATEMENT

GFCL, a foreign manufacturer and foreign exporter of granular PTFE resin from India, submits this memorandum of law in support of its motion for judgment on the agency record, challenging the *Final Determination* as set forth below.  GFCL appeals Commerce's final determination in the CVD investigation of granular PTFE resin from India and contends that Commerce's actions resulted in an erroneous and unlawful subsidy rate for GFCL.  On March 15, 2022, Commerce issued the CVD order.  *Granular Polytetrafluoroethylene Resin From India and the Russian Federation*, 87 Fed. Reg. 14509 (Dep't Commerce Mar. 15, 2022) ("*Order*"). P.R. 257.  On the basis of that unlawful determination, Commerce has instructed CBP to require a CVD cash deposit of 31.89% *ad valorem* on entries of granular PTFE resin produced by GFCL. Memo to File: Customs Instructions From U.S. DOC to U.S. CBP Pertaining to Interested Parties Cash Deposit Instructions (Order), P.R. 258; Memo to File: Customs Instructions From U.S. DOC to U.S. CBP Pertaining to Interested Parties Liquidation (Negative Critical Circumstances), P.R. 259.

## II.     ISSUES PRESENTED AND SUMMARY OF ARGUMENT

### A.      Whether Commerce properly investigated IWL and determined that IWL provided an input to GFCL primarily dedicated to the production of the downstream product?

- Commerce's determination to investigate IWL was not based on substantial evidence and was not accordance with law or consistent with Commerce's precedent.  IWL did not provide an input to GFCL which was primarily dedicated to the production of the downstream product.

Commerce provided no real explanation for investigating IWL, a cross owned affiliate of GFCL that produces wind turbines, even though in a 2017 investigation involving the same respondents and essentially the same products, Commerce made the opposite determination.

Here, Commerce erroneously determined that a small amount of wind energy sold by IWL to GFCL is "primarily dedicated" to GFCL's downstream production even though wind energy generation is not IWL's core business but a tangential product.  Commerce's interpretation of the input supplier attribution rule under 19 C.F.R. § 351.525(b)(6)(iv) is inconsistent with its past practice and the intent of the regulations.

> **B.    Whether Commerce's determination to countervail the provision of land by the Gujarat Development Corporation ("GIDC") to GFCL was in accordance with law?**

- Commerce's determination to countervail the provision of land by the GIDC fails to address the mandatory criteria required by the statute, 19 U.S.C. § 1671(a) and is otherwise not in accordance with law.

For the provision of land by the GIDC at less than adequate remuneration ("LTAR"), Commerce assigned a final subsidy rate for GFCL, but it never made the required statutory findings, *i.e.* whether the provision of land represents a financial contribution by an authority and whether it is specific.

Commerce also summarily rejected GFCL's private land transactions as useable benchmarks in favor of the Ahmedabad benchmark without addressing GFCL's ten arguments why the Ahmedabad benchmark was unusable.

> **C.    Whether Commerce's benchmark selections for the provision of land by the GIDC and the provision of land by the State Industrial Development Corporation ("SIDC") were based on substantial evidence and in accordance with law?**

- Commerce's benchmark selections were not based on substantial evidence, and were not in accordance with law.  Commerce's benchmark selections deviate without explanation from Commerce's prior determinations.

Commerce calculated the benefit on the GIDC's provision of land using a benchmark that does not meet its regulatory criteria: it is not an actual transaction, but an unconfirmed bid at a "staggering price" for land in the "Walled City" of Ahmedabad, not comparable to industrial

land used by GFCL. There is also no evidence that the auction involved private parties.

Commerce rejected actual sales transactions between private parties in the state of Gujarat as benchmarks to measure the adequacy of remuneration on land provided by the GIDC even though the same land transactions were used by Commerce as benchmarks in a 2017 investigation involving the same respondent and the same facts.

For the provision of land by the SIDC in the State of Madhya Pradesh for IWL's wind turbine production, Commerce compared IWL's 30-year lease payments with two exorbitant bid prices for land situated in the middle of urban areas of Ahmedabad and Mumbai.  Both of these cities are in different states: Ahmedabad is in Gujarat and Mumbai is in Maharashtra. Such prices do not meet Commerce's regulatory preference for benchmarks that are comparable to the land at issue, including geographic proximity. The Mumbai and Ahmedabad benchmarks also involves mere bids, not sales (as reported by news articles of unknown provenance) and there is no evidence that the auctions involved private parties. Indeed, the evidence suggests the sellers were in fact *not* private parties.

 Of course, what is most head scratching is Commerce's rather comical defense seeking to justify why large industrial concerns, including one, GFCL, which is a *chemical plant*, would want to relocate to expensive, crowded, urban areas. And, just as important, why these large urban areas would ever invite industrial concerns, including a chemical plant, into the middle of their highly populated cities.

## III.    FACTUAL BACKGROUND

The Statement of Facts Section of the Complaint fully sets forth the relevant facts, and is incorporated herein by reference.  *See* Compl. ¶¶ 15 to 40, ECF No. 6.  We provide below the pertinent facts in the broader context of the previous CVD investigation of GFCL covering a

very similar product.

    **A.**    **The CVD Investigation of Granular PTFE Resin from India Is the Second CVD Investigation on PTFE Resin Involving GFCL in the Last Five Years.**

The administrative determination at issue is Commerce's second CVD investigation in the last five years of PTFE resin from India.

In 2017-2018, Commerce investigated PTFE resin from India. *See Polytetrafluoroethylene Resin from India,* 83 Fed. Reg. 9842 (Dep't Commerce Mar. 8, 2018) (prelim. affirm. CVD determ.) and accompanying IDM ("*2017 Prelim.*"), unchanged in *Polytetrafluoroethylene Resin from India,* 83 Fed. Reg. 23422 (Dep't Commerce May 21, 2018) (final affirm. CVD determ.), and accompanying IDM ("*2017 Final*") (collectively, the "2017 Investigation"). GFCL was the only mandatory respondent in that investigation; at the time, IWL was a cross-owned company of GFCL and Commerce was reviewing potential subsidies over a similar period.

Relevant here, in the 2017 Investigation, Commerce investigated if inputs from IWL were primarily dedicated to the production of downstream products and the provision of land by the GIDC to GFCL. Commerce determined that inputs from IWL were not primarily dedicated to the production of downstream products and that GFCL did not receive a benefit as a result of the GIDC's provision of land. *See 2017 Final* at 21; *2017 Prelim.* at 2-4. Commerce's determinations in this investigation directly contradict its prior findings.

    **B.**    **The Preliminary CVD Determination.**

Three years later, Commerce initiated this investigation and again selected GFCL as the sole mandatory respondent. *See Granular Polytetrafluoroethylene Resin from India*, 86 Fed. Reg. 35479 (Dep't Commerce Jul. 6, 2021) (prelim. affirm. CVD & critical circum. determ.) ("*Preliminary Determination*")**,** and accompanying Decision Memorandum (Jun. 28, 2021)

("*PDM*"), at 7, P.R.173.  As in the 2017 Investigation, Commerce investigated whether GFCL

has cross-owned affiliates that provided GFCL inputs primarily dedicated to the production of

the downstream merchandise and certain allegations of land provided for LTAR.  However, on

virtually indistinguishable facts, in this investigation Commerce made the exact opposite

determination.  Specifically, Commerce determined that because "IWL's wind power is supplied

to GFCL through a common energy pool, specifically for GFCL's use" and "GFCL reported that

it paid IWL to generate a certain amount of wind power … the electricity input from IWL is

primarily dedicated to the production of downstream products produced by GFCL." *PDM* at 8,

P.R.173.

Commerce similarly deviated from the 2017 Investigation in valuing the GIDC's

provision of land to GFCL.  Commerce rejected GFCL's land purchases in Mahidad and

Ranjitnagar, which represent private land transactions from independent sellers, as benchmarks,

although it relied on the *exact same transactions* in the 2017 Investigation. *See* Gujarat

Fluourochemicals Limited's Section III Questionnaire Response (May 6, 2021) ("GFCL Initial

QR") at 79, Exh. 16(a)-(g), P.R. 90, 107, C.R. 51, 75-77.  Instead of using agricultural land

purchased for industrial use -- which describes perfectly the transaction GFCL undertook --

Commerce relied on "information on a private *auction* of *industrial* land in Ahmedabad,

Gujarat," placed on the record by petitioner ("Ahmedabad Benchmark").  *PDM* at 10-11

(Emphasis added), P.R.173.

However, in its preliminary calculations, Commerce relied on the rates provided by

GFCL for the Mahidad and Ranjitnagar Benchmarks, *not* the Ahmedabad Benchmark provided

by the petitioner.[1] *See* Memorandum from J. Martin to The File, Re: *Preliminary Determination Calculations for Gujarat Fluorochemicals Limited* (Jun. 28, 2021) *("Preliminary Calculation Memo"),* P.R. 178, C.R.147.  The consequence of this inconsistency was Commerce's decision that the "GIDC's Provision of Land for LTAR … did *not* confer a measurable benefit during the POI." *PDM* at 26, P.R.173.  Thus, Commerce did "not reach a preliminary determination as to whether there is a financial contribution or specificity for this program."  *Id*.  Commerce's preliminary determination was thus confusing and internally inconsistent with the *Preliminary Calculation Memo* and ignored relevant evidence on the record.

