**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED,   ) <br>   ) <br>       *Plaintiff,*   ) <br>   v.   ) <br>   ) <br> THE UNITED STATES,   ) <br>   ) <br>       *Defendant,*   ) <br>   and   ) <br>   ) <br> DAIKIN AMERICA INC.,   ) <br>   ) <br>       *Defendant-Intervenor.*   ) <br>   ) | Court No. 22-00120 |

**PLAINTIFF GUJARAT FLUOROCHEMICALS LIMITED'S**
**REPLY BRIEF**


John M. Gurley
Diana Dimitriuc Quaia
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

October 28, 2022             *Counsel for Gujarat Fluorochemicals Limited*

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ARGUMENT ............................................................... 2

II.    ARGUMENT ................................................................................................... 4

    A.    Commerce's Benchmark Determinations Are Not Supported By Substantial Evidence; Nor Are They In Accordance With Law ........................... 4

        1.    The Mumbai Benchmark Fails Commerce's Criteria For Tier-One Benchmarks .................................................................................... 5

        2.    GFCL's Proposed Land Benchmarks Are The Best Evidence On The Record And Were Specifically Intended For Industrial Use ............. 9

        3.    The Ahmedabad Benchmark Fails Commerce's Criteria For A Tier-One Benchmark .................................................................... 11

    B.    Commerce's Attribution of IWL's Subsidies To GFCL As A Cross-Owned Entity Is Not Supported By Substantial Evidence or In Accordance With Law ......................................................................... 18

        1.    Commerce Has Not Provided An Adequate Explanation For Its Determination .................................................................................. 19

        2.    IWL Does Not Provide An Input Primarily Dedicated To The Downstream Products .................................................................... 20

    C.    Defendant's Request For Voluntary Remand Does Not Preclude This Court From Also Ruling On The Merits ............................................................ 22

III.    CONCLUSION .............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ABB, Inc. v. United States*,
  920 F.3d 811 (Fed. Cir. 2019) ................................................................................18

*Altx, Inc. v. United States*,
  167 F.Supp.2d 1353 (Ct. Int'l Trade 2001) ...........................................................15

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) .................................................................................................7

*DAK Americas LLC v. United States*,
  456 F.Supp.3d 1340 (Ct. Int'l Trade 2020) ...........................................................19

*Diamond Sawblades Mfs.' Coal. v. United States*,
  540 F.Supp.3d 1338 (Ct. Int'l Trade 2021) .............................................................8

*New Am. Keg v. United States*,
  No. 20-00008, 2021 WL 1206153 (Ct. Int'l Trade Mar. 23, 2021) ........................15

*Nippon Steel v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003) ................................................................................5

*Nucor Corp. v. United States*,
  No. 21-00182, 2022 WL 6992978 (Ct. Int'l Trade Oct. 5, 2022) .....................20, 21

*Risen Energy Co. v. United States*,
  570 F.Supp.3d 1369 (Ct. Int'l Trade 2022) .........................................................9, 23

*SKF USA Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001) ..............................................................................20

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ...............................................................................................19

**Federal Statutes**

19 U.S.C. § 1677(5)(B) .................................................................................................4

**Regulations**

19 C.F.R. § 351.511(a)(2)(i) .............................................................................. *passim*

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348
(Dep't Commerce Nov. 25, 1998) .......................................................................4, 21

**Administrative Determinations**

*Certain Lined Paper Products from Indonesia,* 71 Fed. Reg. 47174
(Dep't Commerce Aug. 16, 2006) (final affirm. CVD determ. & neg. crit.
circum.), and accompanying Issues and Decision Memorandum............................22

*Fine Denier Polyester Staple Fiber From India*, 86 Fed. Reg. 26903 (Dep't
Commerce May 18, 2021) (prelim. CVD results; 2019), and accompanying
Decision Memorandum................................................................................................8

*Fine Denier Polyester Staple Fiber from India*, 86 Fed. Reg. 50047 (Dept
Commerce Sept. 7, 2021) (final CVD results; 2019), and accompanying Issues
and Decision Memorandum..........................................................................................9

*Fine Denier Polyester Staple Fiber from India*, 87 Fed. Reg. 41663 (Dep't
Commerce July 13, 2022) (final CVD results; 2020), and accompanying
Issues and Decision Memorandum ...............................................................12, 13, 14

*Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed.
Reg. 80011 (Dep't Commerce Dec. 11, 2020) (final CVD determ.), and
accompanying Issues and Decision Memorandum............................................21, 22

*Granular Polytetrafluoroethylene Resin From India,* 87 Fed. Reg. 3765 (Dep't
Commerce Jan. 25, 2022) (final affirm. CVD & critical circum. determ.), and
accompanying Issues and Decision Memorandum....................................... *passim*

*Granular Polytetrafluoroethylene Resin From India and the Russian Federation*,
87 Fed. Reg. 14509 (Dep't Commerce Mar. 15, 2022) (Order) ...........................2, 23

*Polytetrafluoroethylene Resin from India*, 83 Fed. Reg. 23422
(Dep't Commerce May 21, 2018) (final affirm. CVD determ.), and
accompanying Issues and Decision Memorandum............................................3, 10

*Polytetrafluoroethylene Resin From India,* 83 Fed. Reg. 9842 (Dep't Commerce
Mar. 8, 2018) (prelim. affirm. CVD determ.), and accompanying Decision
Memorandum................................................................................................................3

*Utility Scale Wind Towers From India*, 86 Fed. Reg. 56896 (Dep't Commerce
Oct. 13, 2021) (final affirm. CVD determ.), and accompanying Issues and
Decision Memorandum................................................................................................8

*Granular Polytetrafluoroethylene (PTFE) Resin from India and Russia*;
*Determinations*, 87 Fed. Reg. 14038 (Int'l Trade Comm'n Mar. 11, 2022) .........23

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, | ) |
| | ) |
| *Plaintiff*, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | )   Court No. 22-00120 |
| | ) |
| *Defendant,* | ) |
| and | ) |
| | ) |
| DAIKIN AMERICA INC., | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |

### PLAINTIFF GUJARAT FLUOROCHEMICALS LIMITED'S REPLY BRIEF

Plaintiff Gujarat Fluorochemicals Limited ("GFCL") respectfully submits this reply brief in response to Defendant United States' Response in Partial Opposition to Plaintiff's Motion for Judgment on the Agency Record dated September 30, 2022, ECF No. 46 ("Def. Br."), and Defendant-Intervenor Daikin America Inc.'s Response in Opposition to Plaintiff's Motion for Judgment on the Agency Record dated October 7, 2022 (corrected), ECF No. 49 ("Def.-Int. Br.").

