UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

_____
                                            )
                                            )
GUJARAT FLUOROCHEMICALS LIMITED,            )
                                            )
      *Plaintiff*,                                 )
                                            )
v.                                          )   Court No. 22-00120
                                            )
UNITED STATES,                              )
                                            )
      *Defendant*,                                 )
                                            )
and                                         )
                                            )
DAIKIN AMERICA INC.,                        )
                                            )
      *Defendant-Intervenors*.                     )
_____)

**DEFENDANT'S SUPPLEMENTAL BRIEF**
**ON THE INTERPRETATION OF 19 C.F.R. § 351.525(b)(6)(iv)**

Pursuant to the Court's request for supplemental briefing "on the interpretation of Regulation 351.525(b)(6)(iv)," *see* ECF 57, defendant, the United States, respectfully submits this supplemental brief.

Section 1671(a)(1) of Title 19 requires Commerce to calculate countervailing duties based upon the net countervailable subsidy provided "directly or indirectly . . . with respect to the manufacture, production, or export" of subject merchandise imported into the United States. 19 U.S.C. § 1671(a)(1). Commerce's regulations provide criteria for attributing subsidies received by one company to another, including cross-owned corporations. The relevant regulation here provides:

> (iv) <u>Input suppliers</u>. If there is cross-ownership between an input supplier and a downstream producer, and production of the input

> product is primarily dedicated to production of the ***downstream product***, [Commerce] will attribute subsidies received by the input producer to the combined sales of the input and ***downstream products*** produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added) (the regulation).

In this investigation, Commerce considered whether IWL, GFCL's cross-owned affiliate, provided wind power (the input product) that was "primarily dedicated to the production of the downstream product." *See* Issues and Decision Memorandum at 8–12 (Dep't Commerce Jan. 18, 2022) (IDM). Commerce applied the term "downstream product" to include both subject *and* non-subject merchandise and reasonably determined that IWL's wind power was primarily dedicated to GFCL's downstream production of both subject and non-subject merchandise during the period of investigation. *Id.* at 11–12.

GFCL did not meaningfully challenge Commerce's interpretation in its motion for judgment on the agency record. *See* ECF No. 38. At the January 11 hearing, however, the Court questioned the parties on whether the term "downstream product" in the dependent clause of the regulation should be narrowly construed to mean only "subject merchandise," in contrast to Commerce's interpretation. In light of the hearing, defendant understands that this specific issue is the relevant question to be addressed by our supplemental brief. As explained below, consistent with our position at the hearing, the term "downstream product" should not be strictly construed to mean "subject merchandise" but instead should be interpreted to include both subject and non-subject merchandise.

*First*, in considering whether "the input product is primarily dedicated to production of the downstream product," Commerce has long applied the regulation to include *both* subject and non-subject merchandise. Nearly two decades ago, in *Lined Paper Products*, Commerce

confronted this exact issue: the "question at hand" was "whether 'downstream product(s)' as used in 19 CFR 351.525(b)(6)(iv), can encompass more than the subject merchandise." *See Issues and Decision Memorandum for the Final Determination In the Countervailing Duty Investigation of Certain Lined Paper Products From Indonesia*, 71 ITADOC 47,174 at Comment 3 (Dep't of Commerce Aug. 16, 2006) (*Lined Paper*). Commerce reasonably concluded the Regulation *can* encompass both subject and non-subject merchandise and offered several reasons to support its interpretation. *See id.*

Commerce first rejected the argument that "product" has a standard meaning that indicates "exactly how similar" goods must be to fall under the definition of a "product." *Id.* As Commerce explained, the word "product" can take various meanings and could be applied to "motor vehicles, cars, Ford cars, Ford Focus, or green 2006 model Ford Focus, depending on the level of specificity the user wants to convey."[1] *Id.* Commerce then aptly pointed out that by avoiding the use of the term "subject merchandise," which appears elsewhere in 19 C.F.R. § 351.525, the regulation left open the possibility that the "products" benefitting from the subsidy may include both subject and non-subject merchandise. *Id.*; *see also AD Glob. Fund, LLC ex rel. N. Hills Holding, Inc. v. United States*, 481 F.3d 1351, 1354 (Fed. Cir. 2007)

---

[1] The discrepancy between the singular reference to "downstream product" in the dependent clause and the plural reference to "downstream product*s*" in the independent clause also should not change the Court's calculus here, because there is no indication in the regulation that the two cannot be used interchangeably. *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 129 (2012) (explaining the well-known canon that "in the absence of contrary indication . . . the singular includes the plural (and vice versa)"). Moreover, this distinction in the regulation cannot be dispositive of whether "downstream product" in the dependent clause equates to "subject merchandise," because "subject merchandise" is defined in such a manner that it could include one or *many* products. *See* 19 U.S.C. §1677(25) ("The term 'subject merchandise' means the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."); *cf.* 19 U.S.C. § 1677i (providing rules on "downstream product monitoring" without mentioning "subject merchandise").

("Where Congress 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)); *Arzio v. Shinseki*, 602 F.3d 1343, 1347 (Fed. Cir. 2010) (explaining that canons of construction apply to the interpretation of regulations and statutes) (citing *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) ("The canons of construction of course apply equally to any legal text and not merely to statutes."))). Commerce also noted that the terms "downstream products" and "products" are used several times in 19 C.F.R. § 351.525 in discussing the proper attribution of subsidies, and, in those instances, there is no indication that Commerce intended to limit the attribution of the subsidy to *only* subject merchandise. *See Lined Paper* at Comment 3.

