**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, | ) |
| | ) |
| *Plaintiff,* | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) Court No. 22-00120 |
| | ) |
| *Defendant,* | ) |
| and | ) |
| | ) |
| DAIKIN AMERICA INC., | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |


**PLAINTIFF GUJARAT FLUOROCHEMICALS LIMITED'S**
**SUPPLEMENTAL BRIEF ON THE INTERPRETATION OF REGULATION**
**351.525(b)(6)(iv)**

John M. Gurley
Diana Dimitriuc Quaia
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

*Counsel for Gujarat Fluorochemicals Limited*

January 20, 2023

AFDOCS:26837270.8

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 2

II.   SUMMARY OF ARGUMENT ............................................................................ 4

III.  ARGUMENT ........................................................................................................ 4

      A.    Commerce's Interpretation Of The Regulation Is Plainly Erroneous................... 4

            1.    Defendants' Interpretation of the Regulation Is Contrary to the
                  Broader Statutory Scheme ......................................................... 4

            2.    Commerce Incorrectly Applied the Regulation ........................................ 6

            3.    As an Exception to the General Attribution Rule, Section
                  351.525(b)(6)(iv) Should Be Interpreted Narrowly ............................... 10

            4.    The Statutory Provision on Upstream Subsidies Is Instructive with
                  Respect to Commerce's Interpretation of the "Input Supplier" Rule ...... 12

      B.    The Regulation Does Not Apply To IWL ............................................................. 15

            1.    IWL's Core Business Is Unrelated to Production of PTFE Resin ........... 15

            2.    The Power Provided by IWL Cannot Be "Primarily-Dedicated"
                  Under the Regulation Where Nearly All of the Merchandise
                  Produced with It Is Not Subject Merchandise ........................................ 16

      C.    Commerce's Interpretation Of Its Regulation Presumes A Benefit To
            GFCL From The SIDC's Provision Of Land To IWL, Whereas None Was
            Shown To Exist .................................................................................................... 19

IV.   CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*City of Takoma v. Richardson,*
   163 F.3d 1337 (Fed. Cir. 1998)...................................................................4

*Delverde, SrL v. United States,*
   202 F.3d 1360 (Fed. Cir. 2000)............................................................19, 21

*Dolan v. U.S.P.S.,*
   546 U.S. 481 (2006)...................................................................................11

*Dongbu Steel Co. v. United States,*
   635 F.3d 1363 (Fed. Cir. 2011).................................................................12

*GPX Int'l. Tire Corp. v. United States,*
   780 F.3d 1136 (Fed. Cir. 2015)...................................................................4

*Guangdong Wireking Housewares & Hardware Co. v. United States,*
   745 F.3d 1194 (Fed. Cir. 2014).............................................................4, 21

*King v. Burwell,*
   576 U.S. 473 (2015).....................................................................................6

*Perez v. United States,*
   156 F.3d 1366 (Fed. Cir. 1998)...................................................................4

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1988).....................................................................................6

*United Steelworkers of Am. v. Weber,*
   443 U.S. 193 (1979)...................................................................................14

*Young v. UPS,*
   575 U.S. 206 (2015)...................................................................................14

**Federal Statutes**

19 U.S.C. § 1671(a) ........................................................................5, 8, 11, 21

19 U.S.C. § 1671(a)(1)....................................................................5, 6, 10, 19

19 U.S.C. § 1677-1 ...............................................................................6, 12, 13

19 U.S.C. § 1677-1(a)...................................................................................14

ii

19 U.S.C. § 1677-1(a)(1) ............................................................................... 13

19 U.S.C. §§ 1677-1(a)(2) ............................................................................... 14

19 U.S.C. § 1677-1(a)(3) ............................................................................... 14

19 U.S.C. § 1677(5)(B) ............................................................................. 5, 19

19 U.S.C. § 1677(5)(E) ................................................................................. 21

19 U.S.C. § 1677(5A)(B) ................................................................................ 5

**Regulations**

19 C.F.R. § 351.525 ................................................................................ 12, 22

19 C.F.R. § 351.525(b)(6)(i) ........................................................................ 10

19 C.F.R. § 351.525(b)(6)(ii) ....................................................................... 10

19 C.F.R. § 351.525(b)(6)(iii) ...................................................................... 10

19 C.F.R. § 351.525(b)(6)(iv) .................................................................. *passim*

19 C.F.R. § 351.525(b)(6)(v) ........................................................................ 10

19 C.F.R. § 351.525(b)(6)(vi) ........................................................................ 1

*Countervailing Duties*, 63 Fed. Reg. 65348,
    (Dep't Commerce Nov. 25, 1998) (final rule) ............................................ *passim*

**Administrative Determinations**

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg.
    38361 (Dep't Commerce Jun. 26, 2020) (final CVD results; 2017), and
    accompanying Issues and Decision Memorandum (final CVD results; 2017) ...................... 18

*Granular Polytetrafluoroethylene Resin from India*, 86 Fed. Reg. 35479 (Dep't
    Commerce Jul. 6, 2021) (prelim. affirm. CVD & critical circum. determ.), and
    accompanying Decision Memorandum ............................................................ 2, 7

*Granular Polytetrafluoroethylene Resin From India,* 87 Fed. Reg. 3765
    (Dep't Commerce Jan. 25, 2022) (final affirm. CVD & critical circum.
    determ.), and accompanying Issues and Decision Memorandum ................................. *passim*

