Slip Op. No. 23-9

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GUJARAT FLUOROCHEMICALS LIMITED,** | |
| Plaintiff, | |
| v. | **Before: Timothy C. Stanceu, Judge** |
| **UNITED STATES,** | **Court No. 22-00120** |
| Defendant, | |
| and | |
| **DAIKIN AMERICA, INC.,** | |
| Defendant-Intervenor. | |

OPINION AND ORDER

[Remanding to the issuing agency a determination in a countervailing duty investigation on granular polytetrafluoroethylene from India]

Dated: January 24, 2023

*John M. Gurley* and *Diana Dimitriuc-Quaia*, ArentFox Schiff LLP, of Washington, D.C., argued for plaintiff. With them on the briefs was *Jessica R. DiPietro*.

*Daniel F. Roland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the briefs was *Paul K. Keith*, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Elizabeth J. Drake*, Shagrin Associates, of Washington, D.C., argued for defendant-intervenor. With her on the briefs were *Roger B. Shagrin*, *Luke A. Meisner*, and *Justin M. Neuman*.

Plaintiff Gujarat Fluorochemicals Limited ("Gujarat Fluorochemicals" or "GFCL"), an Indian producer of granular polytetrafluoroethylene ("PTFE") resin, brought this action to contest a final affirmative countervailing duty ("CVD") determination (the "Final Determination") issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"). Concluding that the Final Determination is contrary to law, the court remands the decision to Commerce for expeditious corrective action.

## I. BACKGROUND

### A. The Contested Determination

Commerce published the Final Determination as *Granular Polytetrafluoroethylene Resin From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3,765 (Int'l Trade Admin. Jan. 25, 2022), in which Commerce determined for GFCL an estimated total countervailable subsidy rate of 31.89%. The estimated total countervailable subsidy rate was the sum of ten individual estimated countervailable subsidy rates, which Commerce described in the "Final Issues and Decision Memorandum" and incorporated into the Final Determination by reference. *Issues and Decision Memorandum for the Final Affirmative*

*Determination of the Countervailing Duty Investigation of Granular Polytetrafluoroethylene*

*Resin from India* (Int'l Trade Admin. Jan. 18, 2022), P.R. 248 ("*Final I&D Mem.*").[1]

## B. The Parties

Plaintiff is an Indian producer and exporter of PTFE resin.  Defendant is the

United States.  Defendant intervenor Daikin America, Inc. ("Daikin") is a U.S. domestic

producer of PTFE resin that was the petitioner in the countervailing duty investigation.

## C. Proceedings before Commerce

On January 27, 2021, Daikin filed antidumping and countervailing duty petitions

on imports of granular PTFE resin from India and Russia.  *Daikin Antidumping and*

*Countervailing Duty Petitions*, P.R. 1.  On February 23, 2021, Commerce initiated a

countervailing duty investigation of imports of this product during a time period (the

"period of investigation" or "POI") of April 1, 2019 through March 31, 2020.  *Granular*

*Polytetrafluoroethylene Resin From India and the Russian Federation: Initiation of*

*Countervailing Duty Investigations*, 86 Fed. Reg. 10,931.  Gujarat Fluorochemicals was

selected as the sole mandatory respondent in this investigation with respect to imports

of granular PTFE from India (the "subject merchandise").  *Countervailing Duty*

*Investigation of Granular Polytetrafluoroethylene Resin from India: Respondent Selection* at 4

(Int'l Trade Admin. March 9, 2021), P.R. 42.

---

[1] Documents in the Joint Appendix are cited as "P.R. __."

Commerce issued a "Preliminary Determination" for the investigation on July 6,

2021.  *Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative*

*Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances*

*Determination, and Alignment of Final Determination With Final Antidumping Duty*

*Determination*, 86 Fed. Reg. 35,479.  The Preliminary Determination incorporated by

reference a "Preliminary Decision Memorandum."  *Decision Memorandum for the*

*Preliminary Determination of the Countervailing Duty Investigation of Granular*

*Polytetrafluoroethylene Resin from India* (Int'l Trade Admin. June 28, 2021), P.R. 173

("*Prelim. Decision Mem.*").

After issuing the Final Determination, Commerce made no change in the 31.89%

estimated countervailing duty rate when, following an affirmative injury determination

of the U.S. International Trade Commission (the "Commission"), Commerce issued a

countervailing duty order on PTFE resin from India.  *Granular Polytetrafluoroethylene*

*Resin From India and the Russian Federation: Countervailing Duty Orders*, 87 Fed. Reg.

14,509 (Int'l Trade Admin. Mar. 15, 2022).

