C-533-900
Remand
Slip Op. 23-9
POI:  04/01/2019 – 03/31/2020
**Public Document**
E&C/OVIII:  JCM

***Gujarat Fluorochemicals Limited v. United States***
**Court No. 22-00120, Slip Op. 23-9 (CIT January 24, 2023)**
**Granular Polytetrafluoroethylene Resin from India**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT),

issued on January 24, 2023, in *Gujarat Fluorochemicals Limited v. United States*, Court No. 22-

00120, Slip Op. 23-9 (CIT January 24, 2023) (*Remand Order*).  These final results concern the

final determination of the countervailing duty investigation on granular polytetrafluoroethylene

resin from India.[1]  The period of investigation (POI) is April 1, 2019, through March 31, 2020.

On remand, the CIT ordered that:  (1) Commerce shall delete from the overall rate the

26.50 percent estimated subsidy rate for the provision of land by the State Industrial

Development Corporation (SIDC); and (2) Commerce shall reconsider its inclusion of an

estimated 0.12 percent subsidy rate for the provision of land by the Gujarat Industrial

Development Corporation (GIDC).[2]

---

[1] *See Granular Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 FR 3765 (January 25, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 30.

On February 10, 2023, Commerce released its Draft Results of Redetermination on the two issues identified above.[3]  In the Draft Results of Redetermination, we stated that interested parties may submit comments only on Commerce's findings regarding the GIDC's provision of land issue.[4]  Because the CIT ordered Commerce to delete the subsidy rate for the SIDC's provision of land and given the short amount of time provided to complete the remand redetermination, we stated that we would not consider comments regarding the SIDC's provision of land or Commerce's primarily dedicated analysis.[5]  On February 14, 2023, Daikin America, Inc. (the petitioner) and Gujarat Fluorochemicals Limited (GFL) submitted timely comments on the Draft Results of Redetermination.[6]

In accordance with the *Remand Order*, Commerce has deleted the 26.50 percent estimated subsidy rate for the SIDC's provision of land from GFL's overall subsidy rate, under respectful protest.  Additionally, Commerce has reconsidered the inclusion of the estimated 0.12 percent subsidy rate for the GIDC's provision of land.  Specifically, Commerce finds that the GIDC's provision of land constitutes a financial contribution from an authority and is specific.  Moreover, Commerce has further explained its "findings associated with a benchmark analysis," consistent with the *Remand Order*.  Accordingly, Commerce has made no changes to the 0.12 percent estimated subsidy rate for the GIDC's provision of land.  Finally, Commerce has revised the all-others rate, which was based on GFL's rate.  In the "Interested Party Comments" section

---

[3] *See* Draft Results of Redetermination Pursuant to Court Remand, *Gujarat Fluorochemicals Limited v. United States*, Court No. 22-00120, Slip Op. 23-9 (CIT January 24, 2023), dated February 10, 2023 (Draft Results of Redetermination).

[4] *Id.* at 9.

[5] *Id.* at 9-10.

[6] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated February 14, 2023 (Petitioner's Draft Remand Comments); *see also* GFL's Letter, "Gujarat Fluorochemicals Ltd.'s Comments on the Draft Remand Redetermination in Court No. 22-00120 (Slip Op. 23-9)," dated February 14, 2023 (GFL's Draft Remand Comments).

below, we have addressed the petitioner's and GFL's comments on the Draft Results of Redetermination.

## II.    BACKGROUND

### A.  SIDC's Provision of Land to Inox Wind Limited

In the *Final Determination*, Commerce found that wind energy supplied to respondent GFL by its cross-owned affiliate, Inox Wind Limited (IWL), was primarily dedicated to GFL's downstream production because:  the entire amount of power generated by IWL is sold to GFL, IWL contracts directly with GFL to provide wind power, and IWL's wind energy generation during the POI was provided expressly for the purpose of providing electricity to GFL and had no purpose outside of GFL's overall production chain.[7]  Accordingly, Commerce attributed the subsidy received by IWL, the SIDC's provision of land for less than adequate remuneration (LTAR), to the combined sales of the input and downstream products produced by both IWL and GFL, excluding intercompany sales, pursuant to 19 CFR 351.525(b)(6)(iv).

In its opinion, the CIT disagreed with Commerce's analysis, stating that "{e}lectricity used to power an entire production plant cannot fairly be characterized as 'merely a link in the overall production chain' of the finished products that are made there."[8]  The CIT further stated, "{i}t is energy, and, being of universal application, is not remotely describable as an upstream product that is 'primarily dedicated to the production of the downstream product' as is required by {19 CFR} 351.525(b)(6)(iv)."[9]  The CIT explained that Commerce's reasoning "overlook{ed} the type of physical relationship the regulation requires between the input and the particular downstream product in the production chain{.}"[10]  Having found Commerce's

---

[7] *See Final Determination* IDM at 11-12.
[8] *See Remand Order* at 18.
[9] *Id.*
[10] *Id.*

inclusion of the 26.50 percent estimated subsidy rate for the provision of land by the SIDC

contrary to law, the CIT ordered that Commerce "shall delete from the overall rate the 26.50%

estimated subsidy rate for the provision of land by the SIDC{.}"[11]

### B.  GIDC's Provision of Land for LTAR

In the *Preliminary Determination*, Commerce determined that the GIDC's provision of

land did not confer a measurable benefit during the POI.  Therefore, Commerce did not reach a

preliminary determination of financial contribution or specificity for the program.[12]

In the *Final Determination*, Commerce explained that it had not used the land benchmark

in its preliminary calculations that it had intended to use.  Specifically, Commerce stated in the

*Preliminary Determination* that, among the possible sources to use to calculate a land benchmark

for land provided by the GIDC, "the private land transaction in Ahmadabad, Gujarat, represents

the best comparable land value on the record to use as a benchmark."[13]  The unit cost for the

private land transaction in Ahmadabad was 31,700 Indian rupees (INR) per square meter, but

Commerce used 115.77 INR per square meter in its preliminary calculations.  Therefore, in the

*Final Determination*, Commerce explained, "{t}o correct these errors, we are using the

Ahmedabad, Gujarat, land benchmark with a unit cost of 31,700 INR per square meter for the

Gujarati benchmark{.}"[14]  The change in the land benchmark resulted in a benefit for the

GIDC's provision of land, but Commerce did not revise its *Preliminary Determination* with

respect to the this program and make the requisite financial contribution or specificity findings in

the *Final Determination*.

---

[11] *Id.* at 30.
[12] *See Granular Polytetrafluoroethylene Resin from India:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 86 FR 35479 (July 6, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 26.
[13] *Id.* at 10-11.
[14] *See Final Determination* IDM at 21.

Because the record lacked the financial contribution and specificity findings required for a countervailable subsidy, Commerce requested a voluntary remand from the CIT so that Commerce could address financial contribution and specificity.  Although the CIT remanded the issue, it disagreed with Commerce's formulation of the issue, *i.e.*, "that the court should order a 'remand of the final determination so that Commerce may consider further its analysis with respect to the GIDC's provision of land for LTAR.'"[15]  The CIT explained that Commerce's formulation "might be interpreted to presume that the land leases by GIDC were for less than adequate remuneration, a determination plaintiff is contesting."[16]  The CIT further noted "that the discussion of this issue in the {*Final Determination* IDM} is inadequate to explain an LTAR and subsidy determination and fails to state critical findings on which it could have been based, including findings associated with a benchmark analysis."  For these reasons, the CIT stated that it would "order Commerce to reconsider in the entirety the decision to include the 0.12% estimated subsidy rate on the GIDC issue."[17]

## III.   ANALYSIS

### A.  SIDC's Provision of Land to Inox Wind Limited

We respectfully disagree with the *Remand Order* concerning our analysis of whether the energy supplied by IWL was primarily dedicated to GFL's production of the downstream product.  Additionally, we disagree with the CIT's decision to direct Commerce to reach a particular outcome on this issue, *i.e.*, to delete the 26.50 percent estimated subsidy rate from the overall rate.  Notably, the U.S. Court of Appeals for the Federal Circuit "generally disfavor{s} limited remands that restrict Commerce's ability to collect and fully analyze data on a contested

---

[15] *See Remand Order* at 28.
[16] *Id.* at 28-29.
[17] *Id*. at 29.

issue."[18]  Nevertheless, the CIT has specifically ordered that Commerce delete the 26.50 percent

estimated subsidy rate for the provision of land by the SIDC from the overall subsidy rate.

Therefore, in compliance with the CIT's order, and under respectful protest,[19] we are removing

the 26.50 percent estimated subsidy rate from GFL's overall rate.

### B.  GIDC's Provision of Land for LTAR

Consistent with the *Remand Order*, Commerce is reconsidering in the entirety the

inclusion of the 0.12 percent estimated subsidy rate for the GIDC's provision of land.  As

explained above, Commerce did not make financial contribution or specificity findings in the

investigation.  Therefore, Commerce is examining whether the GIDC's provision of land

constitutes a financial contribution from an authority and is specific.

The GIDC is the agency of the State Government of Gujarat (SGOG) responsible for

providing businesses with land and other basic infrastructure.[20]  The GIDC establishes industry-

ready land with basic infrastructure, such as roads, water, and power availability, which is then

leased to manufacturers.[21]  The GIDC is a statutory body that functions in accordance with

SGOG statutes and regulations.[22]  To apply for an allotted plot in a GIDC estate, a company

must provide information about the project, area of land required, and employment.[23] According

---

[18] *See Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1375 (Fed. Cir. 2012); *see also American Silicon Technologies v. United States*, 334 F.3d 1033, 1039 (Fed. Circ. 2003) ("By sharply limiting Commerce's inquiry, the trial court's remand actually prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results.").

[19] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

[20] *See* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India:  Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated June 24, 2021 (GOI SQR2), at 14.

[21] *Id.*

[22] *Id.* at 16.

[23] *Id.* at 21-22; *see also* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India:  Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated May 21, 2021 (GOI SQR1), at Exhibit-12.

to the Government of India (GOI), the GIDC then provides long-term leases to industrial users at fair value, under the Gujarat Industrial Development Act 1962.[24]

Both the GOI and GFL reported that the company's Dahej plants are located in the GIDC area and that GFL has a long-term lease from the GIDC.[25]  The GOI explained that the GIDC acquires the land or gets the land transferred from the government for the industrial development in the state, then develops basic infrastructure facilities like roads, power, water, "social and commercial infrastructure," and "environment management infrastructure."[26]

Accordingly, Commerce finds that the GIDC is an "authority" under section 771(5)(B) of the Tariff Act of 1930, as amended (the Act) and that the GIDC's long-term lease of land to GFL constitutes a financial contribution under section 771(5)(D)(iii) of the Act.

Regarding specificity, the SGOG establishes industry-ready land within designated GIDC areas, which is leased out to eligible manufacturers.[27]  Therefore, Commerce finds that the program is only available in areas designated as industrial estates inside the SGOG's jurisdiction and, thus, is regionally specific under section 771(5A)(D)(iv) of the Act.

Next, because Commerce is reconsidering in the entirety the decision to include the 0.12 percent rate under this program, pursuant to the *Remand Order*, we are also examining our benefit calculation finding.  To calculate the benefit, Commerce considered all the record information in selecting an appropriate benchmark for the GIDC's provision of land for LTAR. Specifically, we compared the private land transaction benchmark with the prices at which GFL

---

[24] *See* GOI SQR2 at 16.
[25] *See* GFL's Letter, "Granular Polytetrafluoroethylene Resin from India; Gujarat Fluorochemicals Limited's Section III Questionnaire Response," dated May 6, 2021 (GFL IQR), at 78-81 and Exhibits 16(a) and 16(b); *see also* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India: Initial Questionnaire Response to Section-II on behalf of Government of India," dated April 16, 2021, at 141; and GOI SQR1 at Exhibit-12.
[26] *See* GOI SQR2 at 15-16.
[27] *Id.* at 15-16 (describing various GIDC estates, including sector-specific estates for electronics, apparel, chemicals, engineering, brass parts, *etc.*).

leased land from the GIDC.  As stated in the *Preliminary Determination*, we selected

benchmarks for determining the benefit from the provision of land for LTAR in accordance

with 19 CFR 351.511.[28]  Section 351.511(a)(2) of Commerce's regulations sets forth the basis

for identifying comparative benchmarks for determining whether a government good or service

is provided for LTAR.  These potential benchmarks are listed in hierarchical order by

preference:  (1) market prices from actual transactions within the country under investigation

(*e.g.*, actual transactions between private parties, actual imports, or actual sales from

competitively run government auctions) (tier one); (2) world market prices that would be

available to purchasers in the country under investigation (tier two); or (3) an assessment of

whether the government price is consistent with market principles (tier three).

Regarding land purchases from the GIDC, both the petitioner and GFL submitted tier one

benchmark information.  In its questionnaire response, GFL reported two agricultural land

purchases from private parties in Ranjitnagar and Mahidad, as well as land purchased from the

GIDC by another entity.[29]  Because the land purchased from the GIDC was not a private

transaction, we did not include this transaction in the benchmark.  While the Ranjitnagar and

Mahidad land transactions did involve private sellers, upon examination of the deeds and

purchase documents, we found that these land parcels were not comparable to the industry-ready

land that the GIDC provides.[30]  Therefore, we also excluded these transactions from the

benchmark.  In its benchmark submission, the petitioner provided information on a private

auction of industry-ready land in Ahmedabad, Gujarat.[31]

---

[28] *See Preliminary Determination* PDM at 10-11.
[29] *See* GFL IQR at 79 and Exhibits 16(f) and 16(g).
[30] *Id*. at Exhibit 16(g); *see also* GFL SQR2 at Exhibits S2-5(b) and (e).
[31] *See* Petitioner's Letter, "Benchmark Data Submission," dated June 1, 2021 (Petitioner's June Benchmarks), at Exhibit 6.

Both GFL and the petitioner provided market value rates for land determined by the Stamp Duty Valuation Organization (SDVO) and the Superintendent of Stamps and Valuation Department (SSVD) in Gujarat, both of which are government organizations.[32]  GFL further noted that the "valuation of land to determine collection of revenue is carried out by state governments."[33]  However, these land value rates were not generated by an independent third party and are not transaction-specific.  Furthermore, the land rates determined by the SDVO and the SSVD were not actual transactions but, rather, a price valuation of the land based on zoning, building structures, purpose for the land, and any amenities.  As a result, we found that we could not rely on these rates to determine whether land was provided for LTAR.  This determination is consistent with our practice.[34]

As noted above, it is Commerce's preference to use a transaction-specific, or tier one, benchmark derived from the country under investigation.  Therefore, based upon the record evidence, we determined that the private land transaction in Ahmedabad, Gujarat, represented the best comparable land value on the record to use as a benchmark.  This transaction contains a rate for industry-ready land obtained within India (*i.e.*, in the state of Gujarat) and is, therefore, comparable, geographically proximate, and privately purchased.

We conducted the "0.5 percent test," as instructed by 19 CFR 351.524(b)(2), for the year of the relevant GFL lease by dividing the total unallocated benefit for the tract of land for the corresponding year by the appropriate sales denominator.  We found that the benefits were greater than 0.5 percent of the relevant sales for that particular year; therefore, we allocated these

---

[32] *Id.*; *see also* GFL's Letter, "Gujarat Fluorochemicals Limited's Benchmark Submission," dated June 15, 2021 (GFL's Benchmark Submission), at Exhibits 1 and 2.

[33] *See* GFL's Benchmark Submission at 2.

[34] *See Polytetrafluoroethylene Resin from India:  Preliminary Affirmative Countervailing Duty Determination*, 83 FR 9842 (March 8, 2018), and accompanying PDM at 20-21, unchanged in *Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination*, 83 FR 23422 (May 21, 2018).

benefits over the average useful life to determine the amount attributable to the POI.

Accordingly, we calculated an estimated subsidy rate of 0.12 percent for the GIDC's provision of

land for LTAR.[35]

## IV.    INTERESTED PARTY COMMENTS

### A.  SIDC's Provision of Land to Inox Wind Limited

*GFL's Comments*

- Removal of the 26.5 percent subsidy rate from GFL's total subsidy rate in the Draft
  Results of Redetermination was correct, and Commerce should make no changes in the
  final results of redetermination.[36]

No other interested party commented on this issue.

**Commerce's Position:**

As noted above in the "Summary" section, we stated in the Draft Results of

Redetermination that we would not consider comments regarding the SIDC's provision of land

or Commerce's primarily dedicated analysis.[37]  Accordingly, we are not addressing GFL's

comments on this issue for these final results of redetermination.

### B.  GIDC's Provision of Land for LTAR

*Petitioner's Comments*

- As Commerce explained in the Draft Results of Redetermination, the provision of land by
  the GIDC confers a financial contribution because the GIDC is an agency of the SGOG.
  Thus, the GIDC is an authority pursuant to section 771(5)(B) of the Act.  Further, the
  provision of land is the provision of a good pursuant to section 771(5)(D)(iii) of the
  Act.[38]
- As Commerce also explained in the Draft Results of Redetermination, the provision of
  land by the GIDC is *de facto* specific in accordance with section 771(5A)(D)(iv) of the

---

[35] *See* Memorandum, "Final Determination Calculations for Gujarat Fluorochemicals Limited," dated January 18, 2022.
[36] *See* GFL's Draft Remand Comments at 5.
[37] *See* Draft Results of Redetermination at 9-10.
[38] *See* Petitioner's Draft Remand Comments at 2.

Act because it is limited to industries in designated geographical regions within the SGOG's jurisdiction.[39]

- Commerce correctly relied on a private auction of industry-ready land in Ahmedabad, Gujarat as the benchmark for calculating GFL's benefit. Unlike the other benchmarks submitted on the record, the Ahmedabad benchmark is for a transaction between private parties, is in the same state as the land from the GIDC, and involves industry-ready land comparable to the land provided by the GIDC.[40]
- Commerce clearly stated that it was relying on the Ahmedabad benchmark in the *Preliminary Determination*, and GFL did not challenge Commerce's selection of this benchmark in its case brief.[41]

*GFL's Comments*

- Commerce's rejection of GFL's private land transactions in favor of the Ahmedabad benchmark is illogical. The record clearly demonstrates that the land parcels identified in GFL's deeds and purchase documents were explicitly purchased for GFL's industrial use.[42]
- GFL's Ranjitnagar and Mahidad land transactions involved private sellers and were actual transactions, consistent with the requirements for benchmarks in Commerce's regulations.[43]
- The Ahmedabad benchmark is not usable under Commerce's regulations. No record evidence demonstrates that the land bid was between private parties, was ever finalized, or was an actual transaction reflecting market principles.[44]
- Commerce did not address GFL's detailed arguments against the use of the Ahmedabad benchmark, including the notion that GFL would or could legally build a petrochemical factory in the middle of a walled city in Ahmedabad.[45]

**Commerce's Position:**

As an initial matter, the petitioner supports Commerce's findings from the Draft Results of Redetermination that the GIDC's provision of land constitutes a financial contribution from an authority and is specific. GFL did not comment on these findings. Therefore, for the reasons explained in the "Analysis" section, above, we continue to find that the GIDC's provision of land constitutes a financial contribution from an authority and is specific.

---

[39] *Id.*
[40] *Id.*
[41] *Id.* at 2-3.
[42] *See* GFL's Draft Remand Comments at 6.
[43] *Id.*
[44] *Id.* at 6-7.
[45] *Id.* at 7.

Regarding the selection of the Ahmedabad benchmark, Commerce agrees with the petitioner and continues to find that the Ahmedabad benchmark is the best available benchmark source on the record for the industry-ready land that the GIDC provides.

GFL argues that Commerce should, instead, rely on its preferred benchmarks, GFL's own purchases of land in Ranjitnagar and Mahidad. As explained above, however, the Ranjitnagar and Mahidad land is not comparable to the industry-ready land provided by the GIDC. Specifically, the Ranjitnagar and Mahidad land is agricultural land. Although GFL argues that it purchased the Ranjitnagar and Mahidad land to use as industrial land, this does not mean that the land had industry-ready infrastructure when GFL purchased it such that the purchase price would reflect industry-ready land. Instead, the record shows that the land was used for farming before GFL purchased it.[46] The GIDC, by contrast, provides land with basic infrastructure facilities like roads, power, water, "social and commercial infrastructure," and "environment management infrastructure."[47] GFL does not argue that the Ranjitnagar and Mahidad land had comparable infrastructure when it was purchased – only that it was purchased for *future* industrial use. Thus, because the record demonstrates that the land did not have industry-ready infrastructure at the time of the transactions, only that it may have such infrastructure in the future, Commerce continues to find that the Ranjitnagar and Mahidad land is not comparable to the GIDC land.

GFL next argues that the Ahmedabad benchmark is not usable under Commerce's regulations. Specifically, GFL argues that there is "some record evidence that this auction *did not* result in an actual transaction." GFL's only support for its argument, however, is that the article detailing the auction states that the Gujarat High Court "decided to retain the Earnest Money Deposit (EMD) of Bahubali, in case the top bidder backs out," and that the highest bidder

---

[46] *See* GFL IQR at Exhibits 16(f) and 16(g).
[47] *See* GOI SQR2 at 15-16.

was asked to "pay the amount within three months."  As GFL acknowledges, however, the article

states that the purchase bid was "finalized."[48]  Moreover, the articled describes a "winning

bidder," "34 rounds of bidding," and at least eight bidders (the winning bidder, the second

highest bidder, and "six other bidders, whose EMD amounts were returned").[49]  Therefore, the

record demonstrates that this was a competitively run auction that resulted in an actual

transaction.  GFL also states that there is no evidence in the article that the auction was between

private parties.  However, the article identifies Siddhi Corporation as the winning bidder with no

indication that Siddhi Corporation, or any of the other auction participants, is not a private

party.[50]

   GFL asserts that because the Ahmedabad land is within a walled city in Ahmedabad,

GFL could not build a petrochemical factory there.  The map cited by GFL, however, neither

explains whether it reflects zoning restrictions nor specifies whether the land-use type for the

walled city is residential, commercial, or industrial.[51]  Moreover, the maps reflect only an

inventory of *public* lands and, therefore, the maps do not purport to cover land use for non-public

lands in Ahmedabad.[52]  In short, neither the article detailing the auction nor the inventory of

public lands contain evidence that industry within the walled city would be prohibited or

impracticable.  Commerce's analysis is limited to record information.  Although it is possible

that the walled city in Ahmedabad is not a suitable location for a petrochemical factory, the

record does not contain sufficient evidence about the walled city to draw that conclusion.

Instead, record evidence demonstrates that the former use of the Ahmedabad land was as a textile

---

[48] *See* GFL's Draft Remand Comments at 7.
[49] *See* Petitioner's June Benchmarks.
[50] *Id.*
[51] *Id.*
[52] *Id.*

mill, *i.e.*, industrial.  GFL argues that Commerce did not address whether an area in the middle of the walled city of Ahmedabad could be assumed to have industrial infrastructure, given that the former textile mill closed in 1989.  Again, Commerce's analysis is limited to record information. The record indicates that the Ahmedabad land was formerly a textile mill, which would have necessarily had at least basic industrial infrastructure.[53]  The record does not indicate that any infrastructure had been removed or was otherwise derelict.  Moreover, as explained above, the infrastructure provided on GIDC land includes roads, power, water, and other basic industrial infrastructure.  GFL cannot have it both ways – arguing that the land is inappropriate for industry because it is in the middle of a city, and also that the land lacks basic infrastructure like roads, power, and water.

In sum, we are limited to an analysis of the record, which indicates that the Ahmedabad land was once a textile mill.  As such, the land was at least at one time a suitable site for industrial use and would have had the necessary infrastructure for such use.  There is no record information to suggest that the land is no longer suitable for industrial use or that it lacks basic industrial infrastructure.  Therefore, we continue to find, based on record evidence, that the Ahmedabad land is the most comparable to the industry-ready land provided by the GIDC and, as such, is the best available benchmark on the record for calculating GFL's benefit under the GIDC provision of land for LTAR program.

## V.     FINAL RESULTS OF REDETERMINATION

Pursuant to the CIT's *Remand Order*, Commerce has deleted the 26.50 percent estimated subsidy rate for the SIDC's provision of land from GFL's overall subsidy rate, under respectful protest.  Additionally, Commerce has reconsidered the inclusion of the estimated 0.12 percent

---

[53] *Id.*

subsidy rate for the GIDC's provision of land.  Specifically, Commerce finds that the GIDC's

provision of land constitutes a financial contribution from an authority and is specific.

Moreover, Commerce has further explained its "findings associated with a benchmark analysis,"

consistent with the *Remand Order*.  Accordingly, Commerce has made no changes to the 0.12

percent estimated subsidy rate for the GIDC's provision of land.  Finally, Commerce has revised

the all-others rate, which was based on GFL's rate.

As a result of this final redetermination pursuant to remand, GFL's updated *ad valorem*

subsidy rate is 5.39 percent.  Additionally, because the all-others rate was based on GFL's rate,

Commerce is also updating the all-others rate to 5.39 percent.

2/23/2023

X ~~Elouaradia~~

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance