# United States Court of Appeals for the Federal Circuit

_____

**GUJARAT FLUOROCHEMICALS LTD.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**DAIKIN AMERICA, INC.,**
*Defendant-Appellant*

_____

2024-1268

_____

Appeal from the United States Court of International Trade in No. 1:22-cv-00120-TCS, Senior Judge Timothy C. Stanceu.

_____

Decided:  October 8, 2025

_____

DIANA DIMITRIUC QUAIA, ArentFox Schiff LLP, Washington, DC, argued for plaintiff-appellee.  Also represented by JESSICA R. DIPIETRO, JOHN M. GURLEY, MATTHEW MOSHER NOLAN, MARIO TORRICO; YUN GAO, New York, NY.

ELIZABETH DRAKE, Schagrin Associates, Washington, DC, argued for defendant-appellant.  Also represented by NICHOLAS J. BIRCH, SAAD YOUNUS CHALCHAL, CHRISTOPHER CLOUTIER, WILLIAM ALFRED FENNELL,

2                    GUJARAT FLUOROCHEMICALS LTD. v. US

JEFFREY DAVID GERRISH, LUKE A. MEISNER, ROGER BRIAN
SCHAGRIN.

————————————

Before REYNA, BRYSON, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Concurring opinion filed by *Circuit Judge* BRYSON.

REYNA, *Circuit Judge*.

This is an appeal from a judgment of the United States
Court of International Trade. According to the Trade
Court, the U.S. Department of Commerce erred in its de-
termination that the cross-ownership regulation at 19
C.F.R. § 351.525(b)(6)(iv) applied to Appellee Gujarat Flu-
orochemicals Ltd.'s product. We agree that 19 C.F.R.
§ 351.525(b)(6)(iv) was inapplicable under the circum-
stances in this case and therefore affirm.

BACKGROUND

I.

The Tariff Act of 1930 authorizes the U.S. Department
of Commerce ("Commerce") to impose a countervailing duty
on imported merchandise to redress the effect of a counter-
vailable subsidy provided by the government of the export-
ing country. *See* 19 U.S.C. § 1671(a). Pursuant to this
statutory authorization, Commerce generally attributes a
subsidy to the products produced by the company that re-
ceives the subsidy. *See* 19 C.F.R. § 351.525(b)(6)(i). How-
ever, Commerce may attribute a subsidy to a company
other than the company producing the subsidized product
when "cross-ownership" exists between two companies. *Id.*

§ 351.525(b)(6)(iv).[1]  In other words, Commerce may attribute a subsidy received by Company A to the products of Company B if these two companies are cross-owned and meet other regulatory requirements. *See id.*  The regulation provides that

> [i]f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary [of Commerce] will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

*Id.*[2]

When Commerce promulgated 19 C.F.R. § 351.525(b)(6)(iv) in 1998, it published a notice of the final

---

[1]   "Cross-ownership exists between two or more corporations when one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets."   19 C.F.R. § 351.525(b)(6)(vii).

[2]   For the remainder of this opinion, we cite to the 1998 version of this regulation, which Commerce applied in this case.  This regulation has since been updated to more explicitly define the circumstances of when an input is "primarily dedicated" to downstream production.  *See* 19 C.F.R. § 351.525(b)(6)(iv)(B) (2025) (listing several factors that Commerce may consider when determining whether an input product is "primarily dedicated to production of the downstream product").  Commerce has not intervened in this appeal to defend its application of 19 C.F.R. § 351.525(b)(6)(iv) in this matter.

rule, which the parties refer to as the "CVD Preamble." In this notice, Commerce explained the purpose of the cross-ownership regulation and provided three examples of when an input was or was not "primarily dedicated" under the regulation. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Int'l Trade Admin. Nov. 25, 1998) ("*CVD Preamble*").

According to the CVD Preamble, subsidies to (1) semolina, an input for the downstream product of pasta, and (2) timber, an input for the downstream product of lumber, were appropriately attributable to the downstream products under 19 C.F.R. § 351.525(b)(6)(iv). *Id.* The CVD Preamble also noted that subsidies provided for the production of plastic, an input for the downstream products of automobiles and appliances, were not appropriately attributable to the downstream products under 19 C.F.R. § 351.525(b)(6)(iv). *Id.* The CVD Preamble also noted that the subsidies provided for the production of plastic would be better captured through the upstream subsidies statutory provision, i.e., a subsidy attribution rule concerning subsidies for inputs which can be attributable to the downstream product irrespective of whether the input producer and the downstream producer are co-owned. *Id.*[3]

---

[3] An "upstream subsidy" is a countervailable subsidy other than an export subsidy that "is paid or bestowed by an authority . . . with respect to a product ( . . . an 'input product') that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding," that "bestows a competitive benefit on the merchandise," and that "has a significant effect on the cost of manufacturing or producing the merchandise." 19 U.S.C. § 1677-1(a).

## II. Commerce's CVD Order

Appellant Daikin America, Inc. ("Daikin") is a U.S. domestic producer of polytetrafluoroethylene ("PTFE") resin. On January 27, 2021, Daikin filed antidumping and countervailing duty petitions on imports of granular PTFE resin from India and Russia. Commerce initiated a countervailing duty investigation during April 1, 2019, through March 31, 2020, also referred to as the period of investigation ("POI"). Commerce selected appellee Gujarat Fluorochemicals Ltd. ("Gujarat"), an Indian resin manufacturer, as the sole mandatory respondent in the investigation.

In March 2022, Commerce issued a countervailing duty order on imports of PTFE resin from India and Russia, assessing against Gujarat a 31.89% countervailing duty rate ("CVD rate"). *Granular Polytetrafluoroethylene Resin from India and the Russian Federation: Countervailing Duty Orders*, 87 Fed. Reg. 14509, 14510 (Dep't Com. Mar. 15, 2022), J.A. 1086–88. Part of this 31.89% CVD rate included a 26.50% CVD rate stemming from Commerce's application of the cross-ownership regulation at 19 C.F.R. § 351.525(b)(6)(iv). Commerce determined that a subsidy in the form of a lease of land received by non-party Inox Wind Limited ("Inox") was attributable to Gujarat because cross-ownership existed between the two companies.[4]

Inox is an Indian manufacturer and seller of wind towers. In March 2020, the last month of the POI, Inox sold two windmills to Gujarat. Prior to this sale, Inox tested the windmills and sold to Gujarat all the wind power produced by the windmills during the testing period. This wind

---

[4] Prior to the POI, the Indian government provided Inox with a discounted 30-year lease of a tract of land, which no party disputes is a subsidy for purposes of this appeal.

power was commingled with power from other sources, which was then used to power Gujarat's production facility, also referred to as the "Dahej Unit." The Dahej Unit manufactured all Gujarat's merchandise, including the subject merchandise of PTFE resin and various other non-subject merchandise. The wind power from Inox constituted only 1.03% of the total power consumed at the Dahej Unit, with only 0.07% of that power being dedicated to the production of PTFE resin.

Because Inox sold wind energy to Gujarat, and only Gujarat, Commerce determined that the wind energy was an "input" under 19 C.F.R. § 351.525(b)(6)(iv) that was "primarily dedicated to the production of downstream products produced by [Gujarat]." J.A. 1014; J.A. 1069. Commerce noted that "[i]n this instance, all of [Inox's] wind power is supplied to [Gujarat] through a common energy pool, specifically for [Gujarat's] use," and that "[Gujarat]. . . paid [Inox] to generate a certain amount of wind power." J.A. 1014. As such, Commerce attributed Inox's lease subsidy to Gujarat in accordance with 19 C.F.R. § 351.525(b)(6)(iv). J.A. 1014; J.A. 1069. Because of this attribution, Commerce arrived at the 31.89% CVD rate. Commerce did not conduct an upstream subsidy investigation for Inox's wind energy to determine whether the wind energy should have been subject to an upstream subsidy but instead applied the cross-ownership regulation.

### III. Proceedings before the Trade Court

Gujarat appealed Commerce's CVD determination to the Court of International Trade ("Trade Court"), arguing that Commerce misinterpreted "primarily dedicated" in 19 C.F.R. § 351.525(b)(6)(iv), resulting in an erroneous determination that the regulation applied to the facts here. The Trade Court agreed with Gujarat. *Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1338 (Ct. Int'l Trade 2023). According to the Trade Court, Commerce determined that Inox's energy was "primarily dedicated" to

Gujarat's downstream production because all of Inox's wind energy was consumed by Gujarat. *Id.* at 1335. But, according to the Trade Court, whether the downstream producer consumes the input is not the standard for determining whether an input is "primarily dedicated" under the regulation. *Id.* at 1336. Rather, according to the Trade Court, the "primarily dedicated" standard focuses on the "role the input performs as a 'link' in the production chain." *Id.* The Trade Court arrived at this conclusion by relying on the examples Commerce highlighted in the CVD Preamble. *Id.* at 1336–38.

The Trade Court remanded and instructed Commerce to delete the 26.50% rate because Inox's land subsidy was not attributable to Gujarat under the cross-ownership regulation at 19 C.F.R. § 351.525(b)(6)(iv). *Id.* at 1342. Commerce, under respectful protest, removed the 26.50% rate. The Trade Court then affirmed Commerce's remand and entered judgment. *Gujarat Fluorochemicals Ltd. v. United States*, 662 F. Supp. 3d 1371, 1377 (Ct. Int'l Trade 2023).

Daikin appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review decisions of the Trade Court de novo and apply the same standard the Trade Court used. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020). Under that standard, we uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* (citation modified). Questions of regulatory interpretation we review de novo. *See Solar Energy Indus. Assoc. v. United States*, 86 F.4th 885, 894 (Fed. Cir. 2023).

DISCUSSION

The issue on appeal is one of regulatory interpretation. The parties dispute whether Inox's wind energy was "primarily dedicated" to Gujarat's downstream production

GUJARAT FLUOROCHEMICALS LTD. v. US

under 19 C.F.R. § 351.525(b)(6)(iv).   According to appel-
lant, Inox's wind energy was "primarily dedicated" under
the regulation because Inox's wind energy went entirely to
Gujarat's Dahej Unit.  Appellant Br. 17 (noting that "all of
the input produced by the cross-owned supplier [was] used
in the production of the downstream product").[5]  Appellee
disagrees, arguing that primary, or sole, consumption of
the input by the downstream producer is not sufficient to
trigger the application of 19 C.F.R. § 351.525(b)(6)(iv).  *See*
Appellee Br. 35.   According to appellee, if consumption
were the standard, then 19 C.F.R. § 351.525(b)(6)(iv) would
apply "in any situation, no matter how insignificant the in-
put, as long as all of that input is sold to the producer of
the downstream product."  *Id.*  Rather, according to appel-
lee, the "primarily dedicated" analysis is fact-specific, con-
sidering the "input producer's operations, as well as the
nature of the input and the downstream products."  *Id.* at
37.  For the reasons discussed below, we agree with appel-
lee.

_____

    [5]   The parties also disagree as to the meaning of
"downstream product" in this provision.  Appellant argues
that "downstream product" refers not only to a singular
product but to a group of products.  Appellant Br. 15–16.
Appellee argues that this provision refers only to a singular
product, i.e., the subject merchandise under review.  Appel-
lee Br. 17–18.  We do not reach this issue because we re-
solve the appeal based on the meaning of "primarily
dedicated to production of the downstream product."  Like
the Trade Court concluded, under the correct application of
"primarily dedicated," Inox's wind energy was not primar-
ily dedicated to any of the downstream products produced
at the Dahej Unit, and, thus, the regulation would not ap-
ply regardless of whether "downstream product" referred
to more than one product.  *See Gujarat*, 617 F. Supp. 3d at
1336.

"A regulation is not ambiguous merely because discerning the only possible interpretation requires a taxing inquiry." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (quotations omitted). Even when an agency regulation "make[s] the eyes glaze over," a court can still arrive at the unambiguous answer by applying traditional tools of regulatory construction. *Id.* These tools include a careful review of the text, structure, history, and purpose of the regulation. *Id.* Thus, if a court can discern the unambiguous meaning of the regulation after this searching exercise, then the court need not defer to the agency's interpretation of the regulation. *Id.*

The regulation provides that

> [i]f there is cross-ownership between an input supplier and a downstream producer, *and production of the input product is primarily dedicated to production of the downstream product*, the Secretary [of Commerce] will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added). The regulatory language on its face focuses on whether the "production of the input" is "primarily dedicated to production of the downstream product." *Id.* Notably, the regulation does not focus on whether the downstream product primarily consumes the input. While the regulation requires some level of connection between the production of the input product and the production of the downstream product, the exact level of connection is unclear.

The purpose and the history of 19 C.F.R. § 351.525(b)(6)(iv), however, assist in providing a clear understanding of "primarily dedicated to production of the downstream product." According to the CVD Preamble, subsidies will be attributable when "the purpose of a

subsidy provided to the input producer is *to benefit the pro-
duction of both the input and downstream products*." *CVD
Preamble*, 63 Fed. Reg. at 65401 (emphasis added).[6]  In
other words, there must be some type of connection be-
tween the production of the input product and the produc-
tion of the downstream products that the subsidies on the
former benefit the latter.  The CVD Preamble does not ex-
plicitly list all scenarios where such a connection is pre-
sent.  *See id.*  It, however, provides examples that are
instructive here.  *Id.*  First, the CVD Preamble explains
that it would be reasonable to attribute "stumpage subsi-
dies on timber that was primarily dedicated to lumber pro-
duction and subsidies to semolina primarily dedicated to
pasta production." *Id.*  Second, the CVD Preamble explains
that it would be unreasonable to attribute subsidies "to a
plastics company to the production of cross-owned corpora-
tions producing appliances and automobiles."  *Id.*  The in-
put product (plastic) was consumed by the automobile and
appliance producers, yet subsidies received for the produc-
tion of plastic were not attributed to the downstream pro-
ducers of automobiles and appliances.  *Id.*  Commerce

---

[6]     In our own independent analysis of the regulatory
provision, we look to the CVD Preamble as a source of the
purpose and history of the regulation.  Based on the brief-
ing in this appeal, the CVD Preamble is relied on by both
parties as *the* source of the history and purpose of the cross-
ownership provision. *See* Appellant Br. 21–22; *see also* Ap-
pellee Br. 13.  Such resort to a preamble as indicative of a
regulation's history and purpose is common.  *See, e.g., Wy-
oming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43,
53 (D.C. Cir. 1999) (explaining that courts "have often rec-
ognized that the preamble to a regulation is evidence of an
agency's contemporaneous understanding of its proposed
rules," and that like with statutory construction, a "pream-
ble of a statute . . . may aid in achieving a general under-
standing of the statute" (quotations removed)).

explained that "[w]here we are investigating products such as appliances and automobiles, we will rely on the up-stream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer." *Id.*

Two takeaways from these examples include: (1) an input product and a downstream product that share a physical connection may trigger the application of 19 C.F.R. § 351.525(b)(6)(iv), such as semolina shares with pasta and timber with lumber, and (2) at a minimum, mere consumption of the input by the downstream producer is not enough to trigger application of 19 C.F.R. § 351.525(b)(6)(iv).

With these takeaways in mind, 19 C.F.R. § 351.525(b)(6)(iv) requires some level of connection (apart from primary, or sole, consumption) between the production of the input and the production of the downstream products for the input to be "primarily dedicated to production of the downstream product." While we do not define the exact level of connection needed to satisfy this, primary, or sole, consumption alone is too broad of a standard and foreclosed by the CVD Preamble. For if this were the standard, the CVD Preamble's plastic example would fail.

Additionally, contrary to appellant's position, that Gujarat was the only customer of Inox's wind energy does not change the outcome here. There is no indication from the regulation or the CVD Preamble that if the downstream producer was the sole customer of the input, that fact alone would trigger the application of 19 C.F.R. § 351.525(b)(6)(iv). Specifically, the timber/lumber, semolina/pasta, and plastics/automobiles/appliances examples place no focus on whether the downstream producer was the sole customer of that product. Rather, these examples illustrate that the physical connection between the input and the downstream products is an important consideration, and confirm that, consistent with the regulatory

language's focus on production, consumption alone is not a sufficient connection.

Appellant nevertheless argues that the history and purpose of the regulation support its position. Appellant Br. 22. Specifically, appellant argues that if this court does not apply 19 C.F.R. § 351.525(b)(6)(iv) broadly, the regulation's "goal of preventing circumvention cannot be achieved." *Id.* Commerce, however, rejected reasoning like appellant's when it adopted the "primarily dedicated" language in 1998.

Leading up to the 1998 promulgation, Commerce received comments requesting it to automatically attribute subsidies from an input supplier to a downstream producer when cross-ownership existed, regardless of the relationship between the input and the downstream product. *CVD Preamble*, 63 Fed. Reg. at 65400–01. The commenters were seeking to close an alleged "loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *Id.* at 65401. Commerce, however, did not adopt the automatic attribution rule but instead adopted the "primarily dedicated" rule, which, as discussed above, requires some level of connection between the production of the input and the production of the downstream product. *Id.* Commerce did so after "a careful review of the upstream subsidy provision of the statute," signaling that it was relying on the upstream subsidy provision to do some lifting in the closing of this loophole. *Id.* Thus, Commerce intended the "primarily dedicated" provision to be narrower than automatic attribution. *Id.* With that in mind, we reject appellant's broad reading of the regulation, which would effectively result in a blanket application of 19 C.F.R. § 351.525(b)(6)(iv), much like the automatic attribution rule Commerce rejected long ago.

In sum, the "primarily dedicated" provision under 19 C.F.R. § 351.525(b)(6)(iv) does not turn on whether the input was primarily, or solely, consumed by the downstream producer. Rather, it is a fact-intensive inquiry focused on production which seeks to determine whether the "purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products."

Under a proper reading of 19 C.F.R. § 351.525(b)(6)(iv), we agree with the Trade Court that Inox's wind energy "cannot be shown *on this record* to be 'primarily dedicated' either to [Gujarat's] PTFE resin or to the production of any of the other (unidentified) products made at Gujarat's facilities . . . ." *Gujarat*, 617 F. Supp. 3d at 1340 (emphasis added). The undisputed facts show that Inox's wind energy was sold to Gujarat, and only Gujarat. *Id.* at 1334. But as discussed above, these facts alone are not enough to trigger the "primarily dedicated" provision at 19 C.F.R. § 351.525(b)(6)(iv).

To be clear, we do not hold that wind energy can never be considered an input that is "primarily dedicated" to the production of a downstream product. Whether it can be turns on the facts of the case *and* the application of the correct "primarily dedicated" standard. Additionally, we do not hold that subsidies on inputs that do not have sufficient connection to a downstream product to trigger the application of 19 C.F.R. § 351.525(b)(6)(iv) can never be captured by Commerce. To the contrary. As the CVD Preamble notes, such subsidies could be captured by an upstream subsidy investigation, which, for reasons not clear in this record, Commerce simply did not do here.

CONCLUSION

We have considered the parties' remaining arguments and do not find them persuasive. For the foregoing reasons, we affirm.

**AFFIRMED**

GUJARAT FLUOROCHEMICALS LTD. v. US

## Costs

Each party shall bear their own costs.

# United States Court of Appeals for the Federal Circuit

_____

**GUJARAT FLUOROCHEMICALS LTD.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**DAIKIN AMERICA, INC.,**
*Defendant-Appellant*

_____

2024-1268

_____

Appeal from the United States Court of International Trade in No. 1:22-cv-00120-TCS, Senior Judge Timothy C. Stanceu.

_____

BRYSON, *Circuit Judge*, concurring.

I concur in the court's determination that the "cross-ownership" regulation at issue in this case does not justify Commerce's imposition of a large countervailing duty on the imported PTFE produced by Gujarat based on Gujarat's purchase of a small amount of electricity from Inox, which received subsidies from the government of India. And I agree with the court's conclusion that neither the language nor the history of the regulation justifies the broad interpretation of the regulation that the appellant asks us to adopt. However, rather than decide the case based solely on whether the purpose of the governmental

subsidy was to benefit the production of both the input and downstream products, I would also hold that the regulation is inapplicable here because the input product (the electricity Inox sold to Gujarat) was not "primarily dedicated to the production of the downstream product," specifically, the PTFE produced and exported by Gujarat.

The Trade Court found that less than one-tenth of one percent of the electricity provided to Gujarat by Inox was used in Gujarat's production of PTFE. That amount was plainly not enough to justify a conclusion that the electricity Inox sold to Gujarat was "primarily dedicated" to the production of the exported PTFE.

The appellant seeks to avoid that problem by arguing that the electricity provided to Gujarat was "primarily dedicated to the production of the downstream product" because Inox "supplies all of the electricity it produces to the production of downstream products" by Gujarat, "without limitation as to the types of input product, downstream product, or input producers and downstream producers that are covered." Appellant's Br. 18. In that respect, the appellant's theory tracks Commerce's analysis, which was based on its finding that all the power generated by Inox is sold to Gujarat and thus "had no other purpose outside of [Gujarat's] overall production chain." Dep't of Com., Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India, comment 1 at 10 (Jan. 18, 2022), reprinted at JA 1068–69.

That theory is based on an unjustifiably broad interpretation of the term "downstream product," seemingly to include anything produced by Gujarat by using electricity. Under that theory, it would not matter if none of the electricity sold to Gujarat was used in the production of PTFE or any other product exported to the United States. The appellant's theory thus effectively rewrites the regulation to apply whenever the input producer provides all or most

of its production of a particular input product to the down-stream producer, regardless of what goods the input product is used to produce. Neither the plain language of the regulation nor its regulatory history supports that interpretation.

I am persuaded by Gujarat's argument that (1) the term "downstream product" in the regulation refers to the merchandise that is the subject of the countervailing duty claim—in this case, the PTFE exported by Gujarat to the United States—and (2) the input product—in this case, the electricity that Inox sold to Gujarat—was not "primarily dedicated to production of the downstream product." I would therefore uphold the Trade Court's decision on that ground as well as the ground relied upon by the court.