### C.    The Post-Preliminary CVD Determination.

Commerce investigated IWL only in its *Post-Preliminary Determination*, analyzing, *inter alia*, the SIDC provision of land to IWL for LTAR. To determine whether the SIDC's provision of land to IWL conferred a benefit, Commerce again rejected benchmarks submitted by GFCL as comparable prices.  *See* Memorandum from S. Fullerton to C. Marsh, Re: *Post-Preliminary Analysis of Countervailing Duty Investigation* (Oct. 1, 2021) *("Post-PDM")* at 3-4, P.R. 212. Commerce unlawfully rejected information put on the record by GFCL demonstrating that agricultural land could be purchased for industrial purposes.  *Id*. at 4; *see also* Gujarat Fluorochemicals Limited's Benchmark Data Submission (Aug. 11, 2021) ("GFCL Benchmark Submission"), P.R. 199.

Instead, Commerce inexplicably decided to rely on a land "transaction" which "involved 'prime' land, formerly used by a textile mill, purchased in a competitive auction in Mumbai, Maharashtra" (the "Mumbai Benchmark").  *See Post-PDM* at 3, P.R. 212.  The record shows that

---

[1] Again, the fact that Commerce's two memoranda have *contradictory findings* is reflective of Commerce's casual, if not sloppy, approach in this investigation

this land was owned by the *National* Textiles Corporation, that the winning bidder at the auction was a realty firm, and that the land is "located in the heart of the metropolis."  *See* Petitioner's Land Benchmark Submission (Aug. 11, 2021) ("Petitioner's August Benchmark Submission") at Exh. 3 (emphasis added). P.R. 198.  There is no indication that this land is comparable to the SIDC land.  Indeed, how could it be? This land is located in the "heart of the metropolis" of Mumbai, in a different state.

Commerce then inexplicably determined that "the only transactions on the record suitable for benchmarking purposes are the transaction that occurred in Mumbai, Maharashtra, and the Gujarat transaction, which was used in the *Preliminary Determination*." *Post-PDM* at 4, P.R. 212.  But in its calculations, causing additional confusion, Commerce *again* relied on the rates provided by GFCL in the Mahidad and Ranjitnagar Benchmarks to which it added the Mumbai Benchmark.  *See* Memorandum from J. Martin to The File: *Post-Preliminary Analysis Calculations for Gujarat Fluorochemicals Limited* (Oct. 1, 2021) ("*Post-Preliminary Calculation Memo*") at 4, P.R. 213, C.R. 154.[2]

Like its *Preliminary Determination*, Commerce's *Post-Preliminary Determination* rejects the private land transactions provided by GFCL in favor of a one-page news article identifying a bid – not a sale or purchase - of incomparable land in Mumbai, Maharashtra.  This Court should not allow such obviously incorrect determinations to stand.

    **D.**    **The *Final Determination* and *Order*.**

The *Final Determination* continues and amplifies the legal errors identified above. Commerce changed its methodology, choosing to rely entirely on the rates provided by the

---

[2] *See* footnote 1.

petitioner, the Ahmedabad parcel of land (GIDC provision of land) and the Mumbai parcel of land (SIDC provision of land).  *IDM* at 16-17, P.R. 248.  Commerce's *Final Determination* provided cursory responses, if any, to GFCL's arguments regarding whether IWL should be investigated, use of the Mumbai Benchmark, and use of the Ahmedabad Benchmark, disregarding the record evidence that directly contradicted its determination.  Not only is the *Final Determination* not based on substantial evidence, but it is the exact *opposite* of its determination made only four years ago, based on much of the same evidence.

Commerce continued to investigate IWL, finding that "IWL's production of wind energy was primarily dedicated to GFCL's downstream production and that Commerce should continue to countervail subsidies received by IWL," *IDM* at 12, P.R. 248, despite evidence showing otherwise.  *See* GFCL's Section III Response Identifying Affiliated Companies (Questions 3-7) (Apr. 15, 2021) ("GFCL Supp. IAC QR") at Exh. S-4b, P.R. 84, C.R. 48; Inox Wind Limited's Second Supplemental Questionnaire Response (Jun. 21, 2021) ("IWL 2nd Supp. QR") at Exh. IWL S2-2(b), P.R. 165, C.R. 135.

With respect to the land benchmark issues, despite evidence to the contrary Commerce stated, without evidence, that "the record only indicates that these parcels were suitable for industrial use," and that "both land parcels were advertised as former textile mill land."  *IDM* at 16, P.R. 248.[3]  Commerce continued to determine that the Mumbai Benchmark represented a comparable land "transaction" when it was simply a bid at an auction for prime real estate in the city of Mumbai, whereas GFCL operates a chemical plant, far from a large city in Gujarat.  Commerce did not address the comparability of the Ahmedabad bid, failing to explain how a

[3] As discussed below, both of these statements are inaccurate.  There was no proof of how the parcels of land were actually advertised.

winning bid – where there is no evidence money has been paid or that a contract has been signed -- is equivalent to an actual sale transaction.

Last, Commerce continued to summarily reject the Mahidad and Ranjitnagar Benchmarks provided by GFCL without providing the necessary reasoned analysis.  Commerce failed to address no less than ten arguments in GFCL's Rebuttal Brief, P.R. 236, C.R. 173, where GFCL demonstrated why the Ahmedabad Benchmark was flawed.   Relying on the Mumbai and Ahmedabad Benchmarks to calculate a benefit under the GIDC and SIDC programs resulted in a *26.50%* CVD rate – the highest LTAR rate, by far, for a land program ever found (to our knowledge) in an Indian CVD case.

Commerce issued the CVD order on March 15, 2022.  *Order*, 87 Fed. Reg. 14509, P.R. 257.

## IV.    STANDARD OF REVIEW

This Court rejects any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005), quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).

When reviewing Commerce's statutory interpretations, the Court applies the two-part test set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106-07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). Under *Chevron*, to determine whether an agency's interpretation of the

11

statute is entitled to deference, the Court conducts a two-part inquiry. Under the first prong, where Congress has spoken directly to the question at issue, the Court and agency "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If the statute is vague or silent on an issue, the Court may uphold Commerce's interpretation, but only so long as the interpretation is reasonable. *See Chevron,* 467 U.S. at 843.

While the court affords deference to Commerce's policy changes under *Chevron*, Commerce must nevertheless provide an "adequate explanation" for changes or reversals in policy coming before the court. *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). Courts "look for a reasoned analysis or explanation" from Commerce to ensure that the agency has not abused its discretion in departing from prior analysis. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962)).

Commerce's determinations must "articulate a rational connection between the facts found and the choices made." *Bowman Transp., Inc. v. Ark-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). Commerce's action is "arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## V.    ARGUMENT

Plaintiff challenges Commerce's *Final Determination* as being contrary to law and unsupported by substantial evidence on the record.  Commerce made two threshold determinations: (1) to investigate IWL notwithstanding its contrary determination in the 2017 Investigation; and (2) to value the provision of land to IWL and GFCL by the SIDC and the GIDC, respectively, using erroneous benchmarks (the Ahmedabad and Mumbai Benchmarks) representing mere bids for land parcels that are not comparable to the land purchases of IWL or

GFCL.

### A. Commerce's Determination to Conduct an Investigation of IWL Was Based on an Incomplete Consideration of the Factual Record and Was Arbitrary

Commerce's determination to conduct an investigation of IWL was arbitrary and a result of an incomplete review of the factual record.  Faced with essentially the same facts and the same threshold question (*i.e.* whether to investigate IWL) Commerce reached radically different conclusions in this investigation compared to the 2017 Investigation.  Commerce deviated from the 2017 Investigation of PTFE resin from India, noting that investigation of IWL was warranted in this proceeding because "{t}he record of each proceeding is separate, reflects different facts, and encompasses a different time period."  *See* Letter from B. Palmer to Arent Fox LLP, Re: Further Clarification of Responses Requirements for Gujarat Fluorochemicals Ltd. and Section III Deadline Extension (Apr. 27, 2021) ("DOC Clarification Letter") P.R. 88.  That sentence is *not* an explanation: it is the equivalent of saying one cannot possibly compare the weather on Tuesday to Monday because Tuesday is a day later.  This record does not differ so substantially that Commerce can make such a statement – without providing a reasoned analysis as support.  Even if investigation of IWL were reasonable, Commerce misapplied its own regulations by attributing IWL's subsidy to GFCL.

### 1. The Input Supplier Attribution Rule Under Commerce's Regulations

The statute, 19 U.S.C. § 1671(a)(1), requires Commerce to calculate countervailing duties based upon the net countervailable subsidy provided "directly or indirectly" with respect to "the manufacture, production, or export of a class or kind of merchandise imported { } into the United States."  Commerce will normally attribute a subsidy to the products produced by the entity that received the subsidy. 19 C.F.R. §351.525(b)(6)(i).  However, in certain instances, Commerce may attribute subsidies received by one company to another, including in the case of

cross-owned corporations, such as IWL and GFCL. *See* IDM at 11-12, P.R. 248.

Commerce's regulations provide that "{i}f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to the production of the downstream product," Commerce "will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)." 19 C.F.R. § 351.525(b)(6)(iv).

Commerce has explained that the "main concern {it} has tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product." *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348, 65401 (Dep't Commerce Nov. 25, 1998) ("*Preamble*"). To illustrate the point, Commerce explained that " {t}his was the case with stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production … ." *Id.*, 63 Fed. Reg. at 65401.

Where Commerce is "dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product." *Id.*, 63 Fed. Reg. at 65401. Commerce's example to illustrate when an input *is not* "primarily dedicated" to the downstream products is very instructive:

> For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.

*Id.*, 63 Fed. Reg. at 65401.

Here, the input provided by IWL to the grid is wind electricity from wind-power and the

14

downstream product (*i.e.* the "higher value added product") is granular PTFE resin, along with the various other chemical products produced at GFCL's Dahej unit's multiple plants.  GFCL Supp. IAC QR at 6 and Exhs. S-5(a) - S-5(b), P.R. 84, C.R. 48 (providing two charts showing (1) raw material inputs and merchandise produced at GFCL's Dahej plants; and (2) a summary of power generation and distribution to each of the plants at the Dahej unit).  Notably, IWL is a *wind turbine* manufacturer and GFCL is a manufacturer of *PTFE resin and other chemical* products.  This fact pattern does not track the purpose of Commerce's regulation or the examples provided in the *Preamble*, which describes products that are merely a link in the overall production chain (*e.g.,* harvested standing timber that is processed into lumber or semolina that is processed into pasta). To the contrary, this is an attribution scenario much closer to the "plastics v. appliances and automobiles" example in the *Preamble*: manufacturing of wind turbines is as irrelevant to production of PTFE and other chemicals as manufacturing of plastics is to appliances and automobiles.

Further, as noted above, the *Preamble* directs Commerce to consider whether the purpose of subsidies provided to a cross-owned input supplier is to benefit the production of both the input and downstream products.  Once again, the input producer's operations, as well as the nature of the input and the downstream products are highly relevant.  For example, in *Cold-Rolled Steel from Brazil*, Commerce found that steelmaking equipment and services are primarily dedicated to the downstream production of steel. *Certain Cold-Rolled Steel Flat Products from Brazil*, 81 Fed. Reg. 49940 (Dep't Commerce July 29, 2016) ("*CRS Brazil Final*"), and accompanying IDM at 55.  In contrast, here, it is not plausible to conclude that the purpose of any subsidies given to a wind turbine manufacturer (IWL) would be to benefit downstream production of PTFE resin because wind energy is not a link in the production of

PTFE resin.  Applying the logic of the *Preamble*, the wind electricity supplied by IWL is not in

any way critical to GFCL's production of granular PTFE resin, as timber is to lumber or steel

making equipment is to production of steel or semolina to pasta.  Rather, wind energy is a

general manufacturing input and not "intricately linked" to production of PTFE resin.

In a similar vein, in *Lined Paper from Indonesia,* Commerce found that "pulp logs are

used to make pulp which, in turn, is used to make paper" and that "the two upstream products

{(*i.e.,* pulp logs and pulp)} have one purpose – as inputs to paper."  *See Certain Lined Paper*

*Products from Indonesia,* 71 Fed. Reg. 47174 (Dep't Commerce August 16, 2006) (final CVD

determ. and final negative critical circumst. determ.) ("*Lined Paper from Indonesia"),* and

accompanying IDM at 31. *See also Certain Seamless Carbon and Alloy Steel Standard, Line,*

*and Pressure Pipe from the People's Republic of China,* 75 Fed. Reg. 57444 (Dep't Commerce

Sept. 21, 2010) (final CVD determ. and final aff. critical circumst. determ.) ("*Seamless Pipe*

*from China*"), and accompanying IDM, at Comment 21 *(*finding that "coke and coking coal are

inputs to the production of steel rounds, which is primarily dedicated to the production of

{subject merchandise})."  Similar to the situation of pulp logs and pulp, in *Seamless Pipe from*

*China* Commerce elaborated on what it means for an input to be a link in the downstream

production: "Because the coke and coking coal were used to make steel rounds, and the

production of those steel rounds was primarily dedicated to the production of subject

merchandise, all inputs were found to be intricately linked to the production of the downstream

product."  *Seamless Pipe from China,* IDM Comment 21.

Here, Commerce stated that "{t}he issue of whether production of the input product is

primarily dedicated to production of the downstream product depends on the specific factual

situations presented to Commerce *because the nature of input and downstream products and*

*production processes vary among case*s." *IDM* at 11, P.R. 248.  While that may be true, it is also true that the guidance of the *Preamble* and Commerce's past practice applies regardless of the nature of the input and the downstream products.  In this case, the evidence on the record demonstrates that the IWL-generated power – which was *extremely* small in quantity—is not primarily dedicated to the production of granular PTFE resin and therefore IWL's transactions do not meet the criteria under 19 C.F.R. §351.525(b)(6)(iv).

### 2.     Commerce's Departure From Its Determination In The 2017 Investigation is Arbitrary and Not Based On Substantial Evidence

It is instructive to consider how Commerce answered this question in the 2017 Investigation.

In the underlying proceeding Commerce did not address the vast similarities between this investigation and the 2017 Investigation, determining only, to paraphrase, that because IWL "sold" electricity to GFCL and GFCL uses electricity, it somehow must be "primarily dedicated." *See IDM* at 11, P.R. 248.  In the 2017 Investigation, Commerce investigated the period of April 1, 2016, through March 31, 2017. *See 2017 Prelim.* at 2-4.  Commerce acknowledged that "GFL … purchased a *small amount* of power generated by its affiliate Inox Wind Limited." *Id.* At 6. "Based upon record evidence, {Commerce} preliminary determine{d} that these inputs are not primarily dedicated to the production of the downstream product." *Id*. "Therefore, {Commerce} attribute{d} subsidies received by GFL to its own sales, in accordance with 19 C.F.R. § 351.525(b)(6)(i)." *Id*.  In its final determination in the 2017 Investigation, Commerce continued to find that inputs from IWL were not primarily dedicated to the production of downstream products. *See 2017 Final*.  Commerce never stated that its determination in the 2017 Investigation was wrong, but that this 2021 record is different. *See* Commerce DOC Clarification Letter, P.R. 88.  Commerce's decision in the *Final Determination*

is not supported by substantial evidence.

The 2021 record is only "different" in that Commerce continued investigating IWL and IWL responded to Commerce's questionnaires.  Although GFCL provided updated information from IWL confirming the information provided in the 2017 Investigation, *see* GFCL Supp. IAC QR at Exh. S-3, P.R. 84, C.R. 48, Commerce continued its investigation of IWL as if the facts on IWL and GFCL's operations were somehow fundamentally different than in the 2017 Investigation.  Without an explanation for why these nearly identical scenarios are treated entirely differently, Commerce's determination is arbitrary and must be remanded.  *See SKF,* 630 F.3d at 1373 (Commerce must provide an "adequate explanation" for changes or reversals in policy).

GFCL provided Commerce its annual reports, IWL's annual reports, and argument explaining why IWL's small electricity production is not primarily dedicated to GFCL's downstream production.  *See* GFCL's Questionnaire Response to Section III (Identifying Affiliated Companies) (Mar. 26, 2021) ("GFCL IAC QR") at Exh. 3 and Exh. 6, P.R. 52, C.R. 21; GFCL Supp. IAC QR at 4-6; Exh. S-1 (IWL's 2019-2020 Annual Report),  Exh. S-3 (Excepts from 2017 Investigation Submission),  and Exh. S-8 (Extract of IWL Annual Report F.Y. 2019-2020) P.R. 84, C.R. 48.  GFCL also included in its submissions to Commerce copies of relevant submissions filed by GFCL in the 2017 Investigation.  *See* GFCL's Section III Identifying Affiliated Companies (Questions 3-7) (Apr. 15, 2021) ("GFCL Supp. IAC QR") at Exh. S-4b, P.R. 84, C.R. 48; IWL's Second Supplemental Questionnaire Response (Jun. 21, 2021) ("IWL 2nd Supp. QR") at Exh. IWL S2-2(b), P.R. 165, C.R. 135.

With these submissions, GFCL demonstrated both that (1) the facts in this investigation are substantially similar to the facts in the 2017 Investigation; and (2) the additional facts

submitted on this record continue to demonstrate that IWL-generated power was not primarily
dedicated to the production of the downstream product. GFCL's submissions contained enough
evidence for Commerce to see that the following facts have not changed in any material way:

- IWL supplied power to the grid, i.*e.,* not directly to GFCL, which goes into a
  common power pool, from where GFCL draws power used to produce all
  merchandise manufactured at its Dahej unit. *See* GFCL's Case Brief (Nov. 18,
  2021) ("GFCL Case Brief") at 8-10, P.R. 234, C.R. 172.

- Power supplied by IWL comprises only [          ]% of the direct cost of
  production, in the current investigation and the 2017 Investigation, respectively.
  *See* GFCL Case Brief at 7, P.R. 234, C.R. 172; GFCL Supp. IAC QR at Exh. S-3,
  P.R. 84, C.R. 48.

- IWL's total revenue from its sale of power to GFCL is only [     ]% of its
  consolidated turnover. *See* GFCL IAC QR at 8, P.R. 52, C.R. 20; *see also* GFCL
  Case Brief at 7, P.R. 234, C.R. 172; GFCL Supp. IAC QR at Exh. S-3 (showing
  that "IWL's revenue for the sale of power is just 0.13% of its consolidated
  turnover" in the 2017 Investigation), P.R. 52, C.R. 20.

- Compared to all of the power GFCL pulls from the common pool, during the
  period of investigation "IWL supplied [          ] kwh of power to the grid for
  "use" by GFCL {and} … {t}he total power consumption of GFCL in the POI is
  [          ] kwh," *i.e.*, [     ]% of GFCL's total power consumption. *See*
  IWL's Section III Questionnaire Response (Part I) (May 24, 2021) ("IWL Initial
  QR (Part I)") at 6, P.R. 121-122, C.R. 97-99; *see also* GFCL Case Brief at 7-8,
  P.R. 234, C.R. 172. This is less than the power procured from IWL in the 2017
  Investigation, which amounted to "just 1.08% of the total power consumption of
  GFL." GFCL Supp. IAC QR at Exh. S-3, P.R. 84, C.R. 48.

In 2017, IWL was deemed not to have provided an input primarily dedicated to the
production of subject merchandise. However, on virtually indistinguishable facts, in this
investigation Commerce made the exact opposite determination.

"Consistency has long been a core interest of administrative law, and inconsistent
treatment is inherently significant." *DAK Americas LLC v. United States*, 456 F.Supp.3d 1340,
1355-56 (Ct. Int'l Trade 2020) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994)).
Commerce's *Final Determination* neither articulates "a rational connection between the facts

found and the choices made," nor does it provide sufficient reason for "treating similar situations differently." *Bowman*, 419 U.S. at 285; *SKF*, 263 F.3d at 1382. Commerce's determination is also inconsistent with the 2017 Investigation of GFCL. *See DAK*, 456 F.Supp.3d at 1355-56. Commerce made no effort to explain why this decision in March 2022, is the opposite of its decision made in September 2018, particularly where the facts are nearly identical. The record continues to demonstrate that IWL does not provide GFCL a product primarily dedicated to the production of the downstream product.

### 3. In this Investigation, as in the 2017 Investigation, the Power Generated by IWL Was Not Primarily Dedicated to the Production of Downstream Inputs

IWL's core business is the production of wind turbines. IWL is a manufacturer of wind turbines, operating in the Madhya Pradesh region of India. IWL sold two [    ] wind turbines to GFCL in March 2020. Prior to March 2020, IWL sold the electricity generated from the same turbines to GFCL. This allowed both IWL and GFCL to test the wind turbines. Therefore, in both the 2017 Investigation and the current investigation, IWL provided the same input to GFCL: electricity generated from the two wind turbines. *See* GFCL Supp. IAC QR at Exh. S-3 (providing details regarding the 2017 Investigation), P.R. 84, C.R. 48; GFCL IAC QR at 7-8, P.R. 52, C.R. 20. As Commerce succinctly stated "IWL did not have any other energy customers and that all wind power generated at IWL's wind farm was to be used in GFCL's production facilities in Dahej." *IDM* at 12, P.R. 248. IWL does not operate a wind farm as its primary business. The overwhelming majority of IWL's sales were to companies other than GFCL because IWL is not in the business of selling wind power, as demonstrated by IWL's audited financial statements. *See* GFCL Case Brief at 7, P.R. 234, C.R. 172. This is part of IWL's production of *wind turbine generators*, which are not an input to GFCL's production of granular PTFE resin or any other downstream product. *Id.* At Exh. IWL-S2-2(a).

20

The nature of IWL's business and the inconsequential value of its wind energy production, while overlooked by Commerce, are relevant to the determination under 19 C.F.R. §351.525(b)(6)(iv).  When determining whether an input is primarily dedicated to the production of subject merchandise within the meaning of 19 C.F.R. §351.525(b)(6)(iv), Commerce's practice has been to consider the affiliates' business activities, "the overall quantities of the inputs produced and sold by the affiliates, as well as the role of those inputs in the production of different products and their consumption by {the respondent.}" *See e.g. Urea Ammonium Nitrate Solutions from the Republic of Trinidad and Tobago*, 87 Fed. Reg. 37828 (Dep't of Commerce June 24, 2022) (final CVD affirm. determ.), and accompanying IDM (June 17, 2022) at 19; *Lined Paper from Indonesia,* IDM at 26.

For example, in *Cold-Rolled Steel Flat Products from Korea*, Commerce determined that POSCO Plantec did not provide an input primarily dedicated to POSCO's steel production, where, among other factors, POSCO Plantec had a very different production business:

> If the record shows the sole purpose of POSCO Plantec's production activities is to provide inputs to POSCO's steel production, one might reasonably conclude that the purpose of a subsidy to POSCO Plantec is to benefit POSCO's steel production. However, on the contrary, the record shows that POSCO Plantec's productions include construction of a refinery, a cargo terminal in Taiwan, a storage tank in an LNG terminal in Korea, and a luggage processing facility in Korea, *etc.*

*See Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38361 (Dep't Commerce June 22, 2020) (final results; 2017 review), and accompanying  IDM at Comment 2.

Commerce also explained that " similar to the plastic to automobile example set out in the *CVD Preamble,* inputs that POSCO Plantec provided to POSCO are used in a typical manufacturing process and not in a way that they are primarily and/or exclusively dedicated to

the production of the downstream product." This logic, when applied to the facts of IWL and GFCL compels the same determination.

IWL's production of wind turbine generators and any small amount of energy generated in *testing* those turbines cannot be dedicated almost exclusively to the production of PTFE products under the rationale of the *Preamble*, 63 Fed. Reg. at 65401 (using examples such as timber primarily dedicated to lumber production and semolina primarily dedicated to pasta production as inputs that are considered "primarily dedicated" to downstream production). IWL's total revenue from its sale of power to GFCL is [      ] of its consolidated turnover. GFCL Case Brief at 7, P.R. 234, C.R. 172.  Attributing to GFCL *any* alleged subsidies received by IWL for its core business, *i.e.* production of wind turbine generators, does not address the regulatory concern that an input producer is passing along subsidies to the producer of the subject merchandise.  *See CVD Preamble*, 63 Fed. Reg. at 65401.

Commerce relies on "power purchase agreements demonstrating that IWL agreed to supply power to GFCL."  *IDM* at 12, P.R. 248.  Yet Commerce overlooks evidence on the record showing that the power generated by IWL is provided to the state distribution system and that the turbines were connected to certain substations.  IWL 2nd Supp. QR at Exh. IWL S2-2, P.R. 165, C.R. 135; GFCL Supp. IAC QR at Exh. S-4b (showing the power is provided to the state distribution system (*i.e.,* the grid)), P.R. 84, C.R. 48.  This power is then comingled with all other electricity on the grid.  *See* GFCL Case Brief at 8, P.R. 234, C.R. 172.

To the extent GFCL could trace the exact source of its power consumption at the Dahej Unit, it is relevant to note that GFCL's Dahej Unit produces both subject and non-subject merchandise. Of the multiple  plants operating  at the Dahej Unit, only [   ] plant has a product line dedicated to PTFE, with the other plants producing various other chemical products. GFCL

Supp. IAC QR at 6 and Exhs. S-5(a) - S-5(b), P.R. 84, C.R. 48.  GFCL estimates that the amount of electricity used during PTFE production is only about [          ] of the total energy in the common pool, which is used to power all of the various plants and production lines at the Dahej unit.  *Id.* at 6 and Exh. S-5(b).  Thus, the power provided by IWL cannot be primarily dedicated to the subject merchandise, where [            ] of the merchandise produced using the power provided by IWL is not subject merchandise.

Commerce seems to be saying that if GFCL purchased even one cent ($0.01) of wind power from IWL then *all* of IWL's alleged subsidies become GFCL's subsidies, such that GFCL's CVD rate for provision of land at LTAR jumps from 0% to 26.50 %.  The absurdity of such a result should not be countenanced by this Court. Commerce's decision to investigate IWL, a company which provided at most [         ] of GFCL's total power consumption and [

          ] of IWL's turnover is case-determinative, as it resulted in an increase in GFCL's subsidy rate of 26.5%.

Commerce's error led to a result that is simply absurd.  The record shows that, compared to the Gujarat transactions, the Mumbai Benchmark created a "benefit" of over 100% of IWL's total revenue in the awarded year.  *See* GFCL Initial QR at 79-80 (providing rates paid for GFCL's Dahej Unit and three private transactions in Gujarat), P.R. 90, C.R. 51; *see also* GFCL Case Brief at 19, P.R. 234, C.R. 172.  This absurd result only occurred because of Commerce's threshold determination that IWL provides an input to GFCL that is primarily dedicated to the production of granular PTFE resin.

### B. Commerce's Determination to Countervail the Provision of Land by the GIDC is Unlawful

#### 1. Commerce's Determination Is Inconsistent with the Statute

Countervailable subsidies arise "when (1) a foreign government provides a financial

23

contribution (2) to a specific industry and (3) a recipient within the industry receives a benefit as a result of that contribution." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)).

The record shows that Commerce never actually found the provision of land to GFCL by the GIDC to be countervailable.  In the *Preliminary Determination*, Commerce determined that the "GIDC's Provision of Land for LTAR … did *not* confer a measurable benefit during the POI."  *PDM* at 26, P.R.173.  Thus, Commerce did "not reach a preliminary determination as to whether there is a financial contribution or specificity for this program."  *Id*.  Commerce did not address this program in the *Post-PDM*.  In the *Final Determination*, Commerce only addresses the GIDC's provision of land to say that it is "using the Ahmedabad, Gujarat, land benchmark" to calculate a benefit.  *IDM* at 21, P.R. 248.

In its *Final Determination*, Commerce lists the final subsidy rate, without ever determining on this record whether the GIDC's provision of land is a financial contribution by an authority or specific, both required under the law.  *See* 19 U.S.C. § 1677(5)(B)(i) (requiring financial contribution); 19 U.S.C. § 1677(5A) (requiring specificity).  This failure to meet the threshold criteria for a finding of countervailable subsidies is indicative of the rather *laissez-faire* approach taken by Commerce in what is supposed to be a rigorous investigation undertaken consistent with the statute and regulations.

By failing to make such statutory findings (financial contribution and specificity), Commerce's subsidy determination for GIDC land is clearly unlawful.

### 2.   Legal Standard for Sales for LTAR and Commerce's Practice Governing Selection of Benchmarks

A countervailable subsidy provides a benefit where it results in the provision of goods or services for LTAR. 19 U.S.C. § 1677(5)(E)(iv). The statute directs Commerce to determine the

adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the {subject} country .... Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id*.

If there is a purchase of a good from the government, such as land, Commerce will identify from the record an appropriate benchmark to measure the adequacy of remuneration, *i.e.*, the benefit. Commerce's regulations provide a hierarchy of preferred benchmarks, in a three-tiered approach. 19 C.F.R. § 351.511(a)(2)(i). Commerce first seeks to compare the government price to a market-based price for the good or service under investigation, in the country in question (a "Tier 1" benchmark), with a preference for "actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions." 19 C.F.R. § 351.511(a)(2)(i). When choosing a transaction for comparison, Commerce "will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability." *Id.*; *see also* 19 U.S.C. § 1677(5)(E)(iv).

With respect to land transactions, Commerce's practice requires that it "take proximity into consideration when choosing the most reliable land transactions to use as a tier-one benchmark." *Utility Scale Wind Towers From India,* 86 Fed. Reg. 56896 (Dep't Commerce Oct. 13, 2021) (final affirm. CVD determ.), and accompanying IDM (Oct. 6, 2021) ("*Wind Towers from India"*) at 44. Indeed, in the 2017 Investigation, Commerce found that "{c}omparability factors such as geographic proximity and contemporaneity are other important factors that indicate whether a private transaction is comparable." *2017 Final* at Comment 11. Commerce has also explained that the future use of land is relevant to its analysis, stating that "{w}hat matters … is the usage for which these parcels were being offered on the market for future use."

*Wind Towers from India* at 43 (quoting *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 81 Fed. Reg. 47349 (Dep't Commerce Jul. 21, 2016) (final affirm. CVD determ.), and accompanying IDM at Comment 2 ("*HWR Pipes and Tubes from Turkey*")).

    Here, Commerce explained its benchmark hierarchy as follows:

> As provided at 19 CFR 351.511(a)(2), the preferred benchmark in the hierarchy is an observed market price from *actual* transactions within the country under investigation.  This is because such prices generally reflect most closely the prevailing market conditions of the purchaser under investigation.

*Post-PDM* at 2-3 (Italics added), P.R. 212.

    Contrary to its stated preference, Commerce unlawfully rejected as benchmarks such private party transactions that were provided on the record by GFCL.

### 3.    Commerce Unreasonably Rejected the Private Transactions Provided by GFCL For Use As Benchmarks

    In selecting a benchmark, Commerce looks for *actual transactions* which reflect *prevailing market conditions*.  *See* 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(i).  On this record, the land transactions submitted by GFCL for the Mahidad and Ranjitnagar projects ("Mahidad and Ranjitnagar Benchmarks"), align most closely with this preference.  GFCL provided details for two *private* land transactions for Commerce to select as a benchmark:



*See* GFCL Initial QR at Exh. 16(l), P.R. 107, C.R. 75-77.

26

These land purchases are outside of the GIDC and are between private parties. *Id.* The exhibits provided contained "details of freehold land in Gujarat purchased from independent sellers not in the GIDC by GFL for its Ranjitnagar and Mahidad facilities." GFCL also demonstrated that the private land purchases [

]. GFCL Initial QR at Exh. 16(g) (identifying " [

]"), P.R. 107, C.R. 75-77. The private transactions were for [                                                                              ]. *See* GFCL Initial QR at Exh. 16(l), P.R. 107, C.R. 75-77. Both transactions were for land in Gujarat and represent *actual* completed transactions, as required under 19 C.F.R..§ 351.511(a)(2). *See id.* at 79, P.R. 107, C.R. 75-77; *see also id.* at Exh. 16(a)-(g), P.R. 107, C.R. 75-77.

In the *2017 Final*, Commerce found these *exact same* transactions to be useable benchmarks:

> While the tier-one benchmark land price represents land that was purchased as agricultural land, Commerce has used tier-one land benchmarks that were not for identical uses in prior cases. In *Rectangular Steel Pipes and Tubes from Turkey,* Commerce used agricultural land offered to the respondent as a tier-one benchmark. In this case, *record evidence demonstrates that GFL intended to develop this land for industrial use rather than continue to use it for agricultural purposes.* Further, this tier-one benchmark satisfies Commerce's preference to use a private market transaction and is the only contemporaneous data on the record.

*2017 Final* at 27-28 (citations omitted).

The reasoning in the 2017 Investigation could not be more clear and indicated that Commerce had conducted a fulsome analysis of record evidence. However, in this investigation "Commerce rejected using GFCL's two land purchases in Gujarat because these transactions, which involved purchases of agricultural land from farmers, were not comparable to the industry-ready land that the GIDC and SIDC provide." *IDM* at 15, P.R. 248. Commerce

27

continued, stating that "{w}hile the deeds noted that the land parcels had either been transitioned to 'non-agricultural' land or the GFCL planned to use these parcels for industrial use, there was no indication that these land parcels had the *infrastructure or amenities in place comparable to what manufacturers would expect on GIDC or SIDC land*." *Id.* This statement is very misleading, as explained below.

The record evidence in this investigation again supports relying on the GFCL land purchases as benchmarks. First, GFCL's purchases represent "actual transactions in the country in question." *See* 19 C.F.R. § 351.511(a)(2)(i) (providing that Commerce will normally rely on "actual transactions").

Second, GFCL's land purchases meet the comparability criteria set forth by the regulation. GFCL's land deeds go further than to "note" that the land parcels are for non-agricultural or industrial use, but state affirmatively that GFCL has an obligation to use the land for industrial purposes. *See* GFCL 2nd Supp. QR at Exh. S2-4(b), P.R. 154, C.R. 127; [


], *see id.* at Exh. S2-5(c), P.R. 154, C.R. 127. Put simply, the seller sold the land for industrial use and there is proof as such. The sale document spelled out the intended use in detail.

There is *no* reason that the agricultural land purchased by GFCL for industrial purposes is no longer comparable to GIDC or SIDC land. *See* GFCL Benchmark Submission at Exh. 2 (explaining the conversion from agricultural land to industrial (or other) land), P.R. 199. Questionnaire responses from the Government of India support this proposition, explaining that "GIDC merely establishes industry ready land with basic and general infrastructure." *See* Letter from TPM, Solicitors & Consultants to Secretary of Commerce, Re: Supplementary

28

Questionnaire Response to Section II on behalf of Government of India (Jun. 24, 2021) at 14, P.R. 168, C.R. 141.  There is no indication that this is different in any significant way from the agricultural land purchased with the intent of industrial use.[4]

Last, Commerce has stated that it looks to the future use of the land.  *See Wind Towers from India* at 43.  Whether the land was marketed as industrial *before* GFCL's purchase *for industrial purposes* should have no bearing on Commerce's decision here.  *See IDM* at 15, P.R. 248.  Consistent with Commerce's determination in *HWR Pipes and Tubes from Turkey*, the record demonstrates with absolute certainty that the land purchased by GFCL as private land transactions could be converted from agricultural land to industrial land (and, indeed, this is precisely what GFCL did).  *See HWR Pipes and Tubes from Turkey* at Comment 2 ("{T}he mere fact that past or current usage of the Istanbul and Yalova parcels was "agricultural" does not undermine comparability for benchmarking purposes.  What matters … is the usage for which these parcels were being offered on the market for *future use*.").

Put simply, Commerce's rationale for why it rejected the benchmarks provided by GFCL is easily refuted by record evidence.  Commerce's determination that "{th}ere was *no evidence* that either of these land parcels had been marketed for industrial use before GFCL's purchases" is in error.  *See IDM* at 16, P.R. 248.  Commerce drew an incorrect conclusion, inconsistent with its position from the 2017 Investigation because it failed to fully review the evidence on the

---

[4] While there is no perfect evidence on the record regarding the exact infrastructure on the agricultural lands at issue, there is also no evidence at all that the land previously occupied by antiquated cotton mills in Mumbai and Ahmedabad – long unused - had any infrastructure at all. *See* Section V.C. below.

29

record.[5]  Unlike the proposed benchmarks submitted by the petitioner, the GFCL land purchases are the only *actual* transactions on the record.

The benchmarks provided by GFCL are clearly comparable to the provision of land by the GIDC and SIDC and, thus, appropriate to calculate the benefit under these two programs. Commerce's rejection of these benchmarks in favor of the Ahmedabad and the Mumbai Benchmarks is contrary to law.

### 4. Commerce Failed to Address Any of GFCL's Arguments Challenging the Ahmedabad Benchmark.

As described below, the Ahmedabad Benchmark suffers many issues.  GFCL argued at length why the Ahmedabad Benchmark is not comparable to either the SIDC provision of land or the GIDC provision of land, pointing to relevant evidence on the record.  Commerce summarily dismissed GFCL's arguments, stating only "{f}or the reasons discussed in Comment 2 above, we are not using GFCL's transaction in Ranjitnagar and Mahidad."  *IDM* at 22, P.R. 248.  Comment 2 of Commerce's *IDM* merely mentions Ahmedabad twice:

- "Those benchmarks are as follows … a private auction of industrial land in Ahmedabad, Gujarat," *id.* at 15, and

- "After eliminating the Indore transaction and GFCL's two agricultural purchases, the remaining best available land benchmarks on the record were the auctioned land in Mumbai, Maharashtra, and in Ahmedabad, Gujarat." *Id.* at 16.

Commerce does not address any of the *ten points* listed in the *IDM* from GFCL's Rebuttal Brief regarding the useability of the Ahmedabad Benchmark.  *See IDM* at 20-21, P.R.

---

[5] The purchase documentation provided by GFCL states: "The said land sold to you has been purchased by you for the Power Project – *bonafide industrial purpose*."  GFCL 2nd Supp. QR at Exh. S2-5(c), P.R. 154, C.R. 127.

248; GFCL Rebuttal Brief at 3-11, P.R. 236, C.R. 173.  This Court "looks for a reasoned analysis

or explanation from Commerce to ensure that the agency has not abused its discretion in

departing from prior analysis." *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United

States*, 498 F.Supp.3d 1345, 1350 (Ct. Int'l Trade 2021) (citations omitted).  This Court also has

the discretion to remand a decision which does not address in a meaningful manner the

arguments raised by the parties during the underlying administrative proceeding.  *See Altx Inc. v.

United States*, 167 F.Supp.2d 1353 (Ct. Int'l Trade 2001) ("When considered individually every

discrepancy discussed here might not rise to the level of requiring reconsideration of the overall

disposition, but taken as a whole, the court finds that the ITC decision is not substantially

supported and explained.").

Indeed, a "supported and explained" agency decision is required by the Statement of

Administrative Action, which explains that "the agencies must specifically reference in their

determinations factors and arguments that are material and relevant, or must provide a discussion

or explanation in the determination that renders evident the agency's treatment of a factor or

argument."  *Statement of Administrative Action*, accompanying H. Rep. No. 103–826(I), at 892,

reprinted in 1994 U.S.C.C.A.N. 4040, 4215.

### C.  Commerce's Benchmark Selections to Calculate the Benefit for the Provision of Land to IWL and GFCL, Respectively, Are Contrary to Law and Unsupported by the Record Evidence

Although Commerce did not make a finding (or, at best, made an implicit finding) that

the provision of land by the GIDC was countervailable, Commerce selected a benchmark to

value the benefit the provision of land provided to GFCL inconsistent with record evidence and

its own precedent.  Instead of relying on GFCL's private land transactions (i.e. the Mahidad and

Ranjitnagar Benchmarks), Commerce relied on the Ahmedabad Benchmark.  *See IDM* at 16,

P.R. 248.  Commerce stated only that the Ahmedabad Benchmark "has a rate for industry-ready

31

land obtained within India (*i.e.*, in the state of Gujarat) and is, therefore comparable, geographically proximate, and privately purchased." *PDM* at 11. P.R. 173. As explained further below, these statements by Commerce are inconsistent with record evidence.

The benchmarks selected by Commerce are for parcels of land located in the center of major cities. Yet, Commerce compares this urban land to IWL's wind turbine generation plant in rural Madhya Pradesh, hundreds of miles away from Mumbai and in a different state. *See* Petitioner's August Benchmark Submission at Exh. 4 (providing map of India), P.R. 198. By choosing such benchmarks, far higher than what Commerce has relied on in other India CVD cases, Commerce calculated a final subsidy rate of 26.50%. Commerce's benchmark choice here is equivalent to saying that the Government of India is suddenly providing land in its industrial zones at hugely lower rates than private, market-rate land transactions, contrary to Commerce's long-time practice finding otherwise. This absurd result was possible because the decision to investigate IWL was compounded by Commerce's irrational choice of benchmarks.

For IWL, Commerce used an average of two benchmarks, neither of which is an actual transaction: one from a winning auction bid for a parcel of land in *downtown Mumbai* and one for a winning auction bid for a parcel of land in *the walled city inside the center of Ahmedabad*. *See IDM* at 13-22, P.R. 248; *see also* GFCL Case Brief at 14, P.R. 234, C.R. 172; Gujarat Fluorochemicals Limited's Rebuttal Brief (Dec. 1, 2021) ("GFCL Rebuttal Brief") at 7, P.R. 236, C.R. 173.

The use of the Mumbai Benchmark in particular represents a radical departure from Commerce's practice and is unsupported by record evidence. Commerce's practice is to consider "the type of land and its state of development," the land parcel's location, *i.e.*, whether

the land is "located *near* a major city,"[6] and if there is "price information or factual information

to rebut the land benchmark price information," if the record allows.  *See Forged Steel Fittings*

*from the People's Republic of China,* 83 Fed. Reg. 50342 (Dep't Commerce Oct. 5, 2018) (final

affirm. CVD determ.), and accompanying IDM ("*Forged Steel Fittings*") at 10 (Comment 1).

Commerce did not identify a single supportable reason to rely on the Mumbai Benchmark over

any other benchmark as a comparison to IWL's land provided by the SIDC.  Commerce only

stated that the parcel of land in Mumbai was "advertised as former textile mill land and, thus,

would have a comparable level of industrial infrastructure, for benchmarking purposes pursuant

to 19 C.F.R. § 351.511."  *IDM* at 16, P.R. 248.  This statement is simply inaccurate.

## 1.    The Mumbai and Ahmedabad Benchmarks Provided by Petitioner Do Not Meet the Regulatory Requirements and Are Thus Unusable.

The regulations provide that Commerce's first choice benchmark is a "market-determined

price for the good or service resulting from *actual* transactions in the country in question."  19

C.F.R. § 351.511(a)(2)(i) (emphasis added).  This "price could include prices stemming from

actual transactions between private parties, actual imports, or, in certain circumstances, *actual*

*sales from competitively run government auctions*."  *Id*.  Commerce's determination to use

parcels of land in Mumbai and Ahmedabad to measure the adequacy of remuneration of land

under the SIDC and GIDC programs, respectively, does not adequately explain how these land

parcels meet *any* of the regulatory criteria.  The scant evidence on the record cannot support a

determination that either parcel is comparable to IWL's lease of land from the SIDC or to

---

[6] As can be seen here, the analysis Commerce often undertakes to test the viability of
benchmarks is whether the land benchmark is "near" a major city.  Here, Commerce in a decision
which can charitably be called "novel," managed to find benchmarks for land in the *middle* of
two major cities.

GFCL's purchase of land from the GIDC.  We first discuss the fatal flaws affecting both proposed benchmarks; we then demonstrate that neither the Ahmedabad nor the Mumbai Benchmarks is comparable with the land provided by the SIDC.

### a.   Neither the Mumbai Nor the Ahmedabad Benchmarks Are Based on Actual Transactions

For a benchmark to be "useable," Commerce prefers to rely on actual market transactions, which requires a two-part analysis: (1) a review of whether the proposed benchmark is a transaction; and (2) whether that transaction is between private parties.  *See, e.g. Wind Towers from India* at 41 ("{T}he preferred means of determining whether the government provided goods or services for adequate remuneration is a comparison with private transactions for a comparable good or service in the country.").

Commerce states with no equivocation that it used the average of the Mumbai and Ahmedabad "transactions" to calculate a CVD rate for IWL.[7]  But the two bids at issue are not actual "transactions."  "Transaction" is commonly defined as "an exchange or transfer of goods, services, or funds … a communicative action or activity involving two parties or things that reciprocally affect or influence each other."  *See Transaction*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/transaction?src=search-dict-box (last visited, Jul. 21, 2022)*.*  Indeed, as noted above, the *CVD Preamble* describing Commerce's regulations emphasizes that it prefers "market-determined prices stemming from *actual* transactions," explaining that "{s}uch market-determined prices include *actual sales* involving private sellers and actual imports."  63 Fed. Reg. at 65377.  In this proceeding, Commerce clearly avoided the

_____

[7] *IDM* at 16, P.R. 248; *see also id.* at 6 where Commerce refers to the Ahmedabad bid as a "transaction."

use of words such as "*actual* sales transaction" since there is no proof on the record of *actual*

sales transactions in Ahmedabad or Mumbai, except those provided by GFCL.  Evidently, it

settled on the word "transaction" as a not so clever way to describe mere "bids" – something that

is not encompassed by the CVD regulations.

The evidence on the record cannot support a conclusion that either the Mumbai or the

Ahmedabad Benchmarks are actual transactions.

(i)      Mumbai Benchmark

Looking first to the Mumbai Benchmark, its source is a one-page article that provides no

indication of a completed transaction.  As a result of "an electronic auction conducted by the

*National* Textiles Corporation," a "{f}inancial and realty major{,} Indiabulls Infratech" was the

auction winner "for sale of land vacated by {the National Textiles Corporation's} closed Poddar

Mills."  *See* Petitioner's August Benchmark Submission at Exh. 3, P.R. 198.  There is no other

information on the record confirming whether the "bid" resulted in an actual purchase

transaction or not.  *Id.*

With respect to the second part of this initial analysis, Commerce concluded that the

Mumbai Benchmark is "a *private* auction of *industrial* land in Mumbai, Maharashtra."  *IDM* at

15, P.R. 248.  However, there is no indication that the auction in Mumbai was conducted

between *private parties*.  We assume that the seller – the *National* Textiles Corporation – is

likely a government entity, considering its name includes "National."  Of course, we do not

know if the *National* Textiles Corporation is government-owned or private, but for Commerce to

definitively conclude *without* evidence that the auction was between private parties is part of a

disturbing pattern by Commerce in the final determination to make conclusory statements with

zero support from record evidence.

(ii)     Ahmedabad Benchmark

35

The Ahmedabad Benchmark should similarly fail Commerce's initial analysis as a useable benchmark.  While Commerce asserts that the Ahmedabad Benchmark is "a private auction of industrial land in Ahmedabad, Gujarat," *IDM* at 15, P.R. 248, there is simply no evidence to support this statement.  Rather, there is some record evidence that this auction *did not* result in an actual transaction. Indeed, the short article on the record states that the Gujarat High Court "decided to retain the Earnest Money Deposit (EMD) of Bahubali, in case the top bidder backs out."  *See* Petitioner's June Benchmark Submission at Exh. 6, P.R. 127.  Although the Justice "before whom the auction took place, has finalized the purchase bid," the highest bidder, was asked "to pay the amount within three months."  *Id.*[8]  There is no evidence in this article that the bid was finalized or that it was an actual transaction reflecting market principles.

   **b.    There is No Evidence Demonstrating that the Ahmedabad and Mumbai Auctions Were Competitively Run or Involved Private Parties**

Similarly, there is no proof that the auction was a "private auction of industrial land in Ahmedabad, Gujarat."  Indeed, in the case of the Ahmedabad Benchmark, the article refers to "the land of Ahmedabad Commercial Mill" but it is unclear whether the seller was a private company.  The fact that the Gujarat High Court – not a private company – was conducting the auction suggests that the prior owners no longer owned the land.  *See id.*  Of course, GFCL cannot prove, given the paucity of record evidence, who was the actual owner of the land, but one fact is clear: it is the government (the Court) that is conducting the auction.

The fact that that the auctions were most likely government-run is not in itself a fatal

---

[8] That it was not considered an actual sale is evident from the article itself, stating that "{a}s the sale is finalized, the workmen are likely to get their remuneration after 27 years."  *Id.* (emphasis added) (quotations omitted).

defect.  Commerce's regulations provide that it may rely on "… *actual sales from competitively run government auctions* …" 19 C.F.R. § 351.511(a)(2)(i) (emphasis added).  However, there is no evidence on the record indicating that either auction – Mumbai or Ahmedabad – was competitively run.  We simply know that a Court, in the case of Ahmedabad, and a company (possibly state-owned) in the case of Mumbai, conducted these auctions.  This in itself renders the two benchmarks unusable.  *See IDM* at 16 (requiring "the use of prices stemming from actual transactions in the country" but also that these transactions be "actual sales between private parties, actual imports, or actual sales from competitively run government auctions.").

As explained above, there is no evidence to support Commerce's determination that bids at these auctions resulted in *actual* sales and involved private parties.  *See CVD Preamble*, 63 Fed. Reg. at 65377 (allowing for use of actual private or government-run competitive auctions provided "the government *sells* a significant portion of the goods or services through competitive bid procedures that are open to everyone, protect confidentiality, and that are based solely on price.").

Whether there is record evidence that the "transactions" (mere bids) were between private parties is case dispositive.  Commerce has determined and explained that it does "not consider {certain} information to be a suitable benchmark because the land rates are not observed market prices from actual transactions between private parties." *Fine Denier from India*, 86 Fed. Reg. 26903 (Dep't of Commerce May 18, 2021) (prelim. CVD results), and accompanying IDM (May 12, 2022) at 15. Importantly, Commerce rejected the proposed benchmark because it could not confirm that one of the parties at issue was "a private company, or whether the transactions are commercial sales between private parties." *Id.* Here, we only know the names of some of the participants involved – "Siddhi Corporation," the National Textiles Mill, and the Gujarat High

Court – with nothing further to demonstrate whether *private* parties were participating in or running the auctions which resulted in Commerce's benchmarks. Commerce has conducted no further analysis to determine that the parties at the auction were private parties.

In comparison, Commerce has rejected GFCL's benchmarks that involved actual sales – benchmarks that were useable just four years ago for the same GIDC provision of land – because "there was no indication that these land parcels had the infrastructure or amenities in place comparable to what manufacturers would expect on GIDC or SIDC land." *IDM* at 15, P.R. 248. Commerce seems to employ a separate standard: one for Plaintiff's data and one for petitioner's data. When it comes to the benchmark submissions provided by petitioner, consisting of two short news articles about *bids*, Commerce without citing record evidence simply "assumed" the information is reliable and the proposed benchmarks meet the regulatory requirements.

We discuss below further deficiencies with the Ahmedabad and Mumbai Benchmarks as comparative benchmarks to analyze the SIDC and GIDC provisions of land, respectively.

> **2.    Commerce's Determinations that the Mumbai Land and the Ahmedabad Land Are Comparable Parcels to the SIDC and GIDC land Parcels Are Not Based on Record Evidence**
>
> **a.    Mumbai**

Commerce stated that there is not "any information on the record that would cause {it} to reconsider the comparability of industrial land in Mumbai to industrial land in Gujarat or Madhya Pradesh." *IDM* at 18, P.R. 248. Commerce's determination is flawed for many reasons. First, it is incorrect to say that the Mumbai parcel of land was marketed as a former textile mill land. *Id.* at 16. There is *no* evidence how the parcel of land was marketed. The article only says that the auction was for "*prime*" "land vacated by its closed Poddar Mills," located in the "*heart of the metropolis*." Petitioner's August Benchmark Submission at Exh. 3. There is no evidence that the *National* Textile Mills advertised the vacated, former textile mill land as land that would

"have a comparable level of industrial infrastructure." *IDM* at 16, P.R. 248.  There is no evidence that such prime land located in the heart of Mumbai had infrastructure for a modern industrial facility such as IWL's.

What the auction participants did care about, was, as one says in the real estate business – "location, location, location."  The highest bidder was "*Financial and realty* major IndiaBulls."  The second highest bidder was "Runwal Developers, another Mumbai-based realty firm."  Petitioner's August Benchmark Submission at Exh. 3, P.R. 198.

While GFCL tried to draw Commerce's attention that the top bidders are developers and that the land parcel in Mumbai was in the center of Mumbai and thus not comparable, *see* GFCL Case Brief at 11-22, P.R. 234, C.R. 172, Commerce summarily rejected GFCL's arguments, stating that there is "no record information indicat{ing} that" the Mumbai plot "will be used for commercial or residential purposes."  Of course, if Commerce were intellectually honest, it would also state with even more certainty that there is no record evidence at all that the Mumbai plot would be used for *industrial* purposes.

The land in Mumbai is also not comparable with the land used by IWL because Mumbai is a major city which cannot be compared to an industrial development plot meant for a "mega project" in Madhya Pradesh, to construct wind turbine generators.[9]  Nor is Mumbai proximately close to IWL's facility in Madhya Pradesh.  In previous determinations, Commerce has acknowledged that "prices in Mumbai are higher than in any other Indian state and that the city in Gujarat where" the respondent was located was not a major city.  *Wind Towers from India* at

_____

[9] The amount of SIDC land at issue is [          ] square meters, compared to the mere 2.39 acres, or, approximately 9,671 square meters, demonstrates another stark contrast between the potential land benchmarks.  *See* IWL Initial QR (Part II) at 19, P.R. 125, C.R. 101; Petitioner's August Benchmark Submission at Exh. 3, P.R. 198.

42.  Commerce also acknowledged that "given the high land prices and saturation in Mumbai, several developers" have moved.  *Id.*  (quotations omitted).  There is no reason for Commerce to ignore these statements now, particularly when *Wind Towers from India* was also investigating a land parcel in Gujarat and there is record evidence supporting the disparity between Mumbai and Madhya Pradesh (where the IWL and the SIDC are located).

The land *leased* by IWL is in an industrial area, not a major city, specifically allotted for industrial activity.  *See* Inox Wind Limited's Section III Questionnaire Response (Part II) (May 26, 2021) ("IWL Initial QR (Part II)") at 19, P.R. 125, C.R. 101.  Further, IWL is *leasing* the land, whereas the Mumbai transaction is for the outright *purchase* of land; *see* Petitioner's August Benchmark Submission at Exh. 3, P.R. 198.  IWL does not necessarily have ownership of the land at the end of its lease.  *See* IWL Initial QR (Part II) at 19, P.R. 125, C.R. 101.  The outright purchase of land, where there is an ownership stake in the end, is *extremely* different than paying into a 30-year lease which, at the end, leaves the lessee with nothing.  *See Common Alloy Aluminum Sheet from Bahrain*, 86 Fed. Reg. 13333 (Dep't Commerce Mar. 8, 2021) (final affirm. CVD determ.), and accompanying IDM at 12-13 (considering the purposes of the *rental* properties and whether one was land only or whether the land contained buildings).

Despite this evidence, Commerce made the rather implausible statement that there is record evidence demonstrating that the land in Mumbai is "industry-ready," and, thus, comparable.  The news article submitted by the petitioner *only* states that the land for auction was "2.39 acres of *prime land* belonging to {National Textiles Corporation} at Worli in Mumbai."  Petitioner's August Benchmark Submission at Exh. at 3, P.R. 198.  This is land "located in prime areas of the metropolis."  *Id.*  This "prime land" was "*vacated* by its *closed* Poddar Mills."  *Id.*  No party has any idea of the current condition of this very small parcel of

40

land; only that the land had long been abandoned.

The critical point here is that Commerce said there was no proof that the prime land in downtown Mumbai was going to be used for commercial or retail purposes, despite evidence to the contrary.  At the same time, Commerce took a much less critical approach by finding that a short newspaper article about land where an old textile mill was once located in the heart of Mumbai was "proof" that the land was just waiting for major industries to build their large facilities on *2.39 acres* of prime land.

Ironically, Commerce based the Mumbai benchmark on a simple one-page article but said it would not rely on a Wikipedia article on the record because it "does not go into any depth regarding the state's economic status in a way that would allow Commerce to make an assessment of the land market in Madhya Pradesh relative to that of other states in India," and that "evidence that support differences in land pricing, such as industrial property reports, availability of data on prices, investment flows, availability, and industry density" is not on the record.  *See IDM* at 16-18, P.R. 248.  However, this article, provided by the Petitioner in the same submission as the article containing the proposed Mumbai benchmark, *does* demonstrate that Madhya Pradesh has the "country's 26th highest per-capita income" Petitioner's August Benchmark Submission at Exh. 3, P.R. 198.  Commerce failed to consider this information that "fairly detracts from the substantiality of the evidence." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011).   As this Court can see, Commerce has very different standards of review for data it favors over other potential benchmarks.  Commerce never explains why certain record evidence is more reliable than other, *i.e.*, why Commerce blindly relied on petitioner's news article to select a benchmark, but could not rely on an article describing Madhya Pradesh.

As explained above, although Commerce will consider the current use of the land, it will also consider the future use. *Wind Towers from India* at 43-44. Here, there is no indication that the Mumbai land will be used for industrial purposes. None. To the contrary, all signs point to commercial or retail use. In contrast, the Mahidad and Ranjitnagar Benchmarks put on the record by GFCL are based on land that is being marketed, sold and used for industrial purposes.

### b.    Ahmedabad

The land on which the Ahmedabad Benchmark is based is not comparable to the SIDC land or the GIDC land. The evidence on the record demonstrates that the Ahmedabad Benchmark was for land behind a market in a Walled City in the middle of a major urban area -- Ahmedabad. Petitioner's June Benchmark Submission at Exh. 6 ("{T}he land behind Madhupura market in the northern part of the Walled City could not be sold for various reasons including dispute over land the closed mill had to forfeit under the Urban Land Ceiling Act."), P.R. 127. The Ahmedabad land is a "22,385 square meter plot" with a "mill {that} had closed and gone into liquidation in *1989.*" *Id.* In contrast, the "land procured from {the} GIDC {had} a total area of [          ] Square meter{s}."[10] GFCL Initial QR at 79, P.R. 90, C.R. 51. Put simply, the land up for bid in Ahmedabad is vastly smaller than that required for GFCL's chemical plant.

Commerce contends that the agricultural land purchased by GFCL for its Mahidad and Ranjitnagar projects is not comparable to "industry-ready" land and, instead, relies on the

---

[10] We note that there are two land areas: Dahej B land, whose area is [          ] square meters in size, which was under construction in the POI. Dahej A has a land area of [          ] square meters. GFCL Initial QR at 79, P.R. 90, C.R. 51; IDM at 15, P.R. 248; Memorandum from J. Simonidis from The File: Final Determination Calculations for Gujarat Fluorochemicals Limited (Jan. 18, 2022) ("Final Calculation Memo") at 2, P.R. 243, C.R. 174, and Attachment 1, P.R. 244, C.R. 175.

Ahmedabad land.  However, it is unclear how land that used to house a textile mill, vacant for 27 years, between a market and a wall in the middle of a major urban area, is "industry-ready.  *See* Petitioner's June Benchmark Submission at Exh. 6 ("{T}he workmen are likely to get their remuneration **after 27 years**") (emphasis added), P.R. 127.  There is no indication that the small plot of land that has been lying fodder for 27 years is industry ready.   Indeed, as explained further below, supporting information on the record demonstrates that 20% of "redevelop{ed} land of closed textile mills" must "be contributed for provision of public amenities / public purpose."  *Id.* at Exh. 6 ("*Inventory of Public Lands in Ahmedabad, Gujarat, India*" Report (May 2013)), P.R. 127.

This "Walled City" is "the original settlement around which the city has grown," where the "original village settlements … have been engulfed by *urban expansion*."  *Id.*  Maps included in the Petitioner's June Benchmark Submission demonstrate that Ahmedabad is a large city, with the Walled City accounting for only a small section of the *downtown* area with land clearly not suitable for industrial use.  *See id*. (Figure 7).  The "Walled City," where the Ahmedabad parcel is located, is in red below:



**Figure 2: Study Area**

*Id.* (Figure 2).

As shown below, any industrial land (in purple) in Ahmedabad is far removed from the middle of the city and appears to be larger than the Walled City:

44



**Figure 7: Public Lands - Land Use Types**

*Id.* (Figure 7).

The above map clearly shows that the Walled City, where the Ahmedabad bid land parcel is located, is *not* zoned for industrial use. *Id.*

Unsurprisingly, the land located in the proximity to the Walled City is some of the more valuable land in Ahmedabad. *See* Petitioner's June Benchmark Submission at Exh. 6, p.27, P.R. 127. Some of the most expensive parcels of land are along the Sabarmati River in an area called "Riverfront" that crosses next to the Walled City, with land valuations ranging from Rs. 54,500 per square meter to Rs. 100,000 per square meter. *Id.* Other expensive parcels of land are located next to City Center, valued at Rs. 26,000 per square meter to Rs. 80,000 per square meter. In contrast, in the Eastern and Southern parts of Ahmedabad, where more of the

45

industrial land is located as shows on the map above in purple, the market prices for the parcels of land vary between Rs. 3,000 per square meter to Rs. 15,000 per square meter. *Id*. at 28, P.R. 127. There is no question that Commerce has used as a benchmark a bid price for some of the more valuable land in Ahmedabad.

Finally, by law, land from former textile mills must be used at least partially for public use. Information submitted by petitioner confirms this important point. "The former Textile Mills," such as the mill on the Ahmedabad parcel, "will be redeveloped and 61 {hectare} (20% of these parcels) will be in the possession of the Municipal Corporation for public uses."[11] *Id.* at Exh. 6, P.R. 127.

As with the Mumbai Benchmark, Commerce's statement that this land was "industry ready" strains credulity. GFCL is essentially a chemical plant of which one end product is granular PTFE resin. It is illogical to find that the land within the Walled City, in the center of Ahmedabad, would be zoned for such an industry. The map above shows it is not. The laws also say clearly that at least 20% of the land must be used for public use. *See id.* The textile mill in the Walled City was closed in *1989*. There is no evidence that the Walled City is industry ready and, in fact, all evidence points to the contrary. GFCL emphasized this record evidence before Commerce and, yet, Commerce provided no response and relied on the Ahmedabad Benchmark without explanation. Commerce must "articulate a rational connection between the facts found and the choice made." *Bowman*, 419 U.S. at 285. It has not done so in this case and therefore the choice of this benchmark should be remanded.

> **3.    Commerce Considers "Proximity" of Potential Benchmarks When Determining Usability as a Tier One Benchmark and the Evidence on**

---

[11] This also shows that there is significant government involvement in any sale of former textile mills in Ahmedabad.

**the Record Demonstrates that Mumbai is Not Proximate to IWL's Facilities.**

As can be seen on the map below (*see* Petitioner's August Benchmark Submission at Exh. 4, P.R. 198), Mumbai is approximately 400 miles from the border of Madhya Pradesh.

Barcode:4151558-01 C-533-900 INV - Investigation -



Petitioner's August Benchmark Submission at Exh. 4, P.R. 198.

Proximity matters as it impacts the comparability of transactions.  Madhya Pradesh is the

second largest state in India by *area*, where "more than 30% of its area is under forest cover,"

but its economy ranks behind the highest priced areas, as only the 10th largest, and the "country's

26th highest per-capita income."  Petitioner's August Benchmark Submission at Exh. 2, P.R. 198.

Explained differently, consider comparing the rental market in San Diego, California or Los

Angeles, California to the rental market in southern Oregon, also adjacent to California.

Commerce's practice requires that it "take proximity into consideration when choosing the most

reliable land transactions to use as a tier-one benchmark." *Wind Towers from India* at 44.  Once

again, Commerce has ignored its own precedent.

### 4. The Mumbai Benchmark Is Inconsistent with Commerce's Prior CVD Determinations Involving India

A simple review of its own precedent would have alerted Commerce to the aberrational

nature of the selected benchmarks.

Out of the 34 cases reviewed by Plaintiff's counsel involving land subsidies in Indian

CVD cases, the highest non-adverse facts available ("AFA") rate determined for a provision of

land is *0.55%*.[12]  Here, Commerce calculated a rate almost ***50 times*** higher than any other LTAR

land rate ever found by Commerce based on a non-AFA rate.[13]  CVD actions are intended to be

remedial rather than punitive in nature, *Chaparral Steel Co. v. United States*, 901 F.2d 1097,

1103 (Fed. Cir. 1990), and it is Commerce's duty to determine rates as accurately as possible.

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

---

[12] *See* Plaintiff's Motion for Preliminary Injunction, ECF 9, at Exhibit 24 (Summary of India Cases Investigating Land Subsidies).

[13] The highest rate assigned with respect to the Indian Government's provision of land where AFA are applied is 18.08%.  *See, e.g. Certain Polyethylene Terephthalate Resin from India*, 81 Fed. Reg. 13334 (Dep't Commerce Mar. 14, 2016).

Commerce's reliance on the Ahmedabad and Mumbai Benchmarks is contrary to that statutory purpose and the absurd subsidy rate calculated by Commerce cannot be allowed to stand.

## VI.    CONCLUSION

Commerce's final determination must be remanded for Commerce to reconsider its many legal errors and for Commerce to revisit the factual record.  In summary, Commerce overlooked and summarily rejected relevant evidence, and has also made a number of legal errors, including *never* determining whether the GIDC's provision of land is countervailable under the statute. These errors are further exacerbated by Commerce's bizarre selection of the Ahmedabad and Mumbai Benchmarks, which are not usable benchmarks under Commerce's regulations.

GFCL should not have to pay such a steep price because of Commerce's multitude of legal errors and mischaracterizations of the record.

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley
Diana Dimitriuc Quaia
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

July 21, 2022                                  *Counsel for Gujarat Fluorochemicals Limited*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that

Plaintiff's 56.2 Motion for Judgment on the Agency Record filed on July 21, 2022, complies

with the word limitation requirement. The word count for Plaintiff's 56.2 Brief, as computed by

ArentFox Schiff LLP's word processing system is 13,931.


 <u>/s/ **John M. Gurley**</u>
John M. Gurley