For the reasons provided in Plaintiff's Motion for Judgment on the Agency Record dated July 21, 2022, ECF No. 38 ("GFCL Br."), and as discussed below, certain aspects of the U.S. Department of Commerce's ("Commerce") final determination in the countervailing duty ("CVD") investigation of granular polytetrafluoroethylene ("PTFE") resin from India are not supported by substantial evidence on the record and contrary to law. *See Granular Polytetrafluoroethylene Resin From India,* 87 Fed. Reg. 3765 (Dep't Commerce Jan. 25, 2022)

1

(final affirm. CVD & critical circum. determ.) ("*Final Determination*"), and accompanying

Issues and Decision Memorandum ("*IDM*"), ECF No. 27-2, P.R. 248; *see also Granular*

*Polytetrafluoroethylene Resin From India and the Russian Federation*, 87 Fed. Reg. 14509

(Dep't Commerce Mar. 15, 2022) ("*Order*"), P.R. 257.

## I.     SUMMARY OF THE ARGUMENT

In the *Final Determination*, Commerce rejected land transactions provided on the record

by GFCL for comparable land in India, previously relied upon as benchmarks for the same

government program and the same respondent, in favor of benchmarks that represent the price of

prime real estate in the city centers of Mumbai and Ahmedabad.  This skewed comparison of

land prices created an apples-to-oranges comparison and a huge subsidy rate of *26.5% ad*

*valorem*, *IDM* at 7, P.R. 248 , a record for a land subsidy in India. Commerce's position that the

land transactions provided by GFCL are not suitable benchmarks because they are not "industry-

ready," but the Mumbai and Ahmedabad benchmarks are suitable and reasonable, relies on a

glaring use of double-standards and repudiation of common sense.  On the one hand, Commerce

discounts the fact that the land parcels proposed by GFCL were specifically purchased for

industrial use, yet on the other hand accepts as "fact" mere speculation that an old textile mill

mothballed for 27 years in the "Walled City" in the middle of one of the largest cities in India

(Ahmedabad), is industry-ready for an industrial *chemical* complex of GFCL's size.  The same

type of sophistry was used to dismiss GFCL's arguments as to why a wind turbine manufacturer

(Inox Wind Limited ("IWL")) would decide to purchase land in the heart of ultra-expensive

Mumbai. There is nothing reasonable about disregarding facts provided by GFCL, but drawing

all positive inferences in support of the Mumbai and Ahmedabad benchmarks, even when such

speculation defies common sense and record evidence.

The benchmarks provided by GFCL for land purchases in Ranjitnagar and Mahidad (Gujarat) are for comparable land, well outside urban centers, purchased for industrial use, and were *private, actual transactions*.  Defendant and Defendant-Intervenor do *not* provide any evidence to the contrary.  The record also demonstrates that the Mumbai and Ahmedabad benchmarks are based on land that is not comparable to the provision of land by either the Gujarat Industrial Development Corporation ("GIDC") or the States Industrial Development Corporation ("SIDC").  There is also no evidence that the Mumbai and Ahmedabad benchmarks represent actual sales of  "industrial" land between private parties.

Second, Commerce's determination to investigate IWL, GFCL's affiliated wind turbine manufacturer, as a cross-owned company providing inputs primarily dedicated to the production of downstream products, was not based on substantial evidence or in accordance with law. Commerce recognizes the inconsistency with its prior determination in the *2017 Investigation*, but instead of explaining how nearly identical facts result in a different determination, it dismisses it as something that "do{es} not bear on the outcome here." Def. Br. at 5.  *See Polytetrafluoroethylene Resin From India,* 83 Fed. Reg. 9842 (Dep't Commerce Mar. 8, 2018) (prelim. affirm. CVD determ.), and accompanying Decision Memorandum at 6, unchanged in *Polytetrafluoroethylene Resin From India*, 83 Fed. Reg. 23422 (Dep't Commerce May 21, 2018) (final affirm. CVD determ.), and accompanying Issues and Decision Memorandum at 21 ("*2017 Final*") (collectively, the "*2017 Investigation*").  Where the facts of the two investigations are so strikingly similar, Commerce cannot turn a blind eye.

In response to GFCL's arguments that IWL's wind energy was not primarily dedicated to the production of GFCL's downstream products, Commerce offers conclusory statements. It states as fact that "IWL's wind energy production during the POI had no other purpose outside of

3

GFL's production chain," Def. Br. at 5, although that very issue is at the heart of this dispute. Commerce's regulations and practice, and precedent from this Court support finding that any countervailable subsidies received by IWL should not be attributed to GFCL. *See* 19 C.F.R. § 351.511(a)(2)(i); *Countervailing Duties*, 63 Fed. Reg. 65348, 65401 (Dep't Commerce Nov. 25, 1998) (final rule) ("*Preamble*").  Contrary to Defendant and Defendant-Intervenor's arguments, the minute quantity of wind energy produced and sold by IWL, in absolute and relative terms, and the nature of this input are valid considerations in Commerce's "primarily dedicated input" analysis.

Finally, GFCL agrees that this Court should remand the *Final Determination* for Commerce to address the statutory factors on the basis of this record to determine whether the GIDC's provision of land to GFCL provides a financial contribution and is specific.  *See* Def. Br. at 29; *see also* 19 U.S.C. § 1677(5)(B).  GFCL requests, however, that this Court consider Commerce's request for voluntary remand after deciding the merits of the remaining issues presented.

## II.    ARGUMENT

### A.    Commerce's Benchmark Determinations Are Not Supported By Substantial Evidence; Nor Are They In Accordance With Law

Defendant's brief suffers the same flaws as Commerce's *Final Determination*:  it summarily rejects GFCL's arguments without any support in the record evidence, relying instead on cherry-picked pieces of information on the record to justify unreasonable benchmark selections.  Defendant describes GFCL's challenge as a "kitchen-sink approach" and argues that GFCL "fails to acknowledge the evidence that supports Commerce's decision." Def. Br. at 16. Here, the "kitchen sink" was full of GFCL arguments that required a response. Had Commerce actually conducted a fulsome review of the record, as GFCL provided in its opening brief and in

administrative briefing before Commerce, only then would Commerce have "fairly considered" the record. *Id.* Instead, Defendant's approach can be described as missing the forest for the trees: drawing unsupported conclusions in isolation and turning a blind eye to the facts, to support a benchmark determination that lacks common sense. This Court must remand the *Final Determination* for Commerce to consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citation omitted).

### 1.    The Mumbai Benchmark Fails Commerce's Criteria For Tier-One Benchmarks

GFCL has identified substantial record evidence which detracts from and undermines the "Mumbai Benchmark." *See* GFCL Br. at 33-41. Importantly, this evidence demonstrates that the Mumbai Benchmark does not even meet the lowest of criteria for Commerce's tier-one benchmarks:  there is no evidence that this proposed benchmark is an actual transaction between private parties or an actual sale resulting from a competitively-run government auction. *See* 19 C.F.R. § 351.511(a)(2)(i).

The information on the record related to the Mumbai benchmark includes a one-page news article, a separate article related to a potential benchmark not at issue here, and a Wikipedia article describing the economic status of Madhya Pradesh.  This evidence indicates little, except that an auction occurred, a financial and realty firm "emerged as the auction winner," that the land was "located in prime areas of the metropolis," and that "{o}ther major builders that made bids for the Poddar Mill land included government-owned National Building Construction Corporation, Lodha Ultimate Buildtech, DB View Infracon and Kohinoor Duet."  Petitioner's

Land Benchmark Submission at Exh. 3 (Aug. 11, 2021) ("Benchmark Submission"). P.R. 198.[1]
This is not evidence of comparable land or of an actual sale from a competitively run
government auction.  To be a useable benchmark, Commerce must at least address these
considerations.  A reasonable review of the record demonstrates that this Mumbai Benchmark is
not comparable to the price of land GFCL procured from the SIDC.  *See* GFCL Case Brief at 16-
22 (Nov. 18, 2021), P.R. 234, C.R. 172.

Defendant makes a number of categorical statements which are not based on the record
evidence to support its position that selection of the Mumbai Benchmark was reasonable.  First,
Defendant claims that the "evidence suggests that this auction involved several private parties,"
Def. Br. at 19, yet the  article from which the Mumbai Benchmark is derived contains no
evidence that any of the parties are private.  Benchmark Submission at Exh. 3, P.R. 198.
Commerce assumed that the involved participants were private parties despite at least one of the
bidders being the "government-owned National Building Construction Corporation." *Id.*

Importantly, the auction was held by the *National* Textile Corporation, with no record
evidence cited by Defendant to show that this was a private company.  In response, the
Government asserts for the first time that the selected benchmark resulted from "competitively
run" government auctions. Def. Br. at 19.  As Commerce at no point in the *Final Determination*
characterized this auction as a "competitively run government auction" under 19 C.F.R.
§ 351.511(a)(2)(i), Defendant's argument amounts to nothing more than *post-hoc* rationalization,

---

[1] Defendant makes the spurious claim that the Mumbai "mill" was not actually a textile mill, but
was simply a "mill." Def. Br. at 27. But, the closed Poddar Mills land was being sold by the
National *Textiles* Corporation. An abandoned textile mill is much different than a modern
chemical plant.

which should be rejected.  *See IDM* at 18-20, P.R. 248.  Def. Br. at 19; *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (Requiring "an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself.").

Second, Defendant argues that the Mumbai Benchmark is an auction that "may be considered a sale."  Def. Br. at 18.  Again, this article does not say anything other than "Indiabulls Infratech has emerged as the auction winner."  Benchmark Submission at Exh. 3, P.R. 198. There is nothing to indicate that there was a "transaction{} or sale{}," as required by the regulation.  19 C.F.R. § 351.511(a)(2)(i).  As described throughout, the benchmarks provided by GFCL are for *actual* sales, *i.e.*, completed transactions, definitively between private parties, and for comparable land intended for industrial use.  *See also* GFCL Br. at 26-30.

Third, Defendant also does not address how land located in a prime area of Mumbai is suitable for industry use by a company producing wind turbines. Defendant and Defendant-Intervenor take issue with relying on the little evidence on the record demonstrating Maharashtra, where the Mumbai Benchmark parcel is located, is incomparable to the state of Madhya Pradesh.  *See* Def. Br. at 20 (stating that the "record is lacking information that may speak to regional comparability."); Def.-Int. Br. at 31.  Defendant and Defendant-Intervenor also spend considerable time arguing that there is not enough evidence on the record to determine that land in Mumbai is not comparable to SIDC-provided land.  Contrary to their claims, there is evidence on the record showing that "30% of {Madhya Pradesh's} area is under forest cover," the economy is the "10th-largest in India," it "ranks 23rd among Indian states in human development index," and is "the country's 26th highest per-capita income."  Benchmark Submission at Exh. 2, P.R. 198.  Defendant argues that Wikipedia content is not useable, Def. Br. at 22, but this is contrary to recent precedent where Commerce relied on such an article to

7

support its review of the ultimate use of a product.  *See Diamond Sawblades Mfs.' Coal. v. United States*, 540 F.Supp.3d 1338, 1349-50 (Ct. Int'l Trade 2021).

Even if Commerce should not rely on the Wikipedia article in assessing comparability, Commerce has conducted other India CVD investigations and previously determined that "prices in Mumbai are higher than in any other Indian state."  *See Utility Scale Wind Towers From India*, 86 Fed. Reg. 56896 (Dep't Commerce Oct. 13, 2021) (final affirm. CVD determ.) and accompanying Issues and Decision Memorandum at 42.  Instead, the SIDC land in Madhya Pradesh where IWL produces wind turbines is located in Relwa Khurd, which does not even rank within Madhya Pradesh's top five cities.  *See* Benchmark Submission at Exh. 2 (listing the largest cities), P.R. 198.

Additionally, Defendant argues that "Commerce reasonably explained" that "even though the land was of interest to a financial and realty firm, the record does not show the future use of the land or that it was marketed solely for commercial use."  Def. Br. at 20.  The Mumbai article clearly shows, as Defendant admits, that the bid was proffered to the *National* Textile Corporation by a *financial and realty firm*.  In the absence of more evidence, one can reasonably assume that the *financial and realty firm* is more likely to use land in Mumbai's center for commercial/residential purposes than for industrial purposes.  This land in Mumbai's center is not comparable to the more remote parcel of land where IWL is producing wind turbines.

Defendant also strains to defend Commerce's *Final Determination* by claiming that GFCL's reliance on *Fine Denier Polyester Staple Fiber From India*, 86 Fed. Reg. 26903 (Dep't Commerce May 18, 2021) (prelim. CVD results; 2019), and accompanying Decision

8

Memorandum,[2] is misplaced.  Def. Br. at 19. Defendant argues that Commerce was "addressing a *different* type of transaction" and, in that other case, "Commerce rejected certain benchmarks because the record lacked information confirming whether the transactions were between private parties."  Def. Br. at 19-20 (emphasis added).  The Government makes this point without actually proving that the Mumbai Benchmark is (1) a transaction between private parties; or (2) a sale from a competitively run government auction based on the record evidence of this proceeding.  As GFCL has explained at length, the evidence on the record in this case does *not* show that the bid was between private parties or that the bid resulted in an "*actual sale{}* from {a} competitively run government auction{}."  *See* 19 C.F.R. § 351.511(a)(2)(i) (emphasis added).

### 2.   GFCL's Proposed Land Benchmarks Are The Best Evidence On The Record And Were Specifically Intended For Industrial Use

Recently, this Court remanded Commerce's benchmark determinations for Commerce to reconsider its initial explanation and to "provide a more robust analysis explaining why it rejected" other benchmark "data based on the record evidence."  *Risen Energy Co. v. United States*, 570 F.Supp.3d 1369, 1376 (Ct. Int'l Trade 2022) (remanding Commerce's choice of a tier-three benchmark).

Commerce's rejection of GFCL's benchmarks also requires a remand. GFCL provided land transaction benchmarks that meet Commerce's criteria for comparable, tier-one benchmarks, consistent with Commerce's regulations.  *See* 19 C.F.R. § 351.511(a)(2)(i)

---

[2] Commerce made no changes to its benchmark decisions in the final results of this case.  *See Fine Denier Polyester Staple Fiber from India*, 86 Fed. Reg. 50047 (Dept Commerce Sept. 7, 2021) (final CVD results; 2019), and accompanying Issues and Decision Memorandum at 5.

(providing that Commerce will "measure the adequacy of remuneration by comparing the government price to a market-determined price"). Commerce's regulations provide that the "market-determined price" results from "*actual transactions* between *private parties*, actual imports, or, *in certain circumstances*, *actual sales from competitively run* government auctions." *Id.* (emphasis added). Commerce considers "*product similarity*; quantities sold, imported, or auctioned; and other *factors affecting comparability*." *Id.* (emphasis added).

Unlike the Mumbai and Ahmedabad benchmarks used, the land transactions GFCL submitted to Commerce meet each of Commerce's criteria to be useable benchmarks. Indeed, in the *2017 Investigation* Commerce determined that the same benchmarks – representing private-party land purchases at Ranjitnagar and Mahidad – were useable tier-one benchmarks. *See 2017 Final* at 27-28 (explaining that the "record evidence demonstrates that GFL intended to develop this land for industrial use rather than continue to use it for agricultural purposes.").

GFCL provided record evidence demonstrating the same in this investigation. *See* GFCL Br. at 26-27. Defendant's sole rationale for rejecting these transactions is that "Commerce appropriately rejected GFL's two-purchases of agricultural land, explaining that there was no indication these parcels 'had the infrastructure or amenities in place comparable to what manufacturers would expect on GIDC or SIDC land' and no indication they 'were offered on the market for industrial purposes.'" Def. Br. at 15 (citation omitted). While Defendant is correct that there is no description of the infrastructure or amenities on these parcels or land, the record does contain evidence that the purchases were for industrial use. GFCL Br. at 27-28.

Defendant-Intervenor's argument that Commerce's determination that the Ranjitnagar and Mahidad parcels were "not comparable to the land provided by the GIDC was clearly supported by the facts on the record" also cherry picks two quotes from exhibits submitted by

10

GFCL.  Def.-Int. Br. at 24.  Reading further into those particular exhibits, or the record in full, demonstrates that the Ranjitnagar and Mahidad land purchases were intended for industrial use and, thus, are comparable to the land sought from the GIDC or SIDC for industrial use.  *See* GFCL Br. at 27-28.

      **3.**      **The Ahmedabad Benchmark Fails Commerce's Criteria For A Tier-One Benchmark**

            **a.**      **Commerce's Use Of The Ahmedabad Benchmark Is Not Based On Substantial Evidence**

GFCL has provided ample evidence to demonstrate that the Ahmedabad Benchmark is not a suitable benchmark.  *See id.* at 36-38, 42-46.  The Ahmedabad Benchmark is based on a land parcel located in "the land behind Madhupura market in the northern part of the Walled City," the "mill had closed and gone into liquidation in 1989," the land could not be sold until now because of complications caused by the "Urban Land Ceiling Act," at the time of publication, the highest bidder had to "pay the amount within three months," and the high court "retain{ed} the Earnest Money Deposit (EMD) of Bahubali, in case the top bidder backs out." *See* Petitioner's Benchmark Data Submission at Exh. 6 (June 1, 2021), P.R. 128 ("June Benchmark").  The article does not provide any evidence that the bid-upon land was industry-ready, was purchased because it was industry-ready, that the auction was competitively run, or that there was an actual sale.  At best, it is unclear from the article *which* bid would be ultimately accepted, as the high court continued to retain the deposit of the next highest bidder in case the top bidder did not pay.  *Id.*  It is unreasonable to assume from this article that the top bid was the price paid for the land, or that the top bid was the worth of the land, particularly if the high court was willing to accept the lower offers.  *Id.*

      Similar to its response regarding the Mumbai Benchmark, Defendant resorts to *post-hoc*

rationalization to explain why the Ahmedabad Benchmark represents an actual sale.  Def. Br. at 18.  Defendant seems to argue that whether the winning bid was actually paid is immaterial, relying on a decision issued *after* Commerce's *Final Determination*.  Apparently, this recent decision dispenses with the need to provide evidence of a transaction and appears to shift the burden to GFCL.  *Id*. ("there was 'no evidence' to suggest that the winning bidder 'did not intend to pay, or did not in fact pay, based on the agreed upon auction terms.'" *Id.* (citation omitted)).  Again, why is the burden on GFCL to prove that the bidder actually purchased the land?  Defendant-Intervenor, who submitted this information on the record, bears that burden. GFCL did place on the record useable benchmarks and the necessary information for Commerce to rely on those benchmarks.

Putting aside that there is also *no evidence* to suggest that the winning bidder *did* intend to pay or actually paid, this argument is unavailing because Defendant is citing to a decision and explanation by Commerce issued *after this litigation initiated*.  *See id.* (citing *Fine Denier Polyester Staple Fiber from India*, 87 Fed. Reg. 41663 (Dep't Commerce July 13, 2022) (final CVD results; 2020), and accompanying Issues and Decision Memorandum at 9) ("*2020 PSF*") ("The Siddhi Corporation land is located in Ahmedabad, Gujarat, and is a 'commercial mill'" (citation omitted)); *see also* Def-Int. Br. at 34-35 (claiming similarly that Commerce could somehow base its *Final Determination*, issued in January 2022, on the *2020 PSF* decision, which was issued in July 2022).

Commerce's decision in *2020 PSF* cannot support the *Final Determination* here to rely on the Ahmedabad Benchmark, nor does Commerce's decision in the *2020 PSF* case preclude remand in this litigation.  Rather, the *2020 PSF* case supports GFCL's arguments in that it emphasizes that Commerce considers "geographic proximity, type of land, and economic

12

development in past cases" when determining comparability.  *2020 PSF* at 9.  In the *2020 PSF*

case, Commerce explained that it "generally prefers *completed* transactions as benchmark prices"

and, in that case, there were no other "completed transactions on the record."  *Id.* at 9-10

(emphasis added).  Although Commerce did state that "there is no evidence to suggest that

Siddhi Corporation did not intend to pay, or did not in fact pay, based on the agreed upon auction

terms," this does not demonstrate that the transaction was completed.  *Id.* at 10.  In *2020 PSF*,

Commerce also explained that the "Siddhi Corporation land … is a 'commercial mill'" and that

that record "contain{ed} limited benchmarks."  *Id.* at 9 (citation omitted).[3]  In contrast, here,

Commerce's record contains benchmarks that are completed transactions – the proposed

benchmarks provided by GFCL.  *See* GFCL Br. at 26-28 (describing the private land purchases

provided by GFCL, which were used in the *2017 Investigation*).

     Additionally, in its *Final Determination*, Commerce claimed  that "the auctioned land in

… Ahmedabad, Gujarat" was "advertised as former textile mill land and, thus, would have a

comparable level of industrial infrastructure."  *IDM* at 16, P.R. 248.  That is pure sophistry.

There is zero evidence how the land was advertised;  nor is there any proof regarding the

industrial infrastructure a closed cotton mill would have.  GFCL argued that there was no

evidence that the Ahmedabad Benchmark reflected land with " a comparable level of industrial

infrastructure" and that it was more likely that this land, in the center of the city, was commercial

in nature.  *Id.* at 21 ("There is no evidence in the Petitioner's Benchmark Submission showing

---

[3] In *2020 PSF* at 12, Commerce stated that it was "consider{ing} the land transaction in
Ahmedabad, Gujarat from *Granular Polytetrafluoroethylene Resin from India* to be the most
suitable benchmark price on the record."  We, thus, assume that Commerce was discussing the
Ahmedabad Benchmark, not the Mumbai Benchmark as Defendant argues.

that the Ahmedabad transaction is for land similar to the GIDC or SIDC land; whether the land

plot is for industrial or commercial purposes; or what the current state development is.").[4]  Now,

Defendant cites to a case discussing the Ahmedabad Benchmark as a "*commercial mill*," which,

as argued by GFCL, is not comparable to the industry land provided by either the GIDC or the

SIDC. *2020 PSF* at 9 (emphasis added); Def. Br. at 18.

      Defendant-Intervenor similarly stretches in its argument that the benchmark material it

submitted provides "no reason to conclude that industrial concerns are for some reason restricted

to public lands deemed suitable for industrial uses" or that "the land in Ahmedabad has become

any less industry-ready during its years of disuse.  Def.-Int. Br. at 38.  In fact, the benchmark

material cited demonstrates the opposite: land within the Walled City, where the Ahmedabad

Benchmark is located, is not suitable for industrial use.  Indeed, the material states that

"{w}hether a plot of land is public or private cannot be decided by ownership alone.  The nature

and extent of rights attached to the land also have to be taken into account." *See* June Benchmark

at Exh. 6, P.R. 128.  Although "zoning" may not be a specific factor in Commerce's benchmark

analysis, land comparability generally is, and a major factor in Commerce's *Final Determination*

was whether the land was for "industrial purposes." *See IDM* at 15, P.R. 248. There is no

evidence here that the plot associated with the Ahmedabad Benchmark is industry-ready and

there is evidence to the contrary – that it is situated in the center of Ahmedabad, consisting of the

"original village settlements" which "have been engulfed by urban expansion." *See* June

---

[4] GFCL did not refer to the Ahmedabad Benchmark as a "transaction" in its Rebuttal Brief,
stating that "{t}here is also no evidence that the Ahmedabad *Bid* was for land comparable … ."
Gujarat Fluorochemicals Limited's Rebuttal Brief at 6 (Dec. 1, 2021) (emphasis added) ("GFCL
Rebuttal Br."), P.R. 236, C.R. 173.

Benchmark at Exh. 6. P.R. 128.

        **b.**    **Commerce's Reliance On The Ahmedabad Benchmark Is Unlawful And Its Determination Inadequately Addresses GFCL's Arguments**

"Although Commerce need not address every single piece of evidence, 'it must address significant arguments and evidence which seriously undermines its reasoning and conclusions.'" *New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, *18 (Ct. Int'l Trade Mar. 23, 2021) (quoting *Altx, Inc. v. United States*, 167 F.Supp.2d 1353, 1374 (Ct. Int'l Trade 2001)).  In other words, "it is not enough for Commerce simply to 'determine,' … that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion." *Id.* As demonstrated below, Commerce did not respond to GFCL's arguments with respect to the Ahmedabad Benchmark.  As presented by Commerce in the *Final Determination*, GFCL's condensed points—all significant and supported by evidence – include:

- The petitioner's proposed benchmark to value GFCL's land is not a comparable private transaction, nor is there record evidence that the benchmark provided by the petitioner is a transaction at all.

- Commerce properly used the GFCL transactions in Ranjitnagar and Mahidad as comparable private land transactions in its calculation memorandum because both transactions occurred in Gujarat and involved independent sellers not in the GIDC.

- The petitioner provided a news article describing a "staggering price" associated with a "winning bid" in Ahmedabad, which ended exponentially higher than the official evaluation of the plot of land.

- There is no evidence in the Petitioner's Benchmark Submission that the Ahmedabad sale was finalized or if it ever took place, and the article acknowledges that the top bidder may still "back out." There is no proof on the record of an actual sale; thus, the proposed benchmark is defective.

- There is no evidence in the Petitioner's Benchmark Submission showing that the Ahmedabad transaction is for land similar to the GIDC or SIDC

land; whether the land plot is for industrial purposes or commercial purposes; or what the current state development is. The "staggering price" paid does suggest the land will be used for commercial or retail use.

- The textile mill where the land was located was closed and liquidated in 1989, *27* years ago.

- The Petitioner's Benchmark Submission shows that Ahmedabad is a large city, with the Walled City (where the old textile mill was located) accounting for only a small section of the downtown area with land clearly not suitable for industrial use.

- In the Post-Preliminary Analysis, Commerce rejected a transaction in Indore, Madhya Pradesh, reported by the petitioner, because it did not consider a commercial land price to be a comparable benchmark for IWL's purchase of industrial land. The land in Ahmedabad is commercial land and relying on this transaction results in an internally inconsistent determination.

- In previous cases, Commerce has stated that the future use of the land is important when considering comparability.

- IWL does not provide an input that is primarily dedicated to the production of the downstream product under investigation, *i.e.*, the subject merchandise. Furthermore, Commerce previously made a contrary decision regarding IWL based on almost identical facts. Therefore, Commerce should not even be investigating whether the SIDC provided land to IWL for LTAR.

- If Commerce continues to investigate this program, it should also continue to use the rate used in its Post-Preliminary Analysis calculations (*i.e.*, 115.77 INR), not the rate proposed by the petitioner (*i.e.*, 31,700 INR).

*IDM* at 20-21, P.R. 248 (emphasis added) (footnotes omitted).  Commerce's full response to these many comments, which were distilled from GFCL's Rebuttal Brief, is as follows:

We agree with the petitioner that Commerce did not calculate the GIDC's Provision of Land for LTAR and the SIDC's Provision of Land for LTAR programs as intended.  To correct these errors, we are using the Ahmedabad, Gujarat, land benchmark with a unit cost of 31,700 INR per square meter for the Gujarati benchmark, and we are adjusting the benefit allocation of IWL's land in Madhya Pradesh by starting with the year of purchase.  For the reasons discussed in Comment 2 above, we are not using GFCL's transactions in Ranjitnagar and Mahidad.

16

IDM at 21-22 (footnote omitted).  In "Comment 2 above," with respect to the Ahmedabad Benchmark, Commerce only states that "the remaining best available land benchmarks on the record were auctioned land in Mumbai, Maharashtra, and in Ahmedabad, Gujarat," and that "no record information indicates that either of these plots will be used for commercial or residential purposes."  *Id.* at 16.  This is not an adequate response. Commerce did not address comparability considering that the Ahmedabad parcel is located in the Walled City; was sold for a "staggering price;" whether this specific benchmark was the result of an actual sale; or why this land would be "industry-ready" versus "commercial," or something else, when the mill closed and liquidated in 1989.

 As explained above, Commerce has not engaged with record evidence that does not support its conclusion to rely on the Ahmedabad Benchmark.  Commerce has also not engaged with record evidence supporting the use of GFCL's proposed benchmarks in Ranjitnagar and Mahida.  Defendant's assessment is that "Commerce made a reasonable determination based on the limited record evidence available that the Ahmedabad benchmark was the only suitable benchmark for land in Gujarat and was suitable, along with the Mumbai benchmark, as a benchmark for land in Madhya Pradesh."  Def. Br. at 28.  There is ample evidence on the record demonstrating that the Ahmedabad Benchmark is not comparable to the GIDC or SIDC land, and that the land purchases in Ranjitnagar and Mahidad are comparable.  *See* GFCL Rebuttal Br. at 5-6, P.R. 236, C.R. 173 (citing Petitioner's Benchmark Submission at Exhibit 6, which includes dozens of pages describing the area of the Ahmedabad Benchmark as within the "Walled City" and "engulfed by urban expansion."); GFCL Br. at 42-46; *see also id.* at 26-30 (describing the comparability of the Ranjitnagar and Mahidad transactions); GFCL Rebuttal Br. at 4-5.

   **c.**  **GFCL Did Not Waive Its Arguments With Respect To The Ahmedabad Benchmark**

Defendant-Intervenor argues that GFCL has waived its arguments with respect to "Commerce's use of the Ahmedabad benchmark in its case brief, even though the agency's reliance on this benchmark was clearly explained in the *Preliminary Determination*." Def.-Int. Br. at 28. As GFCL explained in its rebuttal brief and brief to this Court, Commerce's use of the Ahmedabad Benchmark was not clear. *See* GFCL Rebuttal Br. at 3, P.R. 236, C.R. 173; GFCL Br. at 7-9. Indeed, Commerce relied on the benchmarks provided by GFCL to calculate the benefit with respect to the GIDC provision of land to GFCL, finding no benefit. *See* GFCL Br. at 7-9. When Petitioner argued that Commerce should calculate a benefit with respect to the GIDC provision of land, GFCL rebutted that argument, arguing that Commerce's calculations and supporting documents were correct, and the Ahmedabad Benchmark provided by Petitioner should not be used. GFCL Rebuttal Br. at 3-9; *see also* GFCL Case Br. at 14-16, P.R. 172 (arguing that Commerce should rely on the benchmarks provided by GFCL and Commerce's calculation memos). Commerce did not find that GFCL waived its arguments and Defendant, likewise, has not argued before this Court that GFCL waived any of its arguments with respect to the Ahmedabad Benchmark. Therefore, this Court should also consider GFCL's arguments. *See ABB, Inc. v. United States*, 920 F.3d 811, 817-820 (Fed. Cir. 2019).

  **B.**  **Commerce's Attribution of IWL's Subsidies To GFCL As A Cross-Owned Entity Is Not Supported By Substantial Evidence or In Accordance With Law**

Commerce's determination to conduct an investigation of IWL was arbitrary and resulted from an incomplete review of the record. Defendant and Defendant-Intervenor's claims that the *2017 Investigation* is a "separate, unrelated investigation involving GFCL as a respondent" are disingenuous. Def.-Int. Br. at 12, Def. Br. at 14-15. Defendant-Intervenor mischaracterizes

GFCL's argument as one that creates a slippery slope, one that would result in Commerce being "bound by its determinations regarding the relationship between these two companies{, *i.e.*, GFCL and IWL} in all subsequent matters that come before it." Def.-Int. Br. at 13. GFCL has suggested no such result. Instead, GFCL has provided the record evidence demonstrating that the facts provided in 2017 are virtually indistinguishable from the facts provided during the investigation at issue. *See* GFCL Br. at 18-20 (providing details regarding IWL).

Commerce's *Final Determination* should be remanded for either or both of two distinct reasons: (1) Commerce has not explained its departure from a previous decision where the facts are substantially the same; and (2) Commerce's determination is not in accordance with law because IWL does not provide an input primarily dedicated to the downstream products.

### 1.      Commerce Has Not Provided An Adequate Explanation For Its Determination

As described in GFCL's Brief, the facts upon which Commerce made its determination that IWL's wind energy was *not* primarily dedicated in the *2017 Investigation* are nearly identical to the facts presented here. GFCL Br. at 18-22. Indeed, GFCL provided IWL's submissions from the *2017 Investigation*, demonstrating on this record that the facts are nearly identical, for Commerce to compare. *See* GFCL's Section III Response Identifying Affiliated Companies (Questions 3-7) at Exh. S-3, (Apr. 15, 2021), P.R. 84, C.R. 48. Defendant disposes of these identical facts, arguing that GFCL's argument is only that Commerce's *Final Determination* "is not supported by substantial evidence merely because Commerce reached a different conclusion in its 2017 investigation." Def. Br. at 14. Commerce has an obligation to provide participating parties consistent, explained, determinations. *DAK Americas LLC v. United States*, 456 F.Supp.3d 1340, 1355-56 (Ct. Int'l Trade 2020) (citing *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)). Commerce has not provided an explanation for why these nearly identical

scenarios are treated entirely differently. *See SKF USA Inc. v. United States,* 263 F.3d 1369, 1382 (Fed. Cir. 2001) (Commerce's determinations are "arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (citation omitted)).

### 2.     IWL Does Not Provide An Input Primarily Dedicated To The Downstream Products

Both Defendant and Defendant-Intervenor rely upon, and present in a vacuum, certain facts on the record to argue that the wind energy produced and sold by IWL to GFCL is primarily dedicated to the downstream products. Defendant argues that GFCL "attempt{s} to shift the focus away from the input product at issue," and that the "input product here is 'primarily,' indeed exclusively, dedicated to the production of GFL's downstream products." Def. Br. at 10.

Defendant and Defendant-Intervenor further argue that IWL's primary business and production activities and facts surrounding GFCL's purchase of wind energy are not relevant. Def. Br. at 11-12 (arguing that the "relevant question is not whether an affiliated company's *primary* business activity is the production of an input{.}"); Def.-Int. Br. at 18-19. Recent case precedent demonstrates otherwise: when it comes to whether to attribute subsidies received by a cross-owned (potential) input supplier, a thorough review of the facts is necessary. *Nucor Corp. v. United States*, No. 21-00182, 2022 WL 6992978, *10 (Ct. Int'l Trade Oct. 5, 2022).[5]

_____

[5] In *Nucor*, this Court remanded one of Commerce's "primarily dedicated" determinations and sustained another, requiring on remand that Commerce further explain its determination. The Court required further explanation with respect to Commerce's reliance on the affiliate's "primary function" and its "distinction between producing scrap and generating scrap" to determine that the scrap provided was not "primarily dedicated." *Nucor* at *9-*10. The Court held that "it is incumbent upon Commerce to go beyond simply identifying one set of prior decisions in support of its determination." *Id.* at 10.

Contrary to Defendant's and Defendant-Intervenor's arguments, these facts *are* relevant. In *Nucor*, Commerce reviewed whether certain "raw materials" and equipment were primarily dedicated for the production of steel products.  Notably in this case, Commerce *did* consider "the nature of the equipment and its uses" when determining whether the raw materials (*i.e.* the input) were primarily dedicated to the downstream products.  *Nucor* at *12.  For example, this Court has sustained Commerce's determination that the raw materials were not primarily dedicated to the steel products based on findings "that the raw materials and fixed assets are not 'tied specifically to the production of any steel products' but are 'used in a typical manufacturing process."  *Id.* at *10.  Also here, energy is a widely-used input; certainly not an input that is tied to production of granular PTFE, in the same way as timber is tied to production of lumber or semolina is tied to pasta. *See Preamble* at 65401.

Commerce has also "declined to attribute subsidies when the volume of scrap{, a potential input,} sold to the respondent was small in comparison to the respondent's total production costs."  *Nucor* at *9 (citing *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 80011 (Dep't Commerce Dec. 11, 2020) (final CVD determ.), and accompanying Issues and Decision Memorandum at 58) ("*Fluid End Blocks IDM*").  In *Fluid End Blocks*, the "record demonstrate{d} that" the companies at issue "supplied very small quantities of ingots and scrap" to the respondent. *Fluid End Blocks IDM* at 58. Commerce further explained that "{a}nalogous to the plastic as an input to an automobile example in the *Preamble*, one cannot reasonably conclude that these inputs are dedicated almost exclusively to the production of downstream products or that these are the type of input products that are merely a link in the overall production chain." *Id.*  Here, contrary to Defendant-Intervenor's recitation, *see, e.g.,* Def.-Int. Br. at 18, where the facts demonstrate that IWL

21

provided a miniscule amount of wind energy for a limited amount of time, *i.e.*, ending part-way through this period of investigation, it would be unreasonable to find such insignificant inputs to be dedicated to PTFE production.  Defendant's attempt to summarily reject GFCL's argument, arguing that GFCL has not provided "proper emphasis … to the production of the input product at issue" misses the point.  Def. Br. at 11.

In this case, the record shows that IWL no longer produces wind energy, produced only a miniscule amount of wind energy, the wind energy is pulled from a common pool of electricity to power multiple of GFCL's operations, and GFCL's purchase of wind energy accounts for almost none of IWL's total revenue and almost none of GFCL's total power consumption.  *See* GFCL Br. at 18-23; *see also* GFCL Case Br. at 7-10, P.R. 234, C.R. 172.

GFCL purchases energy to support its general manufacturing and production.  Unlike *Certain Lined Paper*, where "the two inputs (*i.e.*, pulp logs and pulp) have one purpose which is to be used as an input dedicated exclusively to the production of a higher value added product (*i.e.*, the downstream product including subject merchandise)," and like *Fluid End Blocks*, the purchased wind energy, provides only a small amount of energy to GFCL and that small quantity of energy is used to produce a variety of other chemical products.  *See Fluid End Blocks IDM* at 59 (citing *Certain Lined Paper Products from Indonesia,* 71 Fed. Reg. 47174 (Dep't Commerce Aug. 16, 2006) (final affirm. CVD determ. & neg. crit. circum.), and accompanying Issues and Decision Memorandum at 31); *see also* GFCL Br. at 22-23.  Reviewed together, the record evidence demonstrates that the wind energy purchased from IWL is not primarily dedicated to GFCL's subject merchandise or downstream products.

## C.     Defendant's Request For Voluntary Remand Does Not Preclude This Court From Also Ruling On The Merits

GFCL agrees that Commerce must "address on the record whether the GIDC's provision

of land for LTAR constitutes a financial contribution and is specific." Def. Br. at 29. This Court should not delay its opinion on the merits with respect to Commerce's benchmark and attribution determinations. *See generally Risen*, 570 F.Supp.3d at 1373 (granting Commerce's request for voluntary remand, with stipulations, with respect to one issue while also issuing an opinion on the merits with respect to three other issues). Commerce's benchmark determinations, although in part related to Commerce's finding of countervailability of the GIDC's provision of land, are also independently related to Commerce's determination with respect to the SIDC's provision of land. Instead, Commerce's unlawful determination that IWL provides an input primarily dedicated to the production of GFCL's PTFE Resin is a threshold issue, but also a separate determination. *See id.* at 1373-1376 (granting Commerce's request for voluntary remand with respect to the Export Buyers' Program in China and also, simultaneously and separately, remanding Commerce's "use of an indexed 2010 CBRE Report for Thailand industrial land price as a tier-three benchmark." *Id.* at 1376.).

The effects of the *Final Determination* on GFCL are immediate, and will continue through Commerce's first review of the *Order*. As of March 11, 2022, when the U.S. International Trade Commission published its final material injury determination, the 31.89 percent CVD cash deposit went into effect starting to cause GFCL substantial harm to its business goodwill and reputation. *See Granular Polytetrafluoroethylene (PTFE) Resin from India and Russia*; *Determinations*, 87 Fed. Reg. 14038 (Int'l Trade Comm'n Mar. 11, 2022). Thus, GFCL requests that this Court issue a single opinion on the merits with respect to all issues presented, including granting Defendant's request for voluntary remand.

## III.    CONCLUSION

For the reasons described in GFCL's Opening Brief and as described above, the *Final Determination* must be remanded for Commerce to reconsider its many legal errors and revisit the factual record.

Respectfully submitted,


**/s/ John M. Gurley**
John M. Gurley
Diana Dimitriuc Quaia
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

October 28, 2022                          *Counsel for Gujarat Fluorochemicals Limited*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that

Plaintiff's Reply Brief filed on October 28, 2022, complies with the word limitation requirement.

The word count for Plaintiff's Reply Brief, as computed by ArentFox Schiff LLP's word

processing system is 6,971.


 <u> **/s/ John M. Gurley**</u>
John M. Gurley