After determining that that regulation can encompass both subject and non-subject merchandise, Commerce concluded that the input product in that case (pulp logs) was "primarily dedicated" to the production of "downstream product" (paper), which included the subject merchandise, namely, certain lined paper product (CLPP). *See id.* In other words, Commerce determined that the input product was primarily dedicated to the production of subject merchandise (CLPP) and non-subject merchandise (paper that is *not* CLPP).

Since *Lined Paper*, Commerce has repeatedly determined that the regulation can encompass more than subject merchandise. For example, in *Seamless Pipe from China*, Commerce rejected the argument that "steel rounds" are not "primarily dedicated to production of the downstream product" simply because "they are used in pipe products *other than* subject merchandise." *See Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China,* 75 Fed. Reg. 57444 (Dep't Commerce Sept. 21, 2010), and accompanying IDM, 75 ITADOC 57,444 at Comment 21. Numerous other cases demonstrate

4

Commerce's longstanding view on this issue. *See, e.g.*, *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021), and accompanying IDM, 86 ITADOC 53,279 at Comment 5 (finding Nur's production of scrap was primarily dedicated to Kaptan's "downstream steel production," even though the record demonstrated that Nur's scrap was used by Kaptan to "product both subject and non-subject merchandise"); *Certain Frozen Warmwater Shrimp From Thailand*, 78 Fed. Reg. 50,379 (Dep't of Commerce Aug. 19, 2013), and accompanying IDM, 78 ITADOC 50,379 at Comment 3 (*Frozen Shrimp*) (concluding that "feed (whether shrimp feed or fish feed) is primarily dedicated to the production of the downstream product (which includes fresh shrimp and fish and processed shrimp and fish)," notwithstanding that "frozen shrimp" was the subject merchandise).

*Second*, Commerce's interpretation of the regulation is consistent with the *CVD Preamble*. As the petitioner in *Lined Paper* pointed out, the terms "subject merchandise" and "downstream product(s)" appear 47 and 19 times, respectively,[2] in the *CVD Preamble*, yet there is no indication that Commerce used the terms interchangeably or sought to exclude non-subject merchandise from the meaning of "downstream product." *See Lined Paper* at Comment 3; *see generally Countervailing Duties*, *Final Rule*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) (*CVD Preamble*). In fact, in response to a comment on a scenario involving "non-subject merchandise," Commerce "recognize{d} that there may be many scenarios where these attribution rules do not fit precisely the facts of a particular case." *CVD Preamble* at 65,400. Commerce elsewhere explained that the regulation is a "general rule{} of attribution" and that it

---

[2] By our count, the term "subject merchandise" appears 57 times, and the term "downstream product(s)" appears over 20 times. Regardless of the exact number, the fact remains that both terms were frequently used in the *CVD Preamble*, and Commerce did not express an intent to make them interchangeable.

5

cannot account for "all the possible permutations in advance," because "the result would be an extremely lengthy set of rules that might prove unduly rigid." *Id.* at 65,399. Taken together, the *CVD Preamble* shows that Commerce intended to have flexibility in applying the regulation. And although Commerce provided examples where the input product was primarily dedicated to downstream product that was subject merchandise, Commerce did not state that it was restricting "downstream product" to "subject merchandise." *See id.* at 65,401. Those examples merely highlighted the "main concern" Commerce sought to address. *See id.*

   *Finally*, Commerce's interpretation of the regulation is consistent with the principle in 19 U.S.C. § 1671(a) that any countervailable subsidy be provided "with respect to" the "the manufacture, production, or export" of the subject merchandise. The inclusion of non-subject merchandise within the meaning of "downstream product" does not negate that the subsidy will still be issued "with respect to" subject merchandise—as is the case here with GFCL's wind power—even if some cases will involve a more direct link than others. Moreover, countervailing duties are "intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from subsidies paid by their governments." *Lined Paper* at Comment 3 (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 455–56 (1978)). And the purpose of the regulation is "better understood by starting from the fundamental point that the benefits provided to upstream input suppliers benefit *all downstream products* in the line of production." *See Frozen Shrimp*, 78 ITADOC 50,379 at Comment 3 (emphasis added). Accepting the narrow reading proffered by GFCL would undermine these goals by allowing companies to avoid countervailing-duty exposure merely by dedicating the input product to something in addition to subject merchandise or, like here, by commingling the input product (wind power) with other resources such that its use cannot be linked solely to subject merchandise. That is not the

outcome Commerce envisioned when declaring that it is "extremely sensitive to potential circumvention of the countervailing duty law." *CVD Preamble* at 65,400.

At bottom, as the Court acknowledged at the hearing, the regulation is a single sentence designed to cover an endless number of potential situations. Commerce knew this general rule would not "fit precisely" the facts of every case, and it has applied the regulation in a manner that gives it flexibility to consider the unique facts of each case when applying the countervailing duty laws. Commerce's interpretation is, at the very least, reasonable, and it should be sustained.

## CONCLUSION

For these reasons, the Government respectfully requests that the Court sustain Commerce's interpretation of the regulation.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:
PAUL KEITH
Assistant Chief Counsel
Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement & Compliance

s/ Daniel F. Roland
DANIEL F. ROLAND
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0514
E-mail: daniel.f.roland@usdoj.gov

January 20, 2023                                    Attorneys for Defendant