*Granular Polytetrafluoroethylene Resin From India and the Russian Federation*,
    87 Fed. Reg. 14509 (Dep't Commerce Mar. 15, 2022) (order) ................................... 2

*Live Swine From Canada*, 59 Fed. Reg. 12243
    (Dep't of Commerce Mar. 16, 1994) (final CVD results) ......................................................14

**Other Authorities**

H.R. Rep. No. 103–826(I), (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773...................................10

*Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act*, H.R. Rep. No. 103-316 (1994), *reprinted in* 1994
    U.S.C.C.A.N. 4040 ...........................................................................................................9, 13

*Statement of Administrative Action to Accompany the Uruguay Round Agreement*,
    S. Rep. 103-412, 1994 WL 687802 (Leg.Hist.) (1994) ...........................................................14

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

|  |  |  |
|---|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, | ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | Court No. 22-00120 |
| *Defendant*, | ) ) | |
| and | ) ) | |
| DAIKIN AMERICA INC., | ) ) | |
| *Defendant-Intervenor*. | ) ) | |

**PLAINTIFF GUJARAT FLUOROCHEMICALS LIMITED'S
SUPPLEMENTAL BRIEF ON THE INTERPRETATION OF REGULATION
351.525(b)(6)(iv)**

Plaintiff Gujarat Fluorochemicals Limited ("GFCL") respectfully submits this supplemental brief providing GFCL's comments on the interpretation of the Department of Commerce's ("Commerce") regulation at 19 C.F.R. § 351.525(b)(6)(iv) in response to the Court's order dated January 11, 2023, ECF No. 57.

For the reasons provided in Plaintiff's Motion for Judgment on the Agency Record dated July 21, 2022, ECF No. 38 ("GFCL Br."), Plaintiff's Reply Brief dated October 28, 2022, ECF No. 51, and Plaintiff's Motion for Preliminary Injunction dated April 13, 2022, ECF Nos. 9, and as discussed below, certain aspects of the U.S. Department of Commerce's ("Commerce") final determination in the countervailing duty ("CVD") investigation of granular polytetrafluoroethylene ("PTFE") resin from India are not supported by substantial evidence on the record and contrary to law. *See Granular Polytetrafluoroethylene Resin From India,* 87 Fed.

1

Reg. 3765 (Dep't Commerce Jan. 25, 2022) (final affirm. CVD & critical circum. determ.) ("*Final Determination*"), ECF No. 27-1, P.R. 252, and accompanying Issues and Decision Memorandum ("*IDM*"), ECF No. 27-2, P.R. 248; *see also Granular Polytetrafluoroethylene Resin From India and the Russian Federation*, 87 Fed. Reg. 14509 (Dep't Commerce Mar. 15, 2022) ("*Order*"), P.R. 257.

## I.    INTRODUCTION

Commerce's determination that subsidies received by Inox Wind Limited ("IWL") should be attributed to GFCL is contrary to law and is unsupported by the evidence on the record. Commerce's determination that the very small amount of energy that IWL sold to GFCL, generated from its testing of wind turbine prototypes, was "primarily dedicated" to the production of downstream products by GFCL is contrary to law because it is based on an erroneous interpretation of Commerce's regulation at 19 C.F.R. § 351.525(b)(6)(iv).

Commerce's preliminary determination explained that because "IWL's wind power is supplied to GFCL through a common energy pool, specifically for GFCL's use" and "GFCL reported that it paid IWL to generate a certain amount of wind power. . . . {T}he electricity input from IWL is primarily dedicated to the production of downstream products produced by GFCL." *Granular Polytetrafluoroethylene Resin from India*, 86 Fed. Reg. 35479 (Dep't Commerce Jul. 6, 2021) (prelim. affirm. CVD & critical circum. determ.) ("*Preliminary Determination*"), P.R. 174, and accompanying Decision Memorandum at 8 ("*PDM*"), P.R. 173 (footnote omitted). Therefore, Commerce "attribute{d} subsidies received by IWL to the combined sales of the input and downstream products produced by IWL and GFCL." *Id.*  In its *Final Determination*, Commerce stated that "{t}he issue of whether production of the input product is primarily dedicated to production of the downstream product depends on the specific factual situations

presented to Commerce because the nature of input and downstream products and production processes vary among cases." *IDM* at 11, P.R. 248. (*emphasis added*).

Notably, the electricity produced by the wind turbine prototypes was sent to a power substation, not to GFCL. The electricity purchased by GFCL came from the grid, not the wind turbines, making the connection between "electricity" and granular polytetrafluoroethylene resin ("PTFE Resin") even more attenuated. The evidence on the record demonstrates that the IWL-generated power is not primarily dedicated to the production of PTFE Resin. One can hardly envision a more clear factual situation militating against finding that the input was primarily dedicated to the downstream product.

IWL and GFCL submitted information on the record demonstrating that the amount of energy supplied by IWL represented one percent of GFCL's energy consumption and that production of PTFE is a minor share of GFCL's overall energy consumption. *See* GFCL's Section III Response Identifying Affiliated Companies (Questions 3-7) at Exh. S-4b (Apr. 15, 2021) ("GFCL Supp. IAC QR (Qs 3-7)"), C.R. 48, P.R. 84; Inox Wind Limited's Second Supplemental Questionnaire Response at Exh. S2-2(b) (Jun. 21, 2021) ("IWL 2nd Supp. QR"), C.R. 135, P.R. 166. Despite arguments that IWL's primary business is not energy generation and the facts on the record demonstrating that IWL's small production of energy is used for both subject and non-subject products, Commerce continued to find that the provision of land by the State Industrial Development Corporation ("SIDC") is a countervailable subsidy attributable to GFCL. The use of the erroneous benchmarks discussed in Plaintiff's opening brief (GFCL Br. at 31-36) compounds the impact of the SIDC program on GFCL. The SIDC program alone accounts for 26.50 percent of the 31.89 percent subsidy rate for GFCL. *Id.* at 32.

## II.     SUMMARY OF ARGUMENT

Commerce's determination to conduct an investigation of IWL pursuant to 19 C.F.R.

§ 351.525(b)(6)(iv), based on the agency's incorrect interpretation of this regulation, is a

threshold issue in this case.  The agency's interpretation of its own regulation is plainly incorrect

on the face of the regulation and is inconsistent with the statutory scheme overall.  Plaintiff

respectfully requests that the Court remand the *Final Determination* to Commerce to calculate

GFCL's net subsidy margin without regard to any alleged subsidy received by IWL.

## III.     ARGUMENT

### A.     Commerce's Interpretation Of The Regulation Is Plainly Erroneous

The law "is directed to the remedial administration of trade duties, as opposed to raising

government revenue.  Trade statutes . . . are designed to be remedial and to preserve American

industry." *GPX Int'l. Tire Corp. v. United States*, 780 F.3d 1136, 1144 (Fed. Cir. 2015). It is well

established that "the primary purpose of antidumping and countervailing duties generally is

*remedial*, not punitive."  *Guangdong Wireking Housewares & Hardware Co. v. United States*,

745 F.3d 1194, 1206 (Fed. Cir. 2014).

#### 1.     Defendants' Interpretation of the Regulation Is Contrary to the Broader Statutory Scheme

The first step in construing a statute is to look first at the statutory language.  *See Perez v.*

*United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998). The Court must try to read the statute as a

whole, to give effect to all of its parts, and to avoid, if possible, rendering language superfluous.

*See id*.; *City of Takoma v. Richardson*, 163 F.3d 1337, 1340-1341 (Fed. Cir. 1998).

Before imposing a net countervailable subsidy which would be *remedial*, the statute

provides that Commerce must consider whether the authority (government) "is providing,

directly or indirectly, a countervailable subsidy *with respect to the manufacture, production, or*

*export of a class or kind of merchandise imported, or sold* (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a)(1) (emphasis added). If the U.S. International Trade Commission also determines that the "industry in the United States" "is materially injured," "threatened with material injury," or "the establishment of an industry in the United States is materially retarded, by reason of imports *of that merchandise* . . . then there shall be imposed upon such merchandise a countervailing duty." 19 U.S.C. § 1671(a) (emphasis added).

Section 1677 of the Tariff Act of 1930, as amended ("the Act"), defines "countervailable subsidy" as a subsidy "in which an authority . . . provides a financial contribution," which confers a benefit to the recipient, and which is specific. 19 U.S.C. §§ 1677(5)(B) and (5A)(B).

The text and structure of Section 1671(a) and the Act's CVD provisions are clear that the determination of a subsidy is to be made with respect to the manufacture of *the class or kind of merchandise* at issue. Prior to imposing a CVD duty, the statute also requires a corresponding finding of material injury, again, with respect to "*that merchandise*" or "*those imports*," *i.e.* imports of subject merchandise.

Commerce's regulation at 19 C.F.R. § 351.525(b)(6)(iv) applying to inputs that are primarily-dedicated does not use the term "subject merchandise" but the term "downstream product." However, for the regulation to be consistent with the statutory scheme, any subsidy on inputs primarily dedicated to the *downstream product* must be read to refer to *subject merchandise*. It would be illogical for the regulation to apply to inputs used primarily to produce *non-subject merchandise* because such an interpretation would create a broader subsidy than provided by the statute, 19 U.S.C. § 1671(a). In other words, applying this regulation to attribute a subsidy "with respect to" the manufacture of non-subject merchandise would be in violation of the statute. Therefore, the text of Section 351.525(b)(6)(iv) must be read to apply with respect to

5

inputs primarily dedicated to the manufacture of *subject merchandise*. *See King v. Burwell,* 576 U.S. 473, 492-98 (2015) (declining to adopt interpretation of statutory provision that would undermine broader statutory scheme); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

Where the inputs are not primarily dedicated to the manufacture of subject merchandise Section 351.525(b)(6)(iv) does not apply. In that case, Commerce could investigate any potential input subsidies under the upstream subsidy provision, 19 U.S.C. § 1677-1, and impose a CVD duty if the respective conditions are met.

## 2. Commerce Incorrectly Applied the Regulation

As quoted above, 19 U.S.C. § 1671(a)(1), requires Commerce to calculate countervailing duties based upon the net countervailable subsidy provided directly or indirectly "with respect to the manufacture, production, or export of a class or kind of merchandise imported . . . into the United States."

Commerce's regulations provide that "{i}f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to the production of the downstream product," Commerce "will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)." 19 C.F.R. § 351.525(b)(6)(iv).

The regulation is purposeful and broken into two parts, repeated for clarity and emphasis:

(1) "If there is cross-ownership between an input supplier and a downstream producer, *and* production of the *input product* is primarily dedicated to production of the *downstream product*{;}" then

(2) Commerce "will attribute subsidies received by the input producer to the combined sales of the input and *downstream products* produced by both corporations (excluding the sales between the two corporations)."

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).  The first part requires that Commerce consider whether the input at issue is dedicated to the production of the singular "downstream product," *i.e.,* subject merchandise.  With respect to the reference to "downstream products" in the latter part of the regulation, the word "products" reference how Commerce will allocate the subsidies, *i.e.*, what the denominator will be ("the combined sales of the input and downstream products produced by both corporations").  While the regulation clearly uses the singular (downstream product), Commerce erroneously interpreted this language to find that the input at issue here – power -  is primarily dedicated to GFCL's downstream products (plural).

In the *Preliminary Determination*, Commerce erroneously determined that because "IWL's wind power is supplied to GFCL through a common energy pool, specifically for GFCL's use" and "GFCL reported that it paid IWL to generate a certain amount of wind power . . . the electricity input from IWL is primarily dedicated to the production of *downstream products* produced by GFCL." *PDM* at 8, P.R. 173 (emphasis added) (footnote omitted).

In the *Final Determination* Commerce continued to investigate IWL, finding that "IWL's production of wind energy was primarily dedicated to GFCL's *downstream production* and that Commerce should continue to countervail subsidies received by IWL." *IDM* at 12, P.R. 248.

The use of the plural in the latter part of the sentence (downstream products) does not

7

mean that Commerce should attribute input subsidies to all downstream products that an input could be used to produce, as Defendants erroneously sustain.  Rather, the plural is required because it refers to one denominator consisting of *sales* from two entities. Both the Government and Defendant-Intervenor, Daikin, either misquote or paraphrase the regulation to their benefit, adding an "s" to "downstream product," or referring to "production," making the first reference in the regulation plural rather than singular.  *See, e.g.,* Defendant's Response in Partial Opposition to Plaintiff's Motion for Judgment on the Agency Record at 9 (Sept. 30, 2022) ("Def. Br."), ECF No. 46 ("Commerce concluded that the input here was primarily dedicated to GFL's downstream *production*") (emphasis added) ("In determining that IWL's production of wind energy is 'primarily dedicated' to the production of GFL's downstream *products*. . . .") (emphasis added); *id.* at 10 ("Rather, the issue is whether IWL's *production of wind energy*, the relevant input product, was primarily dedicated to the production of the downstream products.") (emphasis in original); Defendant-Intervenor Daikin America Inc.'s Response in Opposition to Plaintiff Gujarat Fluorochemicals Limited's Rule 56.2 Motion for Judgment on the Agency Record at 17 (Sept. 30, 2022) ("Def-Int. Br."), ECF No. 47 ("First, it is necessary to clarify to what *downstream products* the inputs provided by a cross-owned supplier are primarily dedicated.") (emphasis added); *id.* ("{T}he input attribution rule applies to a broader scope of downstream *products* than just subject merchandise.") (emphasis added).  This is important because, as noted supra, the change in regulatory language erroneously changes the meaning.

Defendants' reading of the regulation is at odds with the broader statutory scheme.  The only way that Section 351.525(b)(6)(iv) can be interpreted harmoniously with the statute is to read "downstream product" as referring to subject merchandise.

As discussed above regarding 19 U.S.C. § 1671(a), the statutory language explicitly

incorporates references to the domestic like product or the subject merchandise. The statute is silent with respect to cross-owned companies in the context of countervailable subsidies. Likewise, the legislative history is silent with respect to cross-owned companies in the context of calculating countervailable subsidies. The *Statement of Administrative Action* ("*SAA*") is *not* silent with respect to the "merchandise under review," explaining that "{c}ountervailing duty petitions must also include information concerning the nature and amount of any subsidy provided *with respect to the merchandise*." *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103-316, at 861 (1994) ("*SAA*"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4192 (emphasis added). Put another way, Commerce cannot even contemplate a countervailing duty investigation without a baseline of information regarding subsidies on the "merchandise to be investigated." *Id.* Further explained, Commerce "has found a countervailable subsidy to exist where the government took or imposed . . . a formal, enforceable measure which directly led to a discernable benefit being provided to the industry *under investigation*." *Id.* at 926, 1994 U.S.C.C.A.N. at 4239 (emphasis added). There is no mention of subsidies on products or merchandise unrelated to the merchandise under investigation ("subject merchandise"). The statute requires subsidies be related to the subject merchandise. Here, the subject merchandise is PTFE Resin and Commerce must consider whether the investigated subsidies benefit the production of PTFE Resin.

The *SAA* also provides that "Commerce will issue regulations setting forth the details of the methodologies used to identify and measure the benefit of a subsidy." *Id.* at 928, 1994 U.S.C.C.A.N. at 4241. Thus, we look to the language of Commerce's regulations for guidance regarding cross-owned entities and whether countervailable subsidies provided to cross-owned entities should impact the net countervailable subsidy rate of the company under investigation.

**3.      As an Exception to the General Attribution Rule, Section 351.525(b)(6)(iv) Should Be Interpreted Narrowly**

As indicated, 19 U.S.C. § 1671(a)(1), requires Commerce to calculate countervailing duties based upon the net countervailable subsidy provided directly or indirectly "with respect to the manufacture, production, or export of a class or kind of merchandise imported . . . into the United States." Commerce will normally attribute a subsidy to the products produced by the entity that received the subsidy. 19 C.F.R. §351.525(b)(6)(i).

The legislative history of the Act confirms that with the 1994 amendments Congress did not intend to expand the subsidies conferred to a recipient so as to cover subsidies to any input suppliers:

> Section 771(5)(E) of the Act provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy. It states that "a benefit shall normally be treated as conferred where there is a benefit to the recipient," providing examples of how a benefit is to be established under various types of subsidy instruments. Thus, subparagraph (E) reflects the "benefit-to-the-recipient" standard which long has been a fundamental basis for identifying and measuring subsidies under U.S. CVD practice, and which expressly endorsed by Article 14 of the Subsidies Agreement. In using the word "normally" in this subparagraph, the Committee intends only to indicate that in the case of certain types of subsidy programs, such as export insurance schemes, the use of the benefit-to-the-recipient standard may not be appropriate. The use of "normally" should not be construed as suggesting that, in addition to identifying the benefit to the recipient, Commerce should or must consider the effect of the subsidy; section 771(5)(C) already makes this clear. However, neither section 771(5)(C) nor section 771(5)(E) detract from the existing requirements of section 771A(a) (2) and (3) for determining when an upstream subsidy is "passed through" to a downstream producer.

*See* H.R. Rep. No. 103–826(I), at 109 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3882 (emphasis added).

The legislative history also appears to contemplate limited exceptions from this general rule. Indeed, Commerce's regulations at 19 C.F.R. § 351.525(b)(6)(ii) – (v) provide for few

exceptions to this general rule, where, in certain instances, Commerce may attribute subsidies received by one company to another company, in the case of cross-owned corporations. However, Section 351.525(b)(6)(vi) states clearly that not all input suppliers that are cross-owned with the respondent are required to report subsidies. The requirement is limited to input suppliers where the production of the input is "primarily dedicated to the production of the downstream product":

> If there is cross-ownership between an input supplier and a downstream producer, and *production of the input product is primarily dedicated to production of the downstream product*, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products ..

19 C.F.R. § 351.525(b)(6)(iv).

The clear text of this exception read in conjunction with 19 U.S.C. §1671(a) does not permit an expansive read of the term "downstream product" to encompass products outside the class or kind of merchandise. *See Dolan v. U.S.P.S.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

Stated differently, subsidies conferred on an input supplier whose production of that input is primarily dedicated to the production of the class of kind or merchandise are countervailable, pursuant to 19 U.S.C. § 1671(a) and 19 C.F.R. § 351.525(b)(6)(iv). Any benefits bestowed on such input are appropriately included in Commerce's calculations. On the other hand, if the input is not primarily dedicated to the production of the subject merchandise, because, for example, it is used for non-subject merchandise, the regulation does not apply and the subsidies are not countervailable.

### 4. The Statutory Provision on Upstream Subsidies Is Instructive with Respect to Commerce's Interpretation of the "Input Supplier" Rule

Where the statute is silent, or where more clarity is needed, Commerce often looks to the broader statutory language for guidance. Here, the upstream subsidy provision in 19 U.S.C. § 1677-1 is instructive with respect to how Commerce should interpret Section 351.525 of its regulations. Relying on 19 U.S.C. § 1677-1 for guidance would not be unusual. Indeed, the Federal Circuit has required that "Commerce must provide an explanation" when it interprets the same statutory language to "support{} its inconsistent interpretation." *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1372 (Fed. Cir. 2011) (discussing Commerce's interpretation of "virtually identical statutory language" and that "Commerce's discretion is not absolute." *Id.* at 1371-72.). As explained below, Commerce cannot interpret its regulations to apply to subject *and* non-subject merchandise when, for a provision so closely related, the *Preamble*,[1] the statute, and the legislative history so clearly provide that to attribute the subsidies related to an input it must be used to produce subject merchandise.

The *Preamble* directs Commerce to consider whether the purpose of subsidies provided to a cross-owned input supplier is to benefit the production of both the input and downstream products. As also explained in the *Preamble*, if the input supplier and the respondent are not crossed-owned, then any subsidies on inputs used to produce the downstream product are to be investigated in a separate upstream subsidy investigation:

> Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For

---

[1] *See Countervailing Duties*, 63 Fed. Reg. 65348, 65401 (Dep't Commerce Nov. 25, 1998) (final rule) ("*Preamble*").

example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. *Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.* Moreover, we believe that the upstream subsidy provision is still applicable when dealing with lower levels of affiliation. Therefore, if the relationship between the input and downstream producers meets the affiliation standard but falls short of cross-ownership, even if the input product is primarily dedicated to the downstream product, we will only consider subsidies to the input producer in the context of an upstream subsidy investigation.

*See Preamble*, 63 Fed. Reg. at 65401 (emphasis added).

The two provisions regarding subsidies on inputs used in the production of subject merchandise, the primarily dedicated input regulation and the upstream subsidy statutory provision are clearly related, but they apply in different scenarios. A review of the upstream subsidy provision in the statute is therefore instructive.

By way of comparison, the statute defines an upstream subsidy as "a subsidy bestowed on an input which is passed through to a downstream *product.*" *SAA,* H.R. Rep. No. 103-316, at 941, 1994 U.S.C.C.A.N. at 4250 (emphasis added); *see also* 19 U.S.C. § 1677-1. Commerce treats upstream subsidy allegations seriously, analyzing thoroughly whether the subsidy is "bestowed by an authority . . . with respect to a product" (*i.e.*, "an 'input product') that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding." 19 U.S.C. § 1677-1(a)(1). Again, for a similar type of subsidy to one "primarily dedicated to the production of the downstream product," 19 C.F.R. § 351.525(b)(6)(iv), Commerce considers whether the input product is used in the manufacture or production of subject merchandise.

Additionally, and importantly, Commerce conducts an analysis of whether that "upstream subsidy" "has a *significant effect* on the cost of manufacturing or producing the merchandise"

13

and whether that "upstream subsidy" "bestows a *competitive benefit* on the merchandise." 19

U.S.C. §§ 1677-1(a) (2) and (3) (emphasis added).

The legislative history of the URAA also demonstrates that Congress intended the

upstream subsidy provision to apply where the input was used for the production *of subject*

*merchandise*. The Senate Report states:

> Section 268 amends section 771A of the 1930 Tariff Act to establish the criteria
> for determining the existence of an upstream subsidy ... Section 268 therefore
> provides that any countervailable subsidy, other than an export subsidy, bestowed
> on an input *used in the production of the subject merchandise* may constitute an
> upstream subsidy, provided that the other statutory criteria are satisfied.

*Statement of Administrative Action to Accompany the Uruguay Round Agreement*, S. Rep. 103-

412, 1994 WL 687802 (Leg.Hist.) at **99-100 (1994).

An upstream subsidy analysis is concerned with determining the effect of benefits

received by producers of a product which itself is not subject to a countervailing duty

investigation or order, but which is an input into the subject merchandise. *See e.g., Live Swine*

*From Canada*, 59 Fed. Reg. 12243, 12255 (Dep't of Commerce Mar. 16, 1994) (final CVD

results) (citing 19 U.S.C. §1677-1(a)). It would be incongruous with the statutory context to

interpret "downstream products" in 19 C.F.R. § 351.525(b)(6)(iv) to apply to inputs used to

manufacture non-subject merchandise, when the upstream subsidy provision focuses on inputs

used in subject merchandise. *See Young v. UPS*, 575 U.S. 206, 226 (2015) (holding that "a

statute ought, upon the whole, to be so construed that, if it can be prevented, no clause is

rendered superfluous, void, or insignificant." (citation omitted)); *United Steelworkers of Am. v.*

*Weber,* 443 U.S. 193, 202 (1979) (refusing to adopt a statutory interpretation that "would bring

about an end completely at variance with the purpose of the statute").

**B. The Regulation Does Not Apply To IWL**

**1. IWL's Core Business Is Unrelated to Production of PTFE Resin**

As discussed at length in Plaintiff's briefs, the evidence on the record demonstrate that IWL does not provide GFCL an input primarily dedicated to the production of the downstream product. IWL's core business is the production of wind turbines, a production that is entirely unrelated to the production of granular PTFE resin, the downstream product. In the *Final Determination*, Commerce determined that IWL provides an input that is primarily dedicated to "GFCL's downstream production," pointing to evidence that "IWL did not have any other energy customers and that all wind power generated at IWL's wind farm was to be used in GFCL's production facilities in Dahej." *IDM* at 12, P.R. 248.

It is undisputed that IWL is a producer of wind turbines and does not operate a wind farm as its primary business. The vast majority of IWL's sales were to companies other than GFCL because IWL is not in the business of selling wind power. *See* GFCL's Case Brief at 9-10 (Nov. 18, 2021) ("GFCL Case Br."), C.R. 172, P.R. 234. IWL's audited financial statements support this point. *See id.* at 7 (citing GFCL Supp. IAC QR (Qs 3-7) at Exh. S-1, C.R. 48, P.R. 84). The wind turbine generators at issue – those that would generate the power GFCL contracted to purchase – were installed in August 2013 and March 2016 as prototype machines that were not ready to be produced in large numbers or sold to the mass market. *See* IWL 2nd Supp. QR at 3, C.R. 135, P.R. 166. IWL explained that "{f}or every new {wind turbine generator} variant, the company needs to establish the machine and ensure it meets the necessary technical approvals from National Institute of Wind Energy (NIWE)." *Id.* These wind turbine generators were installed as prototype machines to test their wind generation capabilities. *Id.* This is part of IWL's production of *wind turbine generators*. IWL's total revenue from its sale of power to

15

GFCL is only 0.54 percent of its consolidated turnover.  *See* GFCL's Questionnaire Response to Section III (Identifying Affiliated Companies) at 8 (Mar. 26, 2021) ("GFCL Sec. III (IAC) QR"), C.R. 20, P.R. 52; GFCL Case Br. at 7, C.R. 172, P.R. 234.

Attributing subsidies received by IWL for this purpose – production of wind turbine generators – does not address the concern that an input producer is passing along subsidies to the producer of the subject merchandise.  *See Preamble*, 63 Fed. Reg. at 65401 (using examples such as timber primarily dedicated to lumber production and semolina primarily dedicated to pasta production).  The position of IWL with respect to GFCL's production of granular PTFE resin is much closer to the example of the plastic manufacturer mentioned in the *Preamble*.  IWL is a producer of wind turbines and the fact that it supplied a minor amount of electricity, an incidental product, to GFCL does not make it an input supplier under 19 C.F.R. § 351.525(b)(6)(iv).

### 2. The Power Provided by IWL Cannot Be "Primarily-Dedicated" Under the Regulation Where Nearly All of the Merchandise Produced with It Is Not Subject Merchandise

Commerce's interpretation of the regulation as applying to an input used in the production of both subject and non-subject merchandise essentially reads out of the regulation the important qualifier "primarily dedicated."

In finding that IWL's supply of energy to GFCL was primarily dedicated to the manufacture of the downstream product, Commerce relies on "power purchase agreements demonstrating that IWL agreed to supply power to GFCL."  *IDM* at 12, P.R. 248.  The power purchased from IWL went to a common power pool that supplied GFCL's Dahej Unit, which produces both subject and non-subject merchandise. IWL 2nd Supp. QR at Exh. IWL S2-2, C.R. 135, P.R. 165; GFCL Supp. IAC QR (Qs 3-7) at Exh. S-4b, C.R. 48, P.R. 84 (showing the power

is provided to the state distribution system (*i.e.*, the grid). Of the 22 different production plants and products manufactured at the Dahej Unit, including numerous chemical compounds, only two plants are involved in the production of PTFE. *See* GFCL Supp. IAC QR (Qs 3-7) at 6 and Exh. S-5b, C.R. 48, P.R. 84. The record shows that the total power consumption for the production of PTFE during the POI represents only 7.44% of the power consumption at the Dajeh Unit. *Id*. Of the total power consumed by the Dahej Unit (614,473,063 kwh), the power sourced from IWL accounts for only 6,326,181 kwh, which is 1.03% of the total sourced power. *Id.* at Exh. S-5b; *see also* Section III Questionnaire Response (Part I) of Inox Wind Limited at 6 (May 24, 2021) ("IWL Initial QR (Part I)"), C.R. 97, P.R. 121. In short, IWL provided 1.03% of 7.44% of the total power consumed by GFCL at the Dahej Unit to produce PTFE Resin.

Wind energy from IWL cannot be primarily dedicated to the subject merchandise where nearly all of the merchandise produced using the power provided by IWL is *not subject merchandise*. Such an interpretation would read out of the regulation the words "primarily dedicated" which are key to understanding the scope of Section 351.525(b)(6)(iv).

While Commerce does not define the term "primarily dedicated," it provides guidance in the *Preamble*. Commerce has explained that the "main concern {it has} tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product." *Preamble*, 63 Fed. Reg. at 65401. The *Preamble* further describes such primarily dedicated inputs as products that are merely a link in the overall production chain (*e.g.*, harvested standing timber that is processed into lumber or semolina that is processed into pasta). *Id.*

Where Commerce is "dealing with input products that *are not* primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the

input product is to benefit the downstream product." *Id.* (emphasis added). Here, the downstream

product, which is the "higher value added product," is PTFE Resin. As described in GFCL's

briefs before the Court, the "input product" is a miniscule amount of wind energy, which is (1)

not the product or merchandise at issue, and (2) is not primarily dedicated to the production of

PTFE Resin. Moreover, the sale of power account for a minute amount of IWL's business.

Commerce's determination that energy supplied by IWL can be attributed to the

downstream products, rather than the downstream product (singular subject merchandise), is not

in accordance with law. PTFE Resin is the subject merchandise, not the myriad of products

produced at the Dahej plant. Further, Commerce's cursory analysis ignores pertinent evidence

demonstrating that inputs provided by IWL are not primarily dedicated to the production of

subject merchandise.

According to Commerce, the analysis of "whether production of the input product is

primarily dedicated to the production of the downstream product depends on the specific factual

situations presented to Commerce . . . . Thus, Commerce examines the facts of each case and

makes a determination on a case-by-case basis." *Certain Cold-Rolled Steel Flat Products from

the Republic of Korea*, 85 Fed. Reg. 38361 (Dep't Commerce Jun. 26, 2020) (final CVD results;

2017), and accompanying Issues and Decision Memorandum at 30 ("*Cold-Rolled Steel from

Korea IDM*"). Commerce uses two cases as examples: timber primarily dedicated to lumber

production and semolina primarily dedicated to pasta production. *Preamble*, 63 Fed. Reg. at

65401; *see also Cold-Rolled Steel from Korea IDM* at 29. These two examples are substantially

different from the present case. IWL produced a miniscule amount of power, that power was

transmitted to a common pool of power, GFCL pulled certain power from the common pool, and

only some (a minority) of that power went to the production of PTFE Resin. The power

produced by IWL cannot be considered to be "dedicated almost exclusively to the production of" PTFE Resin in the same way as timber to lumber or semolina to pasta, which go to the core of the downstream product. Timber is the number one input for lumber. Similarly, semolina is the number one input for pasta. Where the result of a purchase of power amounting to only 0.20 percent of the direct costs of GFCL's production and only 1.03 percent of GFCL's total power consumption is a benefit of more than 100% of IWL's total turnover and a 26% subsidy rate, the outcome is unreasonable and contrary to the letter and spirit of the law.

### C. Commerce's Interpretation Of Its Regulation Presumes A Benefit To GFCL From The SIDC's Provision Of Land To IWL, Whereas None Was Shown To Exist

"The Tariff Act provides that before Commerce imposes a countervailing duty on merchandise imported into the United States, it must determine that a government is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise." *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000) (citing 19 U.S.C. § 1671(a)(1) (1994)). A countervailable subsidy exists where "an authority {a government or governmental actor} . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B).

Commerce's regulation at 19 C.F.R. § 351.525(b)(6)(iv) provides that "{i}f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product," Commerce "will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)." 19 C.F.R. § 351.525(b)(6)(iv).

In this case, Commerce's interpretation of this regulation conclusively presumes that

GFCL received a benefit as a result of the SIDC's provision of land to IWL, merely because

IWL and GFCL are cross-owned and GFCL purchased an insignificant amount of power from

IWL. *See IDM* at 11-12, P.R. 248. Commerce did not even consider whether the purchase of

power between IWL and GFCL was at arm's length, despite substantial evidence to this point:

- IWL explained on the record that it has sold power to GFCL at market rates. Because the transactions were between affiliated companies, they were subject to review by an independent audit firm, who certified that these transactions were at "arm's length." *See* GFCL Sec. III (IAC) QR at 5 and Exh. 4(b), C.R. 20, P.R. 52.

- The 2019-2020 Annual Report of IWL at pages 54-55 states that:

  o All transactions entered with Related Parties for the year under review were on arm's length basis.

  o All contracts/ arrangements/ transactions entered by the Company during the year under review with Related Parties are approved by the Audit Committee and/or Board. *See* IWL Initial QR (Part I) at Exh. 4(c) , C.R. 97-98, P.R. 121-122

Because IWL and GFCL are cross-owned and GFCL purchased all the power produced

by IWL's two wind turbines, regardless of how insignificant that purchase was, Commerce

automatically assumed that power supplied by IWL was primarily dedicated to the production of

the downstream products and that GFCL received a subsidy. Commerce did not consider

relevant any of the other facts about this minuscule purchase of power.

IWL is a producer of wind turbines and the provision of land by the SIDC, the alleged

subsidy at issue here, was provided to benefit IWL's production of these products. IWL's

questionnaire response with respect to its *lease* of land from the SIDC states that the

manufacturing unit in the SIDC manufactures key components for Wind Turbine Generators. *See*

Inox Wind Limited's Section III Questionnaire Response (Part II) at 19-20 (May 26, 2021)

("IWL Sec. III QR (Part II)"), C.R. 101, P.R. 125. The letter of intent regarding this land lease

from the SIDC confirms that IWL was conducting "construction activities," for its Mega Project

– Manufacturing Wind Turbine Generators. *See id.* at Exhs. 9a, 9b, 9c, C.R. 101, 103-104, P.R. 125. The lease deed in Exhibit 9(c) states that the land is being used for MANUFACTURING OF WIND TURBINE GENERATORS COMPRISING NACELLE, HUB/ BLADE SETS, STEEL TOWER. *Id.* at Exh. 9(c). As discussed above, IWL also produced an insignificant amount of wind energy that was sold to GFCL.

In effect, Commerce adopted *a per se* rule that a respondent receives a subsidy in these circumstances without making any specific finding of a benefit to GFCL, as required under 19 U.S.C. § 1677(5)(E). That conclusion is in conflict with the language of the statute requiring that Commerce find both a financial contribution and a benefit in order to determine if a subsidy exists. *See Delverde*, 202 F.3d at 1367 (finding that the statute clearly requires Commerce to determine that a purchaser of corporate assets received both a financial contribution and a benefit from the government before concluding that the purchaser received a subsidy and concluding that Commerce incorrectly presumed that a respondent received a subsidy simply because it bought assets from another person who earlier received subsidies).

The countervailing duty is "the amount of the net countervailable subsidy." *See* 19 U.S.C. § 1671(a). In other words, it equals the amount by which a foreign government subsidizes a particular product. *Guangdong Wireking*, 745 F.3d at 1196. Here, under Commerce's erroneous reading of its own regulation if GFCL purchased even one cent ($0.01) of wind power from IWL then *all* of IWL's alleged subsidies become GFCL's subsidies. That an inconsequential purchase of a small fraction of GFCL's power requirements turns into a CVD rate of 26.5% for alleged subsidies received by IWL for its provision of land by the SIDC is an absurd result.

Daikin's argument that such a result is entirely acceptable because the amount of the alleged benefit received by IWL is allocated over the combined sales of both IWL and GFCL,

minus intercompany sales, Def-Int Br. at 17-19, does not grapple with the issue that GFCL is being attributed a massive subsidy on its imports of *PTFE Resin* solely because it purchased a minute quantity of an input that was consumed almost entirely for non-subject merchandise. Moreover, evidence on the record shows that such transactions were at arm's length, indicating that no benefit could have even accrued to GFCL. Due to the faulty benchmarks chosen by Commerce, in particular the Mumbai Benchmark, the amount of the benefit on the SIDC land lease calculated by Commerce is *more than 100% of IWL's total revenue* in the awarded year. *See* GFCL's Section III Questionnaire Response at 79-80 (May 6, 2021), C.R. 51, P.R. 91; *see also* GFCL Case Br. at 19, C.R. 172, P.R. 234. Daikin's argument fails to explain the absurd and unfair result faced by GFCL and cannot justify Commerce's incorrect application of the regulation.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiff respectfully requests that the Court remand the *Final Determination* to Commerce to calculate GFCL's net subsidy margin without regard to any subsidy received by IWL. Specifically, Commerce must reconsider its application of 19 C.F.R. § 351.525 in the context of the statute.

<div style="margin-left:40%">

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley
Diana Dimitriuc Quaia
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

</div>

January 20, 2023                              *Counsel for Gujarat Fluorochemicals Limited*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's Supplemental Brief filed on January 20, 2022, complies with the word limitation requirement. The word count for Plaintiff's Supplemental Brief, as computed by ArentFox Schiff LLP's word processing system is 6,580.


  **/s/ John M. Gurley**
John M. Gurley