### D.  Proceedings before the Court

Plaintiff brought this action on April 12, 2022.  Summons, ECF No. 1; Compl.,

ECF No. 6.  Plaintiff filed under USCIT Rule 56.2 the motion now before the court,

which is a motion for judgment on the agency record.  Pl.'s Rule 56.2 Mot. for J. on the

Agency R. (July 21, 2022), ECF Nos. 38 (conf.), 39 (public) ("Pl.'s Mot."); Pl.'s Mem. of

Law in Supp. of its Mot. for J. on the Agency R. (July 21, 2022), ECF Nos. 38-1 (conf.), 39-1 (public) ("Pl.'s Br."). Defendant and defendant-intervenor responded. Def.'s Resp. in Partial Opp'n to Pl.'s Mot. for J. on the Agency R. (Sept. 30, 2022), ECF No. 46 ("Def.'s Resp."); Resp. in Opp'n to Pl. Gujarat Fluorochemicals Limited's Rule 56.2 Mot. for J. on the Agency R. of Def.-Int. Daikin America Inc. (Sept. 30, 2022), ECF Nos. 47 (conf.), 48 (public) ("Def.-Int.'s Resp."). Plaintiff filed a brief in reply. Pl. Gujarat Fluorochemicals Limited's Reply Br. (Oct. 28, 2022), ECF No. 51 ("Pl.'s Reply").

The court held oral argument on January 11, 2023. In response to defendant-intervenor's motion, the court allowed additional briefing on the proper interpretation of a provision in the Department's regulations, 19 C.F.R. § 351.525(b)(6)(iv), which the parties submitted on January 20, 2023. Suppl. Br. of Def.-Int. Daikin America Inc., ECF No. 58 ("Def.-Int.'s Suppl. Br."); Def.'s Suppl. Br. on the Interpretation of 19 C.F.R. § 351.525(b)(6)(iv), ECF No. 59 ("Def.'s Suppl. Br."); Pl. Gujarat Fluorochemicals Limited's Suppl. Br. on the Interpretation of Regulation 351.525(b)(6)(iv), ECF No. 60.

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c),[2] pursuant to which the court reviews actions

---

[2] All citations herein to the United States Code are to the 2018 edition. All citations to the Code of Federal Regulations are to the 2022 edition.

commenced under section 516A of the Tariff Act of 1930, *as amended* ("Tariff Act"),

19 U.S.C. § 1516a, including an action contesting a final affirmative determination by

Commerce of whether or not a countervailable subsidy is being provided with respect

to merchandise subject to a countervailing duty investigation.  *See id*.

§§ 1516a(a)(2)(B)(i), 1671d(a)(1).

     In reviewing an agency determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  *Id*. § 1516a(b)(1).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## B.  Countervailing Duties under the Tariff Act

     When certain conditions are met, the Tariff Act provides for a countervailing

duty to be imposed on imported merchandise to redress the effect of a subsidy

provided by the government of the exporting country.  Section 701(a) of the Tariff Act,

19 U.S.C. § 1671(a), directs generally that Commerce is to impose a countervailing duty

if: (1) Commerce determines that an "authority," defined as either the government of a

country or any public entity within the territory of the country, *id*. § 1677(5)(B), "is

providing, directly or indirectly, a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported, or sold

(or likely to be sold) for importation, into the United States"; and (2) the Commission

determines that an industry in the United States is materially injured or threatened with

material injury by reason of the subsidized imports.

A "countervailable subsidy" exists, generally, where an authority provides a

financial contribution to a "person" and a "benefit is thereby conferred" and where the

subsidy meets the requirement of "specificity," as determined according to various

rules set forth in the statute.  *Id.* §§ 1677(5), (5A).  When subsidies consist of the

provision of goods or services rather than the provision of monies directly, a benefit is

conferred if those goods or services are provided for "less than adequate remuneration"

("LTAR").  *Id.* § 1677(5)(E)(iv).

### C. Estimated Subsidy Rates in the Final Determination

For the Final Determination, Commerce calculated the 31.89% estimated total

subsidy rate by combining the individual estimated subsidy rates it determined for ten

government programs in India, two of which plaintiff is contesting before the court.

Plaintiff contests the Department's including in the total a 26.50% subsidy rate based on

a 30-year lease of a tract of land by a governmental entity, the State Industrial

Development Corporation ("SIDC"), to Inox Wind Limited ("IWL"), an affiliate of

Gujarat Fluorochemicals.  Plaintiff also contests the Department's including a 0.12%

subsidy rate for the provision of land to GFCL by another government entity, the

Gujarat Industrial Development Corporation.[3]

### D.  Inclusion of a Subsidy Rate for the Lease of Land by the State Industrial Development Corporation

Commerce determined the 26.50% SIDC estimated subsidy rate by attributing to

Gujarat Fluorochemicals what Commerce considered to be a subsidy to IWL, an Indian

producer of wind turbines.  Several findings resulted in this determination.

Commerce found that the 30-year lease, which dated back to 2015 and pertained

to land to be used for the construction of manufacturing facilities, was for less than

adequate remuneration.  Gujarat Fluorochemicals contests the finding that the lease was

for LTAR, arguing, in effect, that no subsidy or financial benefit was provided to IWL.

Plaintiff argues that Commerce arrived at the LTAR conclusion by valuing the land

according to "benchmark" prices that were far higher than the value of the leased tract.

Gujarat Fluorochemicals maintains that the record evidence shows that these

benchmarks were not comparable to that tract because, *inter alia*, they pertained to

---

[3] The other eight subsidy programs and rates were as follows: Export Promotion of Capital Goods Scheme, 0.09%; Advanced Authorization Program, 2.76%; Duty Drawback Program, 0.17%; Status Holders Incentive Scrip, 0.07%; Merchandise Export from India Scheme, 0.46%; Renewable Energy Certificate, 0.41%; GDIC Preferential Water Rates, 0.60%; and State Government of Gujarat Exemption from Electricity Duty, 0.71%.  *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India* at 6–7 (Int'l Trade Admin. Jan. 18, 2022), P.R. 248.

parcels of urban land located in the centers of the Indian cities of Mumbai and

Ahmedabad.  *See* Pl.'s Br. 31–48.

Commerce found, further, that GFCL and IWL not only were affiliated but were

"cross-owned" within the meaning of § 351.525(b)(6)(vi) of the Department's

regulations.[4]  Before the court, plaintiff does not contest the Department's determination

of cross-ownership.

Commerce included the 26.50% estimated subsidy rate upon finding that during

the period of investigation, IWL sold electrical power to GFCL, and exclusively to

GFCL, and that this electricity was used as an input for all products GFCL

manufactured at its industrial complex, including PTFE resin.  Commerce concluded

from these factual findings, which plaintiff does not contest, that what Commerce

considered to be a subsidy to IWL should be attributed to the combined sales of the

downstream products of both corporations, according to an "attribution of subsidies"

provision set forth in its regulations.  19 C.F.R. § 351.525(b)(6)(iv).  While not contesting

---

[4] Per the regulations:

Cross-ownership exists between two or more corporations where one
corporation can use or direct the individual assets of the other
corporation(s) in essentially the same ways it can use its own assets.
Normally, this standard will be met where there is a majority voting
ownership interest between the two corporations or through common
ownership of two (or more) corporations.

19 C.F.R. § 351.525(b)(6)(vi).

that IWL sold electrical power to GFCL, and only GFCL, during the period of

investigation, and while not contesting that the power was used in producing the

downstream products at GFCL's production facility (which included numerous

products other than PTFE resin), plaintiff argues that this regulation does not apply in

the situation presented.  The court agrees.

### 1.  The Department's Conclusion that 19 C.F.R. § 351.525(b)(6)(iv) Applied with Respect to the SIDC Land Lease

The court's analysis begins with the statute.  Section 701(a) of the Tariff Act

requires "the administering authority," i.e., Commerce, to impose a countervailing duty

if a governmental entity "is providing, directly or *indirectly*, a countervailable subsidy

*with respect to the manufacture*, *production*, or export of a class or kind of merchandise

[i.e., the merchandise subject to the investigation] imported, or sold (or likely to be sold)

for importation, into the United States" and the Commission reaches an affirmative

determination of injury or threat to the domestic industry by reason of sales of that

merchandise.  19 U.S.C. § 1671(a) (emphasis added).  Here, what Commerce identified

as a subsidy was a domestic, not export, subsidy, and it was provided to IWL, not

GFCL, the producer of the subject merchandise.  Thus, any subsidy was provided, if at

all, only "indirectly" with respect to the manufacture of the imported PTFE resin.

Section 701(e) of the Tariff Act provides, further, that "[w]henever the

administering authority has reasonable grounds to believe or suspect that an upstream

subsidy, as defined in section 771A(a)(1), is being paid or bestowed, the administering

authority shall investigate whether an upstream subsidy has in fact been paid or

bestowed, and if so, shall include the amount of the upstream subsidy as provided in

section 771A(a)(3)."  19 U.S.C. § 1671(e).  In pertinent part, section 771A(a) defines an

"upstream subsidy" as a countervailable subsidy other than an export subsidy that "is

paid or bestowed by an authority . . . with respect to a product (hereafter in this section

referred to as an 'input product') that is used in the same country as the authority in the

manufacture or production of merchandise which is the subject of a countervailing duty

proceeding," that "bestows a competitive benefit on the merchandise," and that "has a

significant effect on the cost of manufacturing or producing the merchandise."  *Id*.

§ 1677-1(a).

     Commerce did not conduct an upstream subsidy investigation of the electricity

input.  Certain record evidence would have been relevant had it done so.  This includes

evidence that during the period of investigation, Inox Wind Limited sold to Gujarat

Fluorochemicals only the electricity produced by two wind turbines that were being

tested prior to GFCL's purchase of these two wind turbines during the last month of the

POI, March 2020.  *Questionnaire Response to Section III Identifying Affiliated Companies of*

*Gujarat Fluorochemicals Limited* at 8, J.A. at 31 (Mar. 26, 2021), P.R. 52.  Measured by

kilowatt hours, the electrical power so provided, which was commingled with other

power supplied on the grid to GFCL's production facilities, was 1.03% of the total

power consumed by those facilities during the period of investigation. *See Section III Questionnaire Response (Part I) of Inox Wind Limited* at 6, J.A. at 508 (May 24, 2021), P.R. 121. Plaintiff estimated that 7.44% of the total power supplied to the facilities was used to produce granular PTFE resin (one of a number of products GFCL made there), *id*. at 7 (citing *Supplemental Questionnaire Response to Section III Identifying Affiliated Companies (Questions 3–7) of Gujarat Fluorochemicals Limited* at Ex. S-5b, J.A. at 392 (Apr. 15, 2021), P.R. 84), such that only approximately 0.07% of the electricity supplied by IWL went to the production of the merchandise subject to the investigation.[5] *See* 19 U.S.C. § 1677-1(a)(3) (requiring for a finding of an upstream subsidy that the input product "has a significant effect on the cost of manufacturing or producing the merchandise"). There is also uncontradicted record evidence that IWL sold the electrical power to GFCL at market prices and at arm's length. *Questionnaire Response to Section III* at 7, J.A. at 30 (Mar. 26, 2021), P.R. 52 (reporting that "IWL has sold power to GFCL at market rates" and that "these transactions were at 'arm's length.'"). *See* 19 U.S.C. § 1677-1(b)(1) (providing generally that "a competitive benefit has been bestowed when the price for the input product . . . is lower than the price that the manufacturer or producer of

_____

[5] The court has used only public record information throughout this Opinion and Order. At oral argument, plaintiff waived a previous claim of confidentiality for the data appearing in this paragraph. *See* Oral Argument at 9:46 (waiving confidentiality for the 1.03% figure), 13:38 (waiving confidentiality for the 7.44% figure); *see also* Gujarat Fluorochemicals Limited's Suppl. Br. on the Interpretation of Regulation 351.525(b)(6)(iv) 17, ECF No. 60 (disclosing both the 1.03% and 7.44% figures publicly).

merchandise which is the subject of a countervailing duty proceeding would otherwise

pay for the product in obtaining it from another seller in an arms-length transaction.").

Commerce declined to conduct an upstream subsidy investigation even though

Section 701(e) provides that Commerce "*shall* investigate whether an upstream subsidy

is being paid or bestowed" when it "has reasonable grounds to believe or suspect" that

such a subsidy is being provided.  19 U.S.C. § 1671(e) (emphasis added).  Instead,

Commerce resorted to an alternate methodology when it included, in the overall

estimated subsidy rate, a rate for IWL's provision of the electrical power input to

Gujarat Fluorochemicals.  This alternate methodology, set forth in 19 C.F.R.

§ 351.525(b)(6)(iv), is not mentioned in the Tariff Act and thus is entirely a creation of

the Department's regulations.

This case does not present the issue of whether § 351.525(b)(6)(iv) accords with

the statute.  Plaintiff does not make a facial challenge to this regulation and instead

claims that the regulation was impermissibly applied in the CVD investigation.  The

regulation at issue in this case consists of a single sentence, as follows:

> *Input suppliers.*  If there is cross-ownership between an input supplier and
> a downstream producer, and production of the input product is
> primarily dedicated to production of the downstream product, the
> Secretary will attribute subsidies received by the input producer to the
> combined sales of the input and downstream products produced by both
> corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv).  The question this case presents, then, is whether

Commerce correctly interpreted its regulation to conclude that the condition precedent

for invoking the procedure in the regulation existed here, i.e., whether "production of

the input product is primarily dedicated to production of the downstream product."  *Id*.

Commerce concluded that the condition was satisfied because IWL did not provide

electrical power to any persons other than GFCL during the period of investigation,

with the result that all of the electricity IWL supplied was used in powering the Dahej

industrial facilities, the location of the production of the PTFE resin and the other

products that GFCL manufactured there.  *Final I&D Mem*. at 12 (". . . IWL did not have

any other energy customers and . . . all wind power generated at IWL's wind farm was

to be used in GFCL's production facilities in Dahej.").

As discussed earlier, there is record evidence that only 0.07% of the electricity

IWL provided was used in producing the subject merchandise, granular PTFE resin,

which was only one of a number of products that Gujarat Fluorochemicals made at the

Dahej industrial facilities.  Commerce reasoned that "[t]he regulations do not specify

whether the downstream product must be subject or non-subject merchandise," *Final

I&D Mem.* at 11, but there is also the issue of whether the regulation requires "the

downstream product" to be a specific, identified product.  That is at least an implication

from the use of the term "*the* downstream product."  In this instance, Commerce

interpreted the term "the downstream product" not to refer to any downstream product

in particular but instead to refer to all of the products GFCL made at those facilities (which, other than granular PTFE resin, Commerce did not identify or analyze).  The use of the particularized, singular reference to "the downstream product" calls the Department's interpretation into question.  Nevertheless, it is unnecessary for the court to decide whether the term "the downstream product" as used in the regulation plausibly could refer to a group consisting of all downstream products made by the producer.  For even if it were assumed, *arguendo*, that the term may be interpreted so broadly in some context, the court still could not agree with the Department's conclusion that the "primarily dedicated" standard is satisfied here.

Commerce relied on the fact that Gujarat Fluorochemicals was the only customer to whom Inox Wind Limited sold power during the POI, but that is not sufficient to meet the "primarily dedicated" standard imposed by the regulation.  As the court will explain, a determination of whether an input is "primarily dedicated to the production of the downstream product" does not hinge on whether the input is primarily sold to the producer of that product and depends instead on the role the input performs as a "link" in the production chain.

Commerce promulgated 19 C.F.R. § 351.525(b)(6)(iv) in 1998 as part of a comprehensive revision of countervailing duty regulations following enactment of the Uruguay Round Agreements Act.  The preamble to the 1998 promulgation ("Preamble") identified as the main concern addressed in § 351.525(b)(6)(iv) "the

situation where a subsidy is provided to an input producer whose production is

dedicated almost exclusively to the production of a higher value added product—the

type of input product that is merely a link in the overall production chain."

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Int'l Trade Admin. Nov. 25, 1998).

Commerce explained that "[w]e believe that in situations such as these, the purpose of

the subsidy provided to the input producer is to benefit the production of both the

input and downstream products." *Id*. Commerce summarized the discussion as

follows:

> Accordingly, where the input and downstream production takes place in
> separately incorporated companies with cross-ownership . . . and the
> production of the input product is primarily dedicated to the production
> of the downstream product, paragraph (b)(6)(iv) requires the Department
> to attribute the subsidies received by the input producer to the combined
> sales of the input and downstream products (excluding the sales between
> the two corporations).

*Id.* The Preamble provided three examples that illustrate the intended meaning of the

term "primarily dedicated to the production of the downstream product" as used in

§ 351.525(b)(6)(iv). Together, they clarify that the term pertains to the role the input

performed, in the physical sense, in the production of the downstream product rather

than whether the input was provided "primarily" to the producer of that product.

As examples of products that are merely links "in the overall production chain,"

Commerce identified "stumpage subsidies on timber that was primarily dedicated to

lumber production and subsidies to semolina primarily dedicated to pasta production."

*Id*. (citing *Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,578 (Int'l

Trade Admin. May 28, 1992) and *Certain Pasta from Italy*, 61 Fed. Reg. 30,287–309 (Int'l

Trade Admin. June 14, 1996)).  In both of these examples, the input was an upstream

product that bore a close physical relationship to the downstream product.  As an

example of an input that Commerce considered not to be primarily dedicated to the

production of the downstream product, Commerce explained as follows:

> Where we are dealing with input products that are not primarily
> dedicated to the downstream products, however, it is not reasonable to
> assume that the purpose of a subsidy to the input product is to benefit
> the downstream product.  For example, it would not be appropriate to
> attribute subsidies to a plastics company to the production of cross-
> owned corporations producing appliances and automobiles.  Where we
> are investigating products such as appliances and automobiles, we will
> rely on the upstream subsidy provision of the statute to capture any
> plastics benefits which are passed to the downstream producer.

*Id*.  The three examples show that Commerce considered the universal role of plastics in

the manufacturing of different downstream products as reason enough to conclude that

plastics are not "primarily dedicated" to the production of automobiles or appliances in

the way timber is primarily dedicated to lumber production and semolina is primarily

dedicated to making pasta.  Both the timber and the semolina are dedicated in the

production chain to production of a related, higher value-added product.  Notably, in

all three examples "the downstream product" is a specific, individually-identified

product, and nowhere in the three examples does Commerce mention, as a pertinent

factor in determining whether the input is "primarily dedicated," whether the producer

is the sole or primary purchaser of the upstream product.

The electricity used to power GFCL's manufacturing facilities might be described

as an "input," but its role in the manufacturing of the finished products at the GFCL

facilities is not analogous to the role timber performed in producing lumber or the role

semolina performed in pasta making.  Electricity used to power an entire production

plant cannot fairly be characterized as "merely a link in the overall production chain" of

the finished products that are made there.  *Id*.  It is energy, and, being of universal

application, is not remotely describable as an upstream product that is "primarily

dedicated to the production of the downstream product" as is required by

§ 351.525(b)(6)(iv).  Ignoring the distinction the Preamble draws between an upstream

product that is merely a link in the production chain of a higher value-added product

and one that is not, Commerce mistakenly thought it sufficient that "IWL's wind energy

generation during the POI was provided expressly for the purpose of providing

electrical energy to GFCL and had no other purpose outside of GFCL's overall

production chain."  *Final I&D Mem*. at 12.  That error in the interpretation of

§ 351.525(b)(6)(iv) led Commerce to the wrong conclusion.

The distinction the Preamble draws in discussing the plastics example is

particularly instructive in this case.  Commerce stated that where the input is not

"primarily dedicated" to the production of the downstream product, it will not invoke

19 C.F.R. § 351.525(b)(6)(iv) and instead "will rely on the upstream subsidy provision of the statute to capture" any benefits provided to the input "which are passed to the downstream producer." *Countervailing Duties*, 63 Fed. Reg. at 65,401. In the investigation at issue, Commerce decided not to do so and instead relied exclusively on § 351.525(b)(6)(iv) in attributing to Gujarat Fluorochemicals what it considered to be a subsidy to Inox Wind Limited.

The plastics example in the Preamble language instructs, further, that Commerce will apply 19 C.F.R. § 351.525(b)(6)(iv), as opposed to an upstream subsidy analysis, when the physical relationship between the input and the downstream product makes it "reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product." *Id.* Because electricity could not have been found on this record to be "dedicated to the production" of any downstream product in the way the regulation contemplates, that condition is missing from the factual scenario in this case.

In summary, Commerce applied § 351.525(b)(6)(iv) contrary to the intent of the term "primarily dedicated to the production of the downstream product." By overlooking the type of physical relationship the regulation requires between the input and the particular downstream product in the production chain, and by defining the term as satisfied because the input is not sold to persons other than the producer of the subject merchandise, Commerce assigned the term a different meaning and purpose than those intended for this regulation.

## 2. Defendant's and Defendant-Intervenor's Arguments that Commerce Reasonably Applied 19 C.F.R. § 351.525(b)(6)(iv) in the Investigation

Defendant and defendant-intervenor offer various arguments on why the court should conclude that the Department's interpretation of § 351.525(b)(6)(iv) was reasonable. But in none of their arguments do they confront the basic flaw affecting that interpretation, which is that electricity cannot plausibly be said to have been "primarily dedicated to the production of the downstream product" in the sense in which Commerce intended that term to be interpreted when promulgating the regulation.

Defendant advances three arguments in its supplemental brief. It argues, first, that "the term 'downstream product' should not be strictly construed to mean 'subject merchandise' but instead should be interpreted to include both subject and non-subject merchandise" and that "Commerce has long applied the regulation" in this way. Def.'s Suppl. Br. 2. Defendant followed this argument with a discussion of how Commerce has interpreted the term to mean both subject and non-subject merchandise in other administrative decisions. *Id*. at 2–5.

Defendant's argument, even if presumed, *arguendo*, to be correct, is unavailing as to whether Commerce permissibly applied its regulation in the CVD investigation. As the Preamble examples show, typically "the downstream product" will be the merchandise under investigation, but the court need not presume that such is

necessarily the case. The salient point is that there is no indication on the record of this

investigation, and nothing in the Department's analysis, to support a notion that

electricity was "primarily dedicated"—in the sense in which that term was intended in

§ 351.525(b)(6)(iv)—to the "production" of any specific "downstream product" Gujarat

Fluorochemicals made at its facilities, or even to all of the downstream products

considered collectively.

Defendant argues, next, that "Commerce's interpretation of the regulation is

consistent with the *CVD Preamble*," maintaining that Commerce did not intend for the

terms "downstream product(s)" and "subject merchandise" to be interchangeable. *Id*.

at 5. This argument also misses the mark.

The Department's interpretation of the regulation is *not* consistent with the

Preamble in the sense that matters: the meaning of the term "primarily dedicated." For

the reasons the court has explained, the meaning the Preamble gives to this term is not

the one Commerce attributed to it in this CVD investigation.

Defendant's third argument is that "Commerce's interpretation of the regulation

is consistent with the principle in 19 U.S.C. §1671(a) that any countervailable subsidy be

provided 'with respect to . . . the manufacture, production, or export' of the subject

merchandise." *Id*. at 6. According to defendant, plaintiff's view of the statute and

regulation would undermine the goals served by the statute and the regulation,

referring, as to the statute, to the offsetting of the unfair competitive advantage foreign

producers otherwise would enjoy from government subsidies and, as to the regulation,

to recognizing that "benefits provided to upstream input suppliers benefit *all*

*downstream products* in the line of production." *Id*. (citations omitted). Defendant

further argues:

> Accepting the narrow reading proffered by GFCL would undermine these
> goals by allowing companies to avoid countervailing-duty exposure
> merely by dedicating the input product to something in addition to
> subject merchandise, or, like here, commingling the input product (wind
> power) with other resources such that its use cannot be linked solely to
> subject merchandise.

*Id*. Defendant adds, "[t]hat is not the outcome Commerce envisioned when declaring

that it is 'extremely sensitive to potential circumvention of the countervailing duty

law.'" *Id*. at 6–7 (quoting *Countervailing Duties*, 63 Fed. Reg. at 65,400).

By speaking only in generalities, and engaging in discussion as to

"circumvention" that is irrelevant to the record facts of this case, defendant's third

argument fails to take into account how the statute and § 351.525(b)(6)(iv) address the

particular situation presented by the electrical energy input provided to GFCL by Inox

Wind Limited. In 19 U.S.C. § 1671(e), the statute addresses upstream subsidies by

directing Commerce to perform an upstream subsidy analysis when there is reason to

believe or suspect that an upstream subsidy is being provided. The plastics example in

the Preamble, which illustrates the limitations under which Commerce will resort to

§ 351.525(b)(6)(iv), recognizes that the regulation is an exception to the general statutory

rule.  Defendant's argument overlooks the pertinent discussion in the Preamble

clarifying that where, as here, the input is not primarily dedicated to the production of

the downstream product, Commerce "will rely on the upstream subsidy provision in

the statute" to capture any benefits that are passed to the downstream producer.

*Countervailing Duties*, 63 Fed. Reg. at 65,401.

Defendant-intervenor's arguments are also misguided.  Daikin relies upon a

decision of this Court, *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,

45 CIT __, 498 F. Supp. 3d 1345 (2021) ("*Icdas*"), to support its position that the

Department's interpretation of 19 C.F.R. § 351.525(b)(6)(iv) was permissible.  Def.-Int.'s

Resp. 15–16; Def.-Int.'s Suppl. Br. 13.  This case is not on point.  In *Icdas*, this Court

sustained a factual finding that the input supplied by a cross-owned affiliate (scrap)

was "primarily dedicated" to the production of the subject merchandise (steel rebar).

*Icdas*, 45 CIT at __, 498 F. Supp. 3d at 1363.  An analogous finding was not made, and on

the record evidence could not have been made, with respect to the electricity input in

the investigation at issue here.

Defendant-intervenor argues that the terms "downstream product" and

"downstream products" as used in § 351.525(b)(6)(iv) "should be interpreted to be

interchangeable, with the singular term including the plural and the plural including

the singular."  Def.-Int.'s Suppl. Br. 3.  Daikin makes the related argument that had

Commerce intended for "the downstream product" to refer only to subject

merchandise, it would have so provided.  *Id*. at 5.

   Neither of these arguments is convincing.  For the reasons the court has

explained, they do not address the central problem with the action Commerce took in

this case, which stemmed from a misinterpretation of the regulation.  The reference in

the regulation to "the downstream product" is not only singular, it is also a reference to

a *specific* product.  Daikin seems to acknowledge this point in stating that "[w]hile the

'downstream product' may be 'subject merchandise' based on the facts in some cases, it

may be defined more broadly than 'subject merchandise' in others."  *Id*.  The point is,

"the downstream product" has to be "defined" by Commerce in some way so that the

"link in the overall production chain" analysis directed by the Preamble can be

performed.  In this case, the Department's interpretation of § 351.525(b)(6)(iv) failed to

identify any specific downstream product and thus failed to consider the role electricity

performed in the production of such a product.  Daikin discusses the Preamble

examples on lumber and pasta, *id*. at 8–9, but its discussion misses the essential problem

by failing to address the lack of any specific relationship between electricity and the

downstream product (whatever Commerce considered it to be) in the production chain.

In summary, the problem is that electricity cannot be shown on this record to be

"primarily dedicated" either to Gujarat Fluorochemicals's PTFE resin or to the

production of any of the other (unidentified) products made at GFCL's facilities, when the term "primarily dedicated" is given its correct meaning.

Defendant-intervenor argues, further, that the court should defer to the Department's interpretation of an ambiguous regulation. *Id*. at 1–2, 14 (citing *Auer v. Robbins*, 519 U.S. 452 (1997) and *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)). The court does not agree that deference is owed to the interpretation Commerce applied to § 351.525(b)(6)(iv) in the investigation.

Ambiguity concerning the intended meaning of the term "primarily dedicated to the production of the downstream product" is resolved by the detailed discussion in the Preamble, which as a statement of general applicability must be regarded as the interpretation that is "the agency's authoritative or official position." *Kisor*, 139 S. Ct. at 2406 (2019). An interpretation inconsistent with a prior one ordinarily will not be accorded deference upon judicial review. *See id*. at 2418 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).

Daikin's final point is that on the record before it, Commerce did not have the discretion to refuse to apply a countervailing duty with respect to the SIDC land lease. Def.-Int.'s Suppl. Br. 17 ("In short, there is no latitude in the statute or regulations for Commerce to exempt GFCL from countervailing duties once the required elements of a countervailable subsidy and attributable benefit have been found."). This argument wrongly presumes that Commerce validly attributed to Gujarat Fluorochemicals any

"benefit" that may have been provided to Inox Wind Limited by the SIDC land lease.

The statute provides an "upstream subsidy" procedure, which Commerce declined to

follow, and the procedure in § 351.525(b)(6)(iv), which is separate from the statutory

procedure, had no application in this case due to the absence of the type of physical

relationship between electricity and the production chain for the downstream product

that the regulation requires for attribution.

### 3. The Inclusion of the 26.50% Estimated Subsidy Rate with Respect to the SIDC Land Lease Was Unlawful

In summary, the inclusion of the 26.50% estimated subsidy rate was

unauthorized by 19 C.F.R. § 351.525(b)(6)(iv) and therefore contrary to law.  The

countervailing duty investigation is completed and its outcome reviewed judicially as a

final determination on the agency record.[6]  Moreover, the 26.50% estimated subsidy rate

is being collected contrary to law, with prejudice to this plaintiff, and must cease.  In the

remand it is ordering, the court will direct Commerce to delete the 26.50% estimated

subsidy rate from the overall estimated subsidy rate in the redetermination it files in

this case.

---

[6] Defendant has not requested that the court grant the agency the opportunity to conduct an upstream subsidy analysis or to reopen the record for this purpose.

### E.  Inclusion of a 0.12% Estimated Subsidy Rate for the Provision of Land by the Gujarat Industrial Development Corporation

In the Preliminary Decision Memorandum, Commerce stated a preliminary finding with respect to three leases of land to Gujarat Fluorochemicals from the Gujarat Industrial Development Corporation ("GIDC") used for manufacturing facilities. Commerce stated that "[w]e preliminarily determined that the following program did not confer a measurable benefit during the POI.  Therefore, we do not reach a preliminary determination as to whether there is a financial contribution or specificity for this program: 1. GIDC's Provision of Land for LTAR."  *Prelim. Decision Mem.* at 26. Commerce made no mention of a countervailable subsidy for land leased to Gujarat Fluorochemicals by GIDC in a post-preliminary analysis.  Nor is there any mention of it in the published Final Determination, which does not address the individual estimated countervailable subsidy rates.

In the Final Issues and Decision Memorandum, under a heading titled "*GIDC's Provision of Land for LTAR*," Commerce stated that it "corrected the unit price for the land transaction in Ahmedabad Gujarat.  The final subsidy rate for this program is 0.12 percent *ad valorem* for GFCL."  *Final I&D Mem*. at 7.  The reference to "the land transaction in Ahmedabad Gujarat" is a reference to a benchmark value Commerce used with respect to the land leased by the GIDC.  *Id*. at 20–22.

The Final Issues and Decision Memorandum contains no analysis of a "financial benefit" or "specificity" for the 0.12% estimated subsidy rate. Defendant concedes this point: "In the Final Determination, as in the PDM [Preliminary Decision Memorandum] and post-preliminary analysis, Commerce did not determine that the GIDC's provision of land for LTAR constitutes a financial contribution or is specific." Def.'s Resp. 29. From the reference to the Ahmedabad Gujarat benchmark, the court can surmise that for the Preliminary Determination Commerce did not find a financial contribution but impliedly presumed one after it performed a revised benchmark analysis.

In its response to GFCL's Rule 56.2 motion, "[d]efendant respectfully requests a voluntary remand of the final determination so that Commerce may consider further its analysis with respect to the GIDC's provision of land for LTAR." *Id.* Plaintiff does not oppose a remand on that issue but states that "[t]his Court should not delay its opinion on the merits with respect to Commerce's benchmark and attribution determinations." Pl.'s Reply 23 (citation omitted). Plaintiff's claim, summarily stated, is that Commerce reached an erroneous determination of less than adequate remuneration based on a flawed analysis of benchmark data.

The court does not agree with defendant that the court should order a "remand of the final determination so that Commerce may consider further its analysis with respect to the GIDC's provision of land for LTAR." This formulation of the issue might be interpreted to presume that the land leases by GIDC were for less than adequate

remuneration, a determination plaintiff is contesting.  The court notes, further, that the

discussion of this issue in the Final Issues and Decision Memorandum is inadequate to

explain an LTAR and subsidy determination and fails to state critical findings on which

it could have been based, including findings associated with a benchmark analysis.  The

court, therefore, will order Commerce to reconsider in the entirety the decision to

include the 0.12% estimated subsidy rate on the GIDC issue.

The court recognizes plaintiff's concern with possible delay.  At oral argument,

defendant informed the court that Commerce would require 30 days to submit a

redetermination in response to its request.  The court will allow only this limited time

period for Commerce to submit a new determination and will grant no extension of the

deadline absent extraordinary and compelling circumstances.  To further expedite this

case, the court will allow only brief time periods for comments following submission of

the remand redetermination.

### III.  CONCLUSION AND ORDER

In its motion for judgment on the agency record, plaintiff moves this Court to

hold the Final Determination contrary to law, remand the Final Determination to

Commerce to recalculate the estimated subsidy rate, and grant such additional relief as

is just and proper.  Pl.'s Mot. 5.  As discussed above, Commerce upon remand must

delete the 26.50% estimated subsidy rate for the provision of SIDC land from the

estimated total countervailable subsidy rate.  Commerce also must reconsider imposing

an estimated subsidy rate for the provision of the GIDC land.

Upon consideration of plaintiff's motion for judgment on the agency record,

upon consideration of all papers and proceedings had herein, and with due

deliberation, it is hereby

**ORDERED** that plaintiff's Rule 56.2 motion for judgment on the agency record be, and hereby is, granted; it is further

**ORDERED** that the Final Determination be, and hereby is, ruled to be contrary to law with respect to the inclusion of a 26.50% estimated subsidy rate for the provision of land by the SIDC; it is further

**ORDERED** that Commerce shall submit a new determination (the "Remand Redetermination") consistent with this Opinion and Order within 30 days of the date of issuance of this Opinion and Order; it is further

**ORDERED** that in the Remand Redetermination Commerce shall delete from the overall rate the 26.50% estimated subsidy rate for the provision of land by the SIDC; it is further

**ORDERED** that Commerce shall reconsider its inclusion of an estimated 0.12% subsidy rate for the provision of land by the GIDC; it is further

**ORDERED** that plaintiff and defendant-intervenor may submit comments on the Remand Redetermination within 14 days of the filing of the Remand Redetermination; and it is further

**ORDERED** that defendant may file a response to the comments on the Remand Redetermination within 7 days of the filing of the last comment submission.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: January 24, 2023
       